IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)

| | | |
|---|---|---|
| In Re: | ) | Case No. 23-11352-KHK |
| | ) | Alexandria, Virginia |
| SKIN LOGIC, LLC, | ) | |
| | ) | |
| Debtor. | ) | August 29, 2023 |
| | ) | 12:25 p.m. |
| -------------------------------- | ) | |

TRANSCRIPT OF HEARING ON
EXPEDITED HEARING ON DEBTOR'S MOTION FOR LEAVE TO PAY PRE-PETITION EMPLOYEE WAGES #7
EXPEDITED HEAING ON DEBTOR'S MOTION TO APPROVE USE OF CASH COLLATERAL #8
BEFORE THE HONORABLE KLINETTE H. KINDRID
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | MAURICE B. VERSTANDIG, ESQ.<br>THE VERSTANDIG LAW FIRM, LLC<br>9812 Falls Roads<br>#114-160<br>Potomac, MD 20854 |
| Office of the United States Trustee: | MICHAEL T. FREEMAN, ESQ.<br>U.S. DEPARTMENT OF JUSTICE<br>1725 Duke Street<br>Suite 650<br>Alexandra, VA 22314 |
| For the United States of America: | MATTHEW TROY, ESQ.<br>U.S. ATTORNEY'S OFFICE<br>2100 Jamieson Avenue<br>Alexandria, VA 22314 |
| For Harry Caman and BNG Group, LLC: | BETHANY BENES, ESQ.<br>BETHUNE BENES, PLLC<br>3975 Fair Ridge Drive<br>Suite 246S<br>Fairfax, VA 22030 |
| | TRACEY M. OHM, ESQ.<br>STINSON LLP<br>1775 Pennsylvania Avenue NW<br>Suite 800<br>Washington, DC 20006 |

For Eagle Bank: BENJAMIN P. SMITH, ESQ.
SCHULMAN ROGERS
12505 Park Potomac Avenue
Potomac, MD 20854

Subchapter V Trustee: STEPHEN METZ, ESQ.
OFFIT KURMAN, ATTORNEYS AT LAW
7501 Wisconsin Avenue
Suite 1000W
Bethesda, MD 20814

Transcription Services: eScribers, LLC
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

THE CLERK: Items 15 and 16 on the docket is Skin Logic, LLC, Case Number 23-11352.

MR. VERSTANDIG: Good afternoon, Your Honor. Maurice VerStandig, proposed counsel for the debtor. And I'm joined by Jacob Bogatin, who is the executive consultant to the debtor and will be our witness today. The debtor's principal is in Belarus at the moment dealing with the family matter but will be returning to the United States in the coming days.

THE COURT: All right.

MR. FREEMAN: Your Honor, Michael Freeman for the U.S. Trustee's Office.

MR. TROY: Your Honor, Matthew Troy, U.S. Attorney's Office for the SBA.

MR. SMITH: Good afternoon, Your Honor. Benjamin Smith here on behalf of Eagle Bank.

MS. BENES: Good afternoon. Your Honor, Bethany Benes on behalf of Harry Caman, both individually and on behalf of BNG Group, LLC.

THE COURT: All right.

MS. OHM: Good afternoon, Your Honor. Tracey Ohm, cocounsel to Harry Caman and BNG.

THE COURT: Okay. Good afternoon.

MR. METZ: And good afternoon, Your Honor. Steve Metz, the Subchapter V Trustee.

THE COURT: All right. All right. We'll take up the

motion to pay pre-petition wages first.

MR. VERSTANDIG: Thank you.

Your Honor, by way of opening, and I recognize my client -- witness is going to end up on the stand, there may be some synergy to taking evidence on both motions together --

THE COURT: All right.

MR. VERSTANDIG: -- in as much as they deal with the finances and accounting of the company.

THE COURT: All right.

MR. VERSTANDIG: I can give a brief overview, but the papers are neither original nor too inane. As for wages, the argument simply is that we need to pay them or there will be a diminution of employee morale that will compromise the business's integrity as a going concern. And on cash collateral, if we're going to be paying wages, it seems we need some money to pay those wages.

THE COURT: All right.

MR. VERSTANDIG: We would call Jacob Bogatin.

THE COURT: Please come and be sworn in.

THE CLERK: I need you to come over here, sir. Sir, excuse me. Raise your right hand.

(Witness sworn)

THE CLERK: You may have a seat in the witness stand.

DIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Mr. Bogatin, please state your name for the record.
A. Jacob Gelsh (ph.) Bogatin.
Q. Okay. Mr. Bogatin --
THE CLERK: I'm sorry. Can he spell his last name, please?
MR. VERSTANDIG: Absolutely.
THE WITNESS: B as in boy, O, G as in George, A, T as in Tom, I, N as in November.
MR. VERSTANDIG: B-O-G-A-T-I-N.
THE CLERK: Thank you.
MR. VERSTANDIG: Of course.
BY MR. VERSTANDIG:
Q. Mr. Bogatin, we all have strange accents to you, which may mean that your accent is a little difficult for some of us. I'm going to ask you to speak slowly not for dramatic effect but just to make things easier.
A. Okay.
Q. Are you familiar with the company known as Skin Logic, LLC?
A. Skin Logic, LLC is a company which involve a number of different businesses like medical spa, yoga, or wellness center, detox weight loss and other.
Q. Okay. And what is your relationship to Skin Logic, LLC?
A. I'm sorry. Can you repeat questions?
Q. Of course. What is your relationship to Skin Logic, LLC?
A. I worked as an executive consultant, so I do different type

of thing for Skin Logic.
Q. Do you know who owns Skin Logic?
A. No.
Q. You don't know who owns it?
A. No. Oh, I'm sorry. I thought you asking me if I own Skin Logic. Skin Logic, LLC, 100 percent owner, Valeria Gunkova.
Q. Okay. And do you have a relationship with the owner of Skin Logic?
A. Little bit difficult to hear.
MR. VERSTANDIG: Your Honor, am I missing the microphone?
THE COURT: Say it again.
MR. VERSTANDIG: Am I missing the microphone?
THE COURT: No.
MR. VERSTANDIG: Okay.
Q. Mr. Bolton, do you have a relationship with Ms. Gunkova, the owner of Skin Logic?
A. Yes. We are living together.
Q. Okay.
A. Partner.
Q. You live together?
A. Yes. And without being too specific, may I surmise that's a romantic relationship?
A. Yeah. We partner and we living together.
Q. Okay. Are you familiar with the operations of Skin Logic?

A. Absolutely.
Q. Are you familiar with the finances of Skin Logic?
A. Yes.
Q. How many employees does Skin Logic have?
A. Skin Logic employed twenty W-2 employee and eight 1099 employee.
Q. Okay. How often does Skin Logic process payroll?
A. We process payroll semi-monthly.
Q. Okay.
A. Twice a month.
Q. Are the 1099 contractors paid at the same time as employees, or is it a separate payroll?
A. No, it's same payroll. And we don't have any contract. It's just employment agreement.
Q. Okay. Sorry. Let me rephrase. The people who are 1099s, are they paid at the same time as the --
A. Same time.
Q. Okay. When was the last payroll run?
A. Last payroll was around August 16th, 2023.
Q. Okay. And but for the occurrence of the bankruptcy, when would the next payroll be scheduled to run?
A. next payroll scheduled on September 2nd, 2023.
Q. Okay. Have all of the employees of Skin Logic performed work since the last payroll through today?
A. Yes. All employee employed and normal operation working

every day with Skin Logic.
Q. Okay. Did they all perform work between the last payroll and August 24th which is the day Skin Logic sought bankruptcy protection?
A. I'm sorry. Could you -- a little bit louder. I'm sorry.
Q. Sure.
A. I have difficulty hearing.
Q. Did all of the employees of Skin Logic perform work between the date of the last payroll and August 24th, 2023 --
A. Yes.
Q. -- with -- okay. What would happen if the employees were not paid for the work between the last payroll and August 24th, 2023?
A. All employee have children. They will be upset. And it will build suspicion in employee about future of company. It will definitely make a negative impact on job.
Q. Okay. Do you believe that would have a material impact on the company or its ability to operate?
A. I apologize again.
Q. Okay. Do you believe the company would be negatively impacted if it was not able to pay its employees wages?
A. Correct. Company operation will be impacted if employee will not get paid.
Q. Okay. And for clarity, Ms. Gunkova is an employee of the company, correct?

A. Correct.
Q. Okay.
A. She's (indiscernible) company.
MR. VERSTANDIG: And, Your Honor, by way of sidenote, I point out we are not seeking leave to pay the principal's wages for the pre-petition period.
THE COURT: I understand.
MR. VERSTANDIG: Thank you.
Q. Mr. Bogatin, does Skin Logic need cash to operate?
A. Skin Logic have developed cash flow for operation.
Q. Okay.
A. and of course, Skin Logic need cash to operate normally.
Q. Do you know how much money Skin Logic had in the bank when it filed for bankruptcy protection on August 24th?
A. I think it's below 5,000 dollars.
Q. Okay. Does Skin Logic have an ability to operate without the use of that sum that is slightly below 5,000 dollars?
A. Can you repeat again? I'm sorry, guys.
Q. Sure. Does Skin Logic need the utilization of that money to continue operating?
A. Yes.
Q. What will that money be used for as Skin Logic continues to operate in bankruptcy?
A. A hundred percent for payroll.
Q. Okay. Are you familiar with the budget that was filed on

the docket in this case? Have you seen an eight-week budget for Skin Logic?
A. Yes, I saw it.
Q. Okay. Did you help make that budget?
A. This budget is very conservative. And --
THE COURT: Excuse me. I didn't understand the response.
MR. VERSTANDIG: I didn't understand it either to be honest. I was about to say that.
THE COURT: All right.
A. It's --
Q. Can you repeat your answer a little more slowly, Mr. Bogatin?
A. Can you step closer to me?
Q. I think if I step away from the microphone, no one else is going to hear me unfortunately.
A. Okay. Can you repeat again question, please?
Q. Okay. Did you help prepare the eight-week budget for Skin Logic?
A. Yes.
Q. Okay. Are you familiar with what Skin Logic spends during an ordinary week, month, and year?
A. Yes.
Q. Okay. Are you familiar with Skin Logic's revenue during an ordinary week, month, and year?

A. Correct, yes.
Q. Okay. What factors did you consider when you helped make the eight-week budget?
A. What --
Q. What were you focused on when you made the eight-week budget?
A. First of all, we build focus on payroll, employee, and revenue, of course. And secondly, to be sure we can pay outstanding debts.
Q. Okay. Does Skin Logic's revenue stay consistent throughout the year or does it vary by season or by week or anything else?
A. Skin Logic pretty much stable over the year, some period of time Skin Logic downtime, some period of time uptime.
Q. Okay.
A. For instance, in September, October, November, December, it is biggest revenue (indiscernible) by Skin Logic because holidays.
Q. Do you believe that the projections in the budget are reasonably likely to be met?
A. Yeah. I think it's a very conservative projection and it's very reasonable.
Q. Okay. And do you believe the debtor can stay within the expenses that are outlined in that eight-week budget?
A. Yes.
MR. VERSTANDIG: The Court's indulgence? Sorry.

Court's indulgence?

THE COURT: Yes.

MR. VERSTANDIG: Thank you.

Your Honor, nothing further subject to redirect, but I have a hunch some of the many lawyers behind me have questions for this witness.

THE COURT: All right. Mr. Freeman, do you have questions?

MR. FREEMAN: I do, Your Honor.

CROSS-EXAMINATION

BY MR. FREEMAN:

Q. Good afternoon, Mr. Bogatin. Mr. Bogatin, can you say again what is your role and relationship to the company?

A. My relationship is?

Q. What is your role with the company, Skin Logic?

A. What my goal?

Q. Your role, your job.

A. Oh, my role. I am consultant for company.

Q. All right. And how long have you served in that position?

A. Around ten years.

Q. Ten years? And are you on payroll or how are you compensated for this?

A. I'm not in payroll.

Q. And how are you compensated?

A. I get gift from Valeria sometime, but I help her to run the

business. So I don't get specifically paid like normal pay every month, no.
Q. All right. Are any of your expenses covered?
A. I'm sorry.
Q. Are your expenses covered? Does Skin Logic pay for any expenses?
A. Skin Logic -- sometimes Valeria pay expenses. Skin Logic doesn't pay directly to me.
Q. So you're saying Valeria directly pays for the --
A. Correct.
Q. All right. Does Skin Logic pay for any of your credit cards?
A. Valeria pay me through you’re personal source Skin Logic source.
Q. I didn't quite understand that. So can you repeat that answer?
A. So Valeria is owner of Skin Logic.
Q. Okay.
A. Ands he pay me sometime my expenses.
Q. What are your duties as executive consultant?
A. Is a control --
Q. What do you do for the company?
A. Oh, I do a few things. Number 1, I do the data entering, like bookkeeping. I do marketing. I do the educational, technical support, normal job.

Q. Do you have a contract or a written agreement with Skin Logic?
A. Can you repeat again? I'm sorry.
Q. Do you have a contract or an agreement with Skin Logic?
A. No, no contract.
Q. All right. So is the position -- it's all informal?
A. I do have a contract with Skin Logic.
Q. You mentioned -- sorry. Do you work on site at the office?
A. I'm sorry.
Q. Do you go on site to Skin Logic? Do you work there?
A. Yes.
Q. And is that frequently five days a week?
A. It depends. About weeks, sometimes three days, sometimes four days.
Q. You mentioned before that Skin Logic is -- controls a bunch of different entities. Is that right?
A. Skin Logic --
Q. Skin Logic controls other companies?
A. No. Skin Logic doesn't control any of the companies.
Q. Do they operate other companies such as, like, Aria Med Spa?
A. It is some company. It's a business name. So Skin Logic legal name. Aria Medical Spa is doing business as.
Q. What other doing business exist for Skin Logic?
A. So Skin Logic Medical Spa, Aria Medical Spa, Skin Logic

Wellness Center, Aria Medical Wellness Center. Skin Logic (indiscernible) Center, Aria (indiscernible) Center.
Q. All right. And you mentioned -- was it Jacob's weight loss?
A. Yeah. It's called Detox.
Q. All right. Is that also a doing business as?
A. It is one of the -- division of -- department of Skin Logic.
Q. Well, when you say division, is that a fictitious name? Is it a separate LLC?
A. It doesn't have a different name. Skin Logic is only one legal name company.
Q. Can I assume that Jacob's weight loss is named for you or part of your duties?
A. I'm sorry?
Q. Jacob's weight loss, is it named for you?
A. Weight loss program. It is developed to help people to lose extra weight.
Q. Is that also owned completely by Valeria?
A. I'm sorry?
Q. Is that also owned by Valeria?
A. It's run by Valeria. It's the company, yes.
Q. Do you serve as an executive consultant to any other companies?
A. Right now, no.

Q. Okay. And just for background, sir, you are also in the Chapter 7 bankruptcy, correct?
A. I am, yes.
Q. All right. And do you recall filling out the schedules and petition in that bankruptcy?
A. I'm sorry. Can you repeat again?
Q. Do you recall filing your schedules and petition in that bankruptcy?
A. Yes.
Q. And did you recall disclosing your position as executive consultant?
A. In my -- where?
Q. Yes, sir.
A. I don't recall this one.
Q. All right. And just one or two more questions. And with Ms. Gunkova, you testified your relationship is she's your partner?
A. Can you repeat the question again? I'm sorry.
Q. You testified that Ms. Gunkova is your partner, correct? You live with her?
A. Yes.
Q. All right.
A. We live together, yes.
Q. Do you share financials?
A. We share?

Q. Bank accounts, expenses?
A. We share one account, yes.
Q. Okay. So you share checking in the savings with her, correct?
A. Yes, sir, only one account which was closed because we opened DIP account. So we don't have any more joint account.
MR. FREEMAN: No further questions, Your Honor. Just argument.
THE COURT: Mr. Troy? Who's representing SBA? Do you have questions for this witness?
MR. TROY: Yes, Your Honor. Matthew Troy, U.S. Attorney's Office, for the SBA.
THE COURT: All right.

CROSS-EXAMINATION

BY MR. TROY:

Q. Mr. Bogatin, what is the monthly rent for Skin Logic's location?
A. So Skin Logic pay until June 2023 $26,720.30. And starting June, Skin Logic pay 27,430 dollars.
Q. So with those two different numbers?
A. I'm sorry? No, no. It's before June and after June.
Q. Okay. So I'm sorry. Can you say that again? Before June?
A. Rate escalation.
Q. Okay. And so I'm sorry. Just say the numbers again. Before June, the rent was what?

A. 26,720.
Q. Okay. And after June, it became what -- went up to what?
A. 27,400.
Q. Okay. Increased by 1,000 dollars or so?
A. Approximately.
Q. Okay. Can you explain then, why on the budget, the eight-week budget accompanying the cash collateral motion, the rental expense is only 12,000 dollars?
A. Because Skin Logic, LLC prepaid rent to BNG on the amount. Right now, it's 98,400 dollars. So it's prepaid rate.
THE COURT: I do not understand.
MR. TROY: I'm sorry. I --
MR. FREEMAN: I didn't understand.
MR. TROY: I couldn't understand either. And I have a hunch it's going to be important.
A. So Skin Logic -- in the past, Skin Logic spend money to build up the tenant in BNG Company. And this money was assigned to prepaid rent deposit. So Skin Logic uses money to pay the additional rent. So it's combination of money from Skin Logic and plus money BNG prepaid deposit. It's accounting --
Q. So there's another entity paying part of the from rent?
A. So Skin Logic pay in the past before this date --
Q. Okay.
A. -- pay money to BNG and (indiscernible) prepaid rent

deposit.
Q. So Skin Logic paid money -- prepaid money to --
A. Correct.
Q. -- the landlord?
A. It's because Valeria Gunkova own fifty percent of BNG and she spend money to build up new tenants.
Q. Okay. BNG is the landlord?
A. Is the landlord, yes. Correct.
Q. So the rent in the budget is 12,000 dollars?
A. Correct. It is a portion which Skin Logic is going to pay towards rent which already prepaid.
Q. Okay. But the actual total amount of the rent --
A. 27,400.
Q. 47,000 (sic)?
A. Correct.
Q. And BNG has the balance of the rent, 35,000, already --
A. It's already paid.
Q. Already paid by Ms. Gunkova sometime before Skin Logic filed bankruptcy?
A. Correct. Correct.
Q. How long can Skin Logic keep paying just 12,000 dollars a month? If this is an eight-week budget and it says for two months, Skin Logic will pay twelve. How long will that continue?
A. How long? Skin Logic will continue to pay as long as

they're going to be (indiscernible) BNG. And the money on prepaid deposit will go down, then Skin Logic must pay full amount.
Q. Okay. The amount that was prepaid --
A. Right now it's enough for six months.
Q. Okay. That's what I was looking for.
A. Correct.
Q. Because eventually the amount that BNG received as a prepayment will be spent?
A. Correct.
Q. Okay. And your testimony is that it will be spent in approximately six months?
A. Let me see. 98,000. Hold on one second. Probably eight months.
THE COURT: Eight months from when?
THE WITNESS: Eight months from now.
THE COURT: From August or June?
THE WITNESS: From the last -- the last payment was done on July 28th. So next payment will be August 28th and then September 28th. Eight months.
Q. And --
MR. VERSTANDIG: I'm sorry. I'm not sure that answered the judge's question. She had asked eight months from when and from when.
THE WITNESS: From --

MR. VERSTANDIG: I'm not trying to coach him. I don't know if he said eight months from July 28th or --

THE WITNESS: From August 28th. July already paid.

MR. VERSTANDIG: So roughly June -- I'm sorry, April 28th, 2024 would be the end date, given -- I don't mean to commandeer your questions. I'm sorry.

MR. FREEMAN: No. I'm just trying to get an answer.

THE COURT: Exactly. So when is the end date for that eight-month period?

THE WITNESS: So the normal payment for end, it is 28th, 29th, 30th. So we have a grace period about five days from (indiscernible).

THE COURT: That does not -- that does not answer the question at all.

Counsel, I'm going to leave it to you to clean this mess up. Continue.

Q. Does BNG agree that Skin Logic's rental payment is 12,000 dollars as reflected on the budget?

A. When you say BNG agree, it is a company -- a company was built -- the tenant who brings the money in. For instance, last half-year, the company -- I think company built up for three tenants, on total amount about 500,000 dollars. And (indiscernible) probably only 50,000 dollars. The rest was paid by Valeria and Skin Logic.

Q. Okay. Let me try it a different way. If --

A. If -- we don't have any agreement with BNG written down, only we have rental agreement.
Q. Do you have an actual written rental agreement, a lease with BNG?
A. Of course.
Q. Okay. So under that rental agreement, it says that Skin Logic is supposed to pay currently --
A. Correct.
Q. -- approximately 47,000 a month?
A. 27,000, yes.
Q. I'm sorry?
A. 27,000.
Q. Okay. 47,000 (sic). So is BNG going to consider Skin Logic in breach of the lease if it only pays 12,000?
A. Well, Skin Logic have money. Skin Logic can pull money from BNG and use this money for payment. Instead, Skin Logic pay additional rent so BNG can survive.
Q. Okay. So if I understand that correctly, you're saying BNG will accept the 12,000 from Skin Logic and draw down from the prepayment it has received?
A. Correct.
Q. Okay. Let me turn to another topic. Again, on the budget, looking -- there's two four week-periods. The net income, the bottom line there, the numbers vary. Odd weeks show a negative net income. The even weeks show a positive net income. By my

calculation, that projected monthly net income on a monthly basis, taking the two negatives and the two positives, comes out to about 32,000 dollars a month?
A. Correct.
Q. What does the debtor intend to do with that money?
A. First of all, the reason why -- negative, it's accounting term. It's not cash term. Because company pay payroll specific time. And as of week we don't pay payroll. The money which we're going to use, of course, for -- if using pay debts, restructure (indiscernible) continue to operate.
Q. I'm not sure -- I'm sorry. I didn't understand. The --
A. Pay outstanding debts.
Q. Okay. You're going to pay --
A. So --
Q. -- the company's debts?
A. Correct.
Q. Okay. Skin Logic owe money to a number of people, number of company. And we use this money in addition to pay when they're paid to pay the outstanding debts.
MR. FREEMAN: Okay. At this point, Your Honor, I don't have any further questions. Thank you.
THE COURT: All right. All right. Representative for BNG, do you wish to --
MS. BENES: Yes, Your Honor. Thank you.
CROSS-EXAMINATION

BY MS. BENES:
Q. Good afternoon, Mr. Bogatin.
A. (Indiscernible).
Q. Skin Logic has regularly paid your premium --
THE COURT: Excuse me. Put the mic close to your mouth when -- there you go.
MS. BENES: Thank you.
Q. Skin Logic has regularly paid your personal expenses. Isn't that right?
A. Pay what? I'm sorry.
Q. Your personal expenses.
A. Valeria Gunkova through Skin Logic pay sometimes my expenses, yes.
Q. Credit cards in the name of Skin Logic LLC have paid for your dental care. Isn't that right?
A. I don't recall for the last two years pay something for this.
Q. Go Smiles Dental, that doesn't sound familiar to you?
A. I don't recall. Maybe it's paid, but I don't remember.
Q. You have a credit card in Skin --
A. Again -- again -- I'm sorry. Skin Logic doesn't have credit card. It's Valeria Gunkova credit card.
Q. Is it your testimony that Skin Logic has no credit cards?
A. Skin Logic have only American Express business card. That's it.

Q. And you have an American Express business card under Skin Logi LLC's name. Isn't that right?
A. I'm authorized user. Yes.
Q. You're an authorized user. You hold a credit card in Skin Logic's name, right?
A. I'm authorized user of Skin Logic LLC business card.
Q. And Skin Logic pays those credit cards, right?
A. Skin Logic pay -- well, I need to explain little bit. Yes, Skin Logic pay credit card because the old credit card, which under the name of Valeria Gunkova, used for business operation, probably seventy percent for business operation of Skin Logic.
Q. I'm talking about the credit cards in which you're the authorized user. You have a credit card with your name on it as an authorized user for Skin Logic, don't you?
A. I could have only one -- one card which is American Express on name of Valeria Gunkova and Skin Logic, LLC.
Q. Is it your --
A. And -- and the same card, I'm not owner. I am authorized user, Skin Logic, LLC, Jacob Bogatin.
Q. And you use that for your personal expenses, don't you?
A. I --
MR. VERSTANDIG: Hold on. Object to the form of the question. I'm going to only ask if it can be temporally limited to pre-petition. There's very big difference between the suggestion that a credit card is being used post-petition

and that a credit card was historically used.

THE COURT: I care.

MS. BENES: Thank you, Your Honor.

MR. VERSTANDIG: I'm not saying it can't be asked both ways. But using the present --

THE COURT: You can ask two separate questions if you like.

MS. BENES: I'm sorry?

THE COURT: You can ask two separate questions before and after, but I want to know the answer to both.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: Okay.

Q. Prior to this bankruptcy being filed in the past week, did you use Skin Logic, LLC credit cards to pay your personal expenses?

A. The only credit card Skin Logic business card has, it is American Express. And it's in the name of Valeria Gunkova. It's not --

Q. Sir --

A. It's even not belong to Skin Logic.

Q. My question is very simple. It's a yes or no question. Prior to the filing of --

A. For the last two --

Q. -- this bankruptcy --

A. For the last two years --

Q. Sir, please let me finish my question.

THE COURT: Excuse me. One moment. You can't talk when she's asking a question.

THE WITNESS: Okay. I'm sorry.

THE COURT: All right?

THE WITNESS: I apologize.

THE COURT: So ask your question and answer yes or no.

THE WITNESS: Okay.

Q. Yes or no? Did you use Skin Logic, LLC's credit card to pay your personal expenses?

A. I don't remember.

THE COURT: Move on.

Q. Since the filing of this bankruptcy, have you used Skin Logic, LLC's credit cards to pay for your personal expenses?

A. I don't remember because Skin Logic, LLC have only one credit card which belongs to Valeria Gunkova. It's not Skin Logic, LLC card.

Q. You drive a Lexus. Isn't that right?

A. I'm sorry?

Q. A Lexus. Do you have a Lexus automobile?

A. I don't have Lexus automobile.

Q. Does Ms. Gunkova have a Lexus?

A. Yes. Ms. Gunkova --

Q. And you --

A. -- has a Lexus.

Q. You drive that vehicle, don't you?
A. No.
Q. You never drive it?
A. Maybe one time when we go to maintenance.
Q. And Skin Logic pays for that Lexus too, doesn't it?
A. Skin Logic pay for Lexus?
Q. Yes.
A. No. Skin Logic doesn't pay for the Lexus. Valeria Gunkova pay credit card for Lexus.
Q. Is it your testimony that Skin Logic has never paid for Ms. Gunkova's Lexus?
A. I'm sorry. Can you repeat again question?
Q. Is it your testimony that Skin Logic, LLC has never paid for Ms. Gunkova's Lexus payments?
A. So for the --
Q. That's also a yes or no question.
A. Well, it's -- what period of time, ma'am? Sorry.
Q. Pre-petition. So prior to last week --
A. For how many -- how many years?
Q. You tell me, Mr. Bogatin. Has Skin Logic LLC prior to August 28th, I believe you said, or --
MR. VERSTANDIG: 23rd, I believe.
Q. 23rd, 2023 ever paid for Ms. Gunkova's Lexus payment?
A. No. Skin Logic doesn't pay for Valeria Gunkova Lexus.
Q. Is it your testimony that Skin Logic has never paid for

that?
A. I don't -- first of all -- first of all, I don't remember because I'm not Valeria Gunkova. And secondly, I don't recall what Skin Logic pay for something related to personal car. If it was paid, then Valeria uses car for business operation.
Q. You indicated that you're an executive consultant for Skin Logic LLC, as well as an executive consultant for BNG, right?
A. No. I don't never -- I state that I'm executive consultant for Skin Logic, LLC.
Q. Have you ever held yourself out to be an executive consultant for BNG?
A. I'm not executive consultant for BNG.
Q. That wasn't my question. My question was, have you ever held yourself out to be an executive consultant for BNG?
A. Name or what? I'm sorry.
Q. Have you ever held yourself out to be an executive consultant --
A. No.
Q. -- for BNG Group, LLC?
A. No.
Q. Your signature block on emails doesn't indicate that you're an executive consultant for BNG Group?
A. I don't recall.
Q. You indicated that you had prior accounts with Ms. Gunkova at banks. Is that right?

A. I have personal account with Ms. Gunkova at Wells Fargo Bank, yes.
Q. How many accounts did you have at Wells Fargo with Ms. Gunkova?
A. Just one saving and one checking.
Q. One checking account. When was that account closed?
A. Closed when Valeria Gunkova filed petition for bankruptcy. It was closed. And there's only one in my name right now.
Q. Okay. So Ms. Gunkova's name was removed from that account when she filed for bankruptcy?
A. This name was removed from the account. And she debit account -- debtor account.
Q. When you say this name was removed from the account, was it Ms. Gunkova's name that was removed from your joint checking account?
A. Ms. Gunkova's name removed from this account. She's not anymore on this account.
Q. And that occurred when?
A. I don't remember exactly date, but this was probably in the end of July, the end of July when she filed bankruptcy petition.
Q. As part of your role of executive consultant of Skin Logic, you assisted in seeking and obtaining loans for Skin Logic, isn't that right?
A. Yes.

Q. As recently as February of this year. Isn't that right?
A. A loan? I don't recall what we applied for loans.
Q. Did you --
A. We applied for short-term money, yes.
Q. Short-term loans?
A. Short-term loans.
Q. Any type of loan, you assisted Skin Logic in seeking and obtaining loans in 2023, right?
A. Yes.
Q. Including through Byline Bank, correct?
A. Correct.
Q. In fact, you sought a renewal of an SBA loan for Skin Logic, right?
A. Yes.
Q. And you represented in those loans that the rent to BNG was over 25,000 dollars, right?
A. Rent to BNG, 26,720 dollars, yes.
Q. And that rent that's owed to BNG, over 25,000 dollars, was pursuant to a lease that you signed as an executive consultant of Skin Logic, right?
A. In 2013, we signed first lease, yes.
Q. And then there have been addendums to those leases, correct?
A. And then was signed by Valeria Gunkova.
Q. And you are a guarantor on that lease, aren't you?

A. I'm sorry. Can you repeat the question again?
Q. You are a guarantor on that lease for Skin Logic, LLC right?
A. On this lease we -- so the first lease in 2013 was signed by me as executive consultant. And then in 2015, 2017 was signed by Valeria Gunkova.
Q. Okay. In 2013, when you signed the lease as an executive consultant for Skin Logic LLC, you also signed as a personal guarantor, didn't you?
A. I don't recall. Maybe.
Q. And then in the amended lease, that provision of you as a personal guarantor remained. Isn't that right?
A. I don't -- I don't remember. I don't know.
Q. And you never entered into a lease or Skin Logic has never entered into an addendum removing you as personal guarantor, right?
A. I don't recall.
Q. There's never been a written document where BNG has agreed to reduce Skin Logic's rent to 12,030 dollars, is there?
A. BBG doesn't have document which outlines this one.
Q. In fact, Ms. Gunkova just reduced the rent on her own, didn't she?
A. Ms. Gunkova doesn't reduce any rent. We pay exactly amount of money which we owe to BNG every month.
Q. Let's talk about --

A. Plus --
Q. -- the money you contend with prepaid. You have an accounting -- you have a financial account on your QuickBooks, right? You manage the QuickBooks of both Skin Logic and BNG? Is that right?
A. Correct, yes.
Q. Mr. Caman has for years now contested your involvement with BNG, hasn't he?
A. Mr. Caman have all access to BNG QuickBook.
Q. That was not my question. My question was BNG -- Mr. Caman has for years now contested your involvement with BNG. Isn't that right?
A. Yes.
Q. And in fact, there's been a lawsuit pending in Loudon County for years now relating to Mr. Caman's membership rights and Ms. Gunkova's disregard for those rights. Isn't that right?
MR. VERSTANDIG: Your Honor --
THE WITNESS: That's correct.
MR. VERSTANDIG: Oh.
Q. Okay. Ms. Gunkova has used --
THE COURT: Excuse me. Get close to the mic, please.
Q. Ms. Gunkova has used Skin Logic money to pay her personal legal bills and the Loudon County litigation. Isn't that right?

A. Ms. Gunokva borrowed money, if I remember exactly from equity line, about 250,000 dollars. And from whom? From Eagle Bank. And Ms. Gunkova used all her personal resources to pay legal expense. Plus Skin Logic also use some resources. Correct.

Q. And the money that Skin Logic paid for Ms. Gunkova's legal bills you characterized as prepaid rent to BNG, didn't you?

A. No, it's not prepaid money to BNG.

Q. There was no money that Skin Logic actually prepaid --

A. No, no. Hold on one second.

Q. Sir, let me finish my question.

A. It's no. Okay.

Q. There was no cash --

THE COURT: Excuse me, counsel. When he's answering a question, don't start asking another question. All right?

MS. BENES: Understood, Your Honor.

THE COURT: All right. Go ahead.

THE WITNESS: No.

Q. There has been no cash that has been actually transferred from Skin Logic to BNG for prepaid rent, has there been?

A. Yes. That's money transferred to BNG from Skin Logic.

Q. No. Skin Logic has not written a check for prepaid rent to BNG, has it?

A. So okay. Skin Logic and BNG have the same bank, TD Bank. And Skin Logic transfer money to BNG (indiscernible).

Q. It's your testimony that Skin Logic has transferred money to BNG's bank accounts --
A. Yes.
Q. -- for prepaid rent?
A. From one account to another account, correct.
Q. And you have evidence of this?
A. Of course. You have as well, because in the monthly report, (indiscernible) bank account.
Q. BNG in June filed suit against Aria in the Loudoun County case for unpaid rent, right?
THE COURT: Excuse me. Counsel, ask a question, okay? Go ahead. What's your question?
Q. Didn't BNG sue Aria in June for unpaid rent relating to this prepaid rent that you contend was made?
A. Well, your statement like this, yes. If I recall it, Mr. Caman and BNG.
Q. So tell me, Mr. Bogatin, is it your testimony now that the prepaid rent to BNG was not expenses that Skin Logic paid on behalf of BNG? want to make sure I understand your testimony now as to what money has been characterized as prepaid.
MR. VERSTANDIG: Objection. Asked and answered. The testimony was that money was transferred from a TD Bank account to a TD Bank account.
MS. BENES: And if that's his testimony, I just want that confirmed.

THE COURT: That's what I heard.
MS. BENES: Thank you.
THE COURT: So your objection is sustained.
MR. VERSTANDIG: Thank you, Your Honor.
Q. I do have some questions about the employees that you seek to pay. I believe I heard in your testimony, it could be that I misheard you, that there are twenty employees and eight 1099s. Did I hear that correctly?
A. Total twenty-eight employees.
Q. Total of twenty-eight? Are all of the employees you seek to pay illustrated on Exhibit A that was filed with the motion?
A. I'm sorry. Can you repeat the question again?
Q. Are you familiar with Exhibit A that was an AccuPay payroll record?
A. Yeah. We process payroll through company called AccuPay. And all employees received money directly from AccuPay, from our bank account.
Q. Mr. Bogatin, Exhibit A only reflects twenty-three employees. And that includes Ms. Gunkova. Who are the five other additional employees that you are now referring to?
A. Well, it's -- you have W-2 and 1099. Yoga employee usually 1099 because they're teachers. And stable employees W-2.
Q. I'm sorry. I did not understand you. What was your answer? I have -- I'm having a hard time understanding you.
A. Okay. So --

Q. I said there -- my question was you --
A. We have -- we have W-2 employee.
Q. I'm sorry. You have what?
MR. VERSTANDIG: W-2.
MS. BENES: W-2. Thank you, counsel.
A. You're welcome. And we have 1099 employee. 1099 employee, it's yoga teacher. So they teach student yoga.
Q. Okay.
A. The 1099s -- they have license and --
Q. Okay. So you have twenty W-2 employees and eight 1099 workers?
A. Yes. The last payroll we processed, I don't recall exactly, but I think is correct.
Q. Okay. So by my calculation, twenty plus eight equals twenty-eight. Exhibit A only shows twenty-three individuals.
A. Twenty-three may be W-2 employee.
Q. I'm sorry?
A. It's W-2 employee.
Q. You have additional W-2 employees that you're seeking to pay that are not reflected on Exhibit A?
A. No. What I tried to say, we have W-2 employee who received money to get paid. And you have a yoga teacher. A different period of time, its going to be eight, can be five, depend upon their schedule. Last payroll was processed exactly this amount of employee.

Q. Exhibit A reflects twenty-three workers. My question to you is who are the five additional workers that you have testified as part of the twenty-eight?
A. Correct.
Q. Because twenty-eight minus twenty-three is five.
A. Do you want me to repeat again? I will repeat again. Our company have two different type of employee, W-2 and 1099. 1099 employee depends upon the schedule and lessons. So this payroll was twenty-three. Next payroll can be twenty-eight.
Q. Who are the five other employees that are not on Exhibit A?
A. Yoga teachers. Do you want a name? If you can --
Q. Are you -- in your --
A. If you give me a list, I will tell you --
Q. Sure. If you could give me the names of the five, yes. I would like to know the names of the five yoga teachers that are not reflected on Exhibit A.
A. I don't remember. From my twenty-eight employees, I don't remember who was busy, who was not busy. Like I said, again, we have yoga studio. Yoga studio employee busy depends about numbers of lessons. We conduct every day between four and five lessons. If the yoga teacher was busy, she get paid. If a yoga teacher was no scheduled this time, she don't get paid.
Q. The budget that you previously testified you assisted in preparing shows payroll expenses of 29,600 every two weeks. Is that payroll figure for the twenty-eight employees or only the

twenty-three that are shown on Exhibit A?
A. This payroll is average of payroll of what we getting paid to -- we pay to employee, average payroll.
THE COURT: I did not understand --
MS. BENES: I don't -- I can't either.
THE COURT: -- that response. Please speak slowly but repeat your response.
A. Okay. So this is average payroll. So month to month -- excuse me, month to month, we pay payroll. And we get average payroll, like, we get --
Q. Average payroll?
A. Correct.
Q. Okay. So 29,600 is just an estimate and does not directly support Exhibit A. Is that what you're saying?
A. This is what I'm saying. Exhibit A is one payroll from August 16, which covers fifteen days ago August 16. August -- September 2nd will be payroll bigger because people was more busy.
Q. And that's the five additional people you want to pay that we don't know their names, right?
A. It's not only five additional. It's -- okay. So W-2 employee, it depends about how many commissions they received during their job. For instance, my (indiscernible) is sixty dollars for one sectional facial. If she done ten facial, she receive one amount of money. If she done twenty facial, she

receive different amount.
Q. I understand, Mr. Bogatin. I'm trying to figure out who is being paid the 29,600 that's set forth in your budget that is not listed on Exhibit A that you filed with your motion. And from what I hear, you can't tell me who those people are. Is that right?
A. No, it's not right.
Q. Okay. So who are the additional people --
A. I -- I -- again --
Q. -- that you seek to pay?
A. I'm sorry, but I can repeat again, our business depends about number of client which we serve. If we serve ten clients, it's one amount. If we serve twenty client, another amount.
Q. And you cannot tell me the five additional employees, the names?
A. Well, if you -- if I see the list of who get paid, I will give you a list of people who don't get paid, who don't --
Q. Who are not on Exhibit A? I can hand you a copy of Exhibit A.
THE COURT: Excuse me, counsel. There are no names on Exhibit A.
MS. BENES: We received an unredacted copy per counsel's request.
MR. VERSTANDIG: Your Honor, I'm happy to share the

Court. We have redacted on the public records so employees wouldn't gossip. But we shared with, I believe, all of the attorneys in court today an unredacted copy.

THE COURT: Very good.

MR. VERSTANDIG: I have an unredacted copy of the Court would like it.

THE COURT: I don't need it.

MR. VERSTANDIG: Okay.

THE COURT: Go ahead.

Q. When was the last time Skin Logic hired a new employee?
A. We hire new employee -- last employee started work yesterday.
Q. I'm sorry. It started working when?
A. Yesterday.
Q. You hired somebody new yesterday?
A. Because one person left and we hired on another person --
Q. Okay.
A. -- from this person.
Q. In the last two months, how many new employees has Skin Logic hired?
A. Last two months, I think we hired two people.
Q. Two?
A. It's from these people -- some people leave. We had new one on to replace them.
Q. What does Tina Barker do?

A. I'm sorry?
Q. Tina Barker.
A. Tina Barker one employee was hired recently, yes.
Q. She is what? I can't understand you. What is her role at Skin Logic?
A. She's front desk person.
Q. She's a front desk person. And was she one of the two recently hired employees?
A. Yes.
Q. Keisha Brooks (ph.), what does she do?
A. Keisha Brooks, she's marketing person. She's does --
Q. Was she --
A. -- marketing for company.
Q. Was she one of the new employees hired in the last two months?
A. I don't recall. We hired her sometime in June I think because the previous person, Elizabeth, left company. So we have to hire a replacement for her.
Q. The exhibit that you filed with the court, Exhibit A, shows that certain employees are paid by regular earnings.
A. I'm sorry?
Q. Some are paid by salary. And some are paid service fees.
A. So --
Q. Can you explain --
A. We don't -- we --

Q. Sir, I'm not done with my question. Can you explain what a service fee is?
A. Sure. So Valeria Gunkova gets salary. The rest of people received money, depends on the number of hours, let's say front desk people, front desk, greeting lady, housekeeping ladies, they receive money based on how many hours they work for company. They're paid per hour. And finally, the aesthetician technologist, therapist, massage therapist, and yoga paid by commission.
Q. Is that what is referred to as the service fee, their commission?
A. Correct. Service fee -- no. Service fee, it is amount of money was paid person for service performed. Let's say yoga teacher perform yoga. She receive forty-five dollars for one hour Yoga. Okay? If she sell some product, let's say water, she receive commission, 3.5 percent. It's called commission.
Q. Are the -- I'm going to use the term employee. Maybe I should -- are the workers who are paid a service fee 1099 or W-2 employees?
A. Everybody who worked for company received a commission based on product sold.
Q. Based on products sold? Is that what you said?
A. Skin care product, yes. Skin care product --
Q. Does Skin --
A. -- water.

Q. I'm sorry. Go ahead. I did not mean to interrupt you.
A. Skin care product.
Q. Skin care product?
A. (Indiscernible) product. Yes.
Q. Does Skin Logic sells Skin care products?
A. Of course.
Q. Does Skin Logic have skin care products in inventory?
A. I'm sorry?
Q. Does the store -- does Skin Logic have skin care products to sell in inventory?
A. No. Front desk have little exhibit with skin care products.
Q. The front desk sells skin care products. Is that your testimony?
A. I'm sorry?
Q. I'm having a hard time understanding it, Mr. Bogatin. I'm sorry. Was it your testimony that the front desk sells skin care product?
A. No. What I said, basically front desk have little exhibition of skin care product which is traditionally sold to the client.
Q. Okay. And where is the actual product cap?
A. What is what?
Q. Where is the actual skin care product kept, in the spa?
A. From vendors?

Q. I'm sorry. From vendors?
A. Vendors, yes. Let's say we have different type of the product, (indiscernible) company. So different companies sell different copies. And we sell this product because (indiscernible).
Q. So do you store the product in the spa?
A. In the medical spa, you have a line of product which is sold. Yes.
Q. Okay.
A. And we pay tax on the sale of course.
Q. Okay. So you buy the product. Skin Logic buys the product from a vendor. You have it in the spa. And then you sell it to the public, right?
A. Skin Logic employee sell to the client. Yes.
Q. Okay. On page 2 of Exhibit A, there's an employee whose name is Monkzal Rachford (ph.). I might be mispronouncing that.
A. Yeah, it's a Zula. She's master aesthetician, yes.
Q. I'm sorry. She's a what?
A. She's master aesthetician.
Q. Master aesthetician?
A. Uh-huh.
Q. Okay. Does Leila Kump still work for Skin Logic?
A. Layla Kump, medical director of Skin Logic, yes.
Q. Okay. And I don't see her name on Exhibit A.

A. Because she's --
Q. Is she still being paid?
A. She's not part of payroll. She's medical director.
Q. How is Skin Logic paying her?
A. We don't pay her anything.
Q. You don't pay your medical director?
A. No.
Q. How is she compensated for the work that she does as medical director of Aria?
A. She's working -- she's working basically outside. She has her own office. We generate money. And Skin Logic doesn't pay anything to her directly.
Q. So she performs services for Skin Logic and Skin Logic does not compensate her. Is that what your testimony is for?
A. We have -- we provide some service for her, and she like our services.
Q. What's the services that Skin Logic provides to her in exchange --
A. Facial, day spa, massages.
Q. Okay. So Skin Logic compensates her through giving her free services at the spa?
A. It's not compensation.
Q. She's just not compensated?
A. No. We don't pay her any money.
Q. Are there any other employees or workers or any other

individuals who perform services for Skin Logic that Skin Logic does not compensate other than Dr. Kump?
A. No. We have a rule in company that employee of Skin Logic can receive service fifty percent discount, but we don't have free service for employees.
Q. Page 3 of Exhibit A indicates there is an employee by the name of Luc, L-U-C, Enterprise.
A. Luc Enterprise?
Q. Yes.
A. It's Dagmar, yes. She's manager of our department, yoga department. She's yoga teacher.
Q. Is that an individual or is that a construction contractor?
A. She's a contractor. Yeah. She's 1099 employee.
Q. She's a construction contractor, right?
A. No, she's not contractor. Luc Enterprise?
Q. Yes.
A. L-U-S Enterprise, it is yoga teacher.
Q. L-U-C Enterprise.
A. Yeah. It's yoga teacher.
Q. She's a yoga teacher?
A. Yes.
Q. Aria lists all of its employees on its website, doesn't it?
A. Not everyone.
Q. Who is not listed on the website that works for Aria.
A. I don't recall -- the last time I was on the website,

probably, like, months ago.
Q. Months ago?
A. We don't remove everybody right away. It takes time.
Q. I noticed that you also listed that Sheila Morris was to be paid?
A. Sheila Morris our employee, yes. She's master -- she's massage therapist.
Q. As part of your bookkeeping of Skin Logic, isn't it true that you represented in past payroll records that Ms. Morris was terminated in 2020?
A. She was -- left company, and then she came back in 2021. She returned back.
Q. She came back in when?
A. I'm sorry?
Q. What year did you say she came back?
A. I don't remember, but she was out of company for, like, maybe one year, two years, and returned back to the company.
Q. Lucas Gaviitt, I noticed he has a rate of zero.
A. What's the name?
Q. Lucas Gavitt, G-A-V-I-T-T. Do you know Lucas?
A. Last name?
Q. Lucas? You don't know Lucas?
A. I just don't hear clearly. Can you repeat again?
Q. Lucas, L-U-C-A-S, last name Gavitt, G-A-V-I-T-T.
A. I think that's yoga teacher.

Q. So do you think Lucas Gavitt and Luc Enterprises are the same thing?
A. No, no. They're different.
Q. So who is Lucas Gavitt and what does he do for Aria?
A. Yoga teacher.
Q. So you have two yoga teachers --
A. We have eight yoga teachers.
Q. I wasn't done with my question.
A. I'm sorry?
Q. So you have a yoga teacher by the name of Lucas and you also have a yoga teacher by the name -
A. Lucas -- Lucas --
Q. -- of Luc --
A. -- is yoga teacher. And Luc Enterprise, it is Dagmar Benesova (ph.), yoga teacher.
Q. You said Luc Enterprise is another yoga teacher?
A. I don't understand your question. I'm sorry. So we have eight yoga teacher. One of yoga teacher, Dagmar Benesova, who used her personal company, Luc Enterprise. Then we have Lucas. Is this yoga teacher, different person.
Q. Luc Enterprise, is that an individual or a company name?
MR. VERSTANDIG: Object to the form of the question. Asked and answered. I'm also --
THE COURT: Asked and answered. Sustained.
THE WITNESS: Okay.

THE COURT: Move on.

THE WITNESS: And, Your Honor, I apologize for (indiscernible).

MS. BENES: I have no further questions at this time. Thank you.

THE COURT: All right. Mr. -- is it Bennett? Mr. Bennett, did you have questions for the --

MR. SMITH: I did. Yes, Your Honor. Court's indulgence for just a minute.

THE COURT: You need to put the mic nearer to your mouth.

MR. SMITH: Sorry, Your Honor.

CROSS-EXAMINATION

BY MR. SMITH:

Q. Good afternoon, Mr. Bogatin.

A. Good afternoon.

Q. I don't anticipate I'll have too many questions, but I did have a few in addition to what has already been asked. Counsel for BNG just asked you a moment ago about Lucas Gavitt, yoga teacher. When did Mr. Gavitt start working for Skin Logic?

A. Lucas was hired in the company probably about three months ago.

Q. About three months ago? I noticed that Mr. Gavitt has been given employee number 181. And it appears that Ms. Gunkova is employee number 1. So am I correct in saying that the numbers

assigned are chronological to the employees?
A. Assigned chronological, yes.
Q. Okay. So I see that there is an Anna Ramodia (ph.). And what does Ms. Ramodia do for Skin Logic?
A. What's her name? I'm sorry.
Q. Anna Ramodia.
A. Anna Ramodia, master aesthetician.
Q. Okay. And when was Ms. Ramodia hired?
A. Probably three months ago.
Q. Probably three months ago.
A. Because two people left us. We hire new people.
Q. And we spoke -- So Ms. Ramodia's employee number I believe is 188. No, I'm sorry. There is a different 188. Tina Barker is hired you said within the last two months, correct?
A. Tina, yes.
Q. Okay.
A. She's front desk person.
Q. Who is the most recent person hired by Skin Logic?
A. Most recent person was I think Tina.
Q. Well, you have an employee number 188. Tina Barker is Number 187.
A. We have another employee, Anna, who as of right now a student. She is a process of teaching.
Q. She's a student?
A. She's a student because we teach her to work on front desk.

Q. Okay.
A. She not employee yet.
Q. Okay. But you pay her --
A. Pay --
Q. Looks like her payroll rate is $1,781.60, correct?
A. To who?
Q. Correct?
A. To who? I'm sorry.
Q. I'm saying, the most recent hire, as I noted as employee number 188, you were saying is a student?
A. What is the name of this employee?
Q. Gulnara Marnishvili (ph.).
A. She's not hired recently. She was transferred from 1099 to W-2. She worked with this company almost five years.
Q. I see. I see.
A. She's cleaning lady.
Q. So if employee number 181 was hired approximately three months ago, that means that we're telling -- that your testimony is that we've had at least eight employees?
A. What's the name of the person?
Q. Well, we just went over how the employee numbers are chronological. And if there are -- if employee number 181, who is Lucas Gavitt, was hired approximately three months ago --
A. Correct.
Q. -- and everyone after that was hired more recently because

it's chronological --
A. Depends about if this person was 1099 or W-2. Some --
Q. Okay. So with the exception of that one person, so seven people have been hired within the last three months. Is that accurate?
A. No. It's not accurate. You're talking about yoga teacher probably. We had about three new yoga teacher because the three yoga teacher left this county, moved to California. So we hired a new three people.
Q. Right. But those are still new hires, correct?
A. Correct. But it's yoga employee. They're getting payment like --
Q. I understand that. But I'm asking you, in the last three months, was it -- is it the case that not including the one person who was transitioned as a 1099 employee to a W-2 employee, there are seven new people at Skin Logic in the last three months?
A. I don't recall exactly amount of people. We hire new people because other people left company and we need to maintain business.
Q. Okay. Of the employees that are paid on a W-2 basis or that receive -- let me rephrase the question. Of the employees that are paid on a regular basis under the budget that you prepared, how many of those workers have had wages increased within the last six months?

A. You're talking wages? I'm sorry. I don't understand questions.
Q. In the last six months, how many of the workers have received an increase in the amount of pay?
A. The last --
MR. VERSTANDIG: Hold on. Object to the form of the question, ambiguity. I'm not sure if he's asking if their hourly rate has gone up or if their cumulative pay has gone up, but I could see where that would create some confusion.
THE COURT: So which is it? Hourly rates or cumulative amount?
MR. SMITH: Either. I'll ask them one at a time.
THE COURT: Rephrase. Why don't you rephrase?
MR. SMITH: All right.
THE WITNESS: Maybe I can answer it easier.
Q. In the last six months, of the workers who are paid on an hourly rate basis, how many in the last six months have received an increase of that hourly rate?
A. Zero.
Q. In the last six months, nobody who is --
A. No.
Q. -- paid hourly has received a --
A. No.
Q. -- payment rate increase? Okay. In the last six months, how many workers who are paid in some other form other than

hourly compensation have received an increase in the amount that they are paid?
A. No, we don't change the compensation rate. The rate -- I mean, the employment depends about how many services are performed.
Q. I see. So if they perform more --
THE COURT: Counsel, you need to get closer to the mic.
Q. So those workers, those types of workers that are not paid on an hourly basis, they are paid by the -- specific to the number of services that they performed?
A. Correct.
Q. Understood. I believe you testified a moment ago that funds from an Eagle Bank line of credit were being used to pay Skin Logic expenses and professional fees or did I mishear that?
A. No, no. What I said basically is that Skin Logic -- you're talking about line of credit from Eagle Bank, yes?
Q. Correct, yes.
A. Was used to -- Skin Logic operation.
Q. It was used to pay operating expenses of Skin Logic?
A. Correct.
Q. Okay.
A. And this was used probably during 2021, 2022.
Q. Mr. Bogatin, are you currently under a criminal indictment?

A. I'm sorry.
Q. Are you currently under a criminal indictment?
A. It was -- the criminal indictment was filed back in 2020.
Q. And am I correct that under that indictment, you are currently being investigated for approximately forty counts of financial crimes?
A. I'm not sure what you're asking me.
Q. Are you being currently investigated for wire fraud?
A. What crime?

MR. VERSTANDIG: Object to the form of the question on relevant grounds. Your Honor, there's a lot of things that have come out today that are going to make this an interesting case. And we have a lot of interesting things to cover in the future. I'd imagine we're going to have a very colorful 341. For today's purposes, we're here on cash collateral and we're here on wages. And absent some defense that raises an insinuation that money is going to be stolen, laundered, or otherwise used in a wrongful way, I would respectfully submit that while it's certainly okay to ask about the indictment to go to credibility, getting into the idiosyncratic specifics is probably beyond the relevance of today. That's not to say it won't come up in the future.

THE COURT: Agreed. Sustained. Move on.

MR. SMITH: Thank you, Your Honor.

Q. Mr. Bogatin, has Skin Logic opened a debtor-in-possession

bank account?
A. I'm sorry?
Q. Has Skin Logic -- has the debtor opened a debtor-in-possession bank account?
A. Skin Logic don't open --
Q. Not yet?
A. Because Valeria Gunkova right now medical emergency is with her mom overseas. And when she coming back, the account will be opened in TD Bank.
Q. Okay. You and I discussed previously that Skin Logic's agreement with Eagle Bank is that any deposit account of any kind held by the debtor is to be located at Eagle Bank.
A. Yes.
Q. Is that --
A. Skin Logic --
Q. Do you recall that?
A. Skin Logic has bank account with Eagle Bank.
Q. They do have a bank account with Eagle Bank. But you just testified previously that you have other accounts at TD Bank, correct?
A. Skin Logic have three bank account with TD Bank which going to be closed when we open DIP account.
Q. Are you going to be closing the accounts at TD Bank and opening your DIP account at Eagle Bank?
A. Well, I don't make the decision, but TD Bank provide number

of financial services which difficult to replace. If you switch bank account to Eagle Bank, then we need to hire another person who going to do bookkeeping operation for TD Bank -- for Eagle Bank. Right now TD Bank deliver this automatically.

MR. SMITH: Your Honor, I have further questions.

THE COURT: All right. Counsel, do you have any redirect?

MR. VERSTANDIG: Oh, yes.

THE COURT: Let's take a break here. We have not had a lunch break yet.

MR. VERSTANDIG: Oh.

THE COURT: So I'm going to take a recess until 2:30.

All right. So Skin Logic will continue at 2:30.

MR. VERSTANDIG: Yes, Your Honor. And only because of the cultural gap, could the Court instruct the client? I want to make sure it's understood that I can't speak to him about his testimony over lunch and that that doesn't seem absurd.

THE COURT: All right. All right. Mr. Bogatin, you're not allowed to talk about this case with your counsel or anyone else during lunch, do you understand, until we reconvene. Do you understand?

THE WITNESS: Yes.

THE COURT: All right.

MR. VERSTANDIG: Thank you, Your Honor. We'll see you at 2:30.

THE COURT: You're welcome.

(Recess from 1:39 p.m. until 2:39 p.m.)

THE COURT: All right. Mr. Bogatin, please take the stand.

Counsel, you can begin your redirect.

REDIRECT EXAMINATION

BY MR. VERSTANDIG:

Q. Mr. Bogatin, do you know if the debtor has made arrangements to open a debtor-in-possession bank account?

A. I'm sorry. Can you -- a little louder.

Q. Do you know if Skin Logic has arranged to open a debtor-in-possession bank account?

A. Yes.

Q. And what financial institution?

A. TD Bank.

Q. Okay. Mr. Bogatin, earlier you testified that Skin Logic prepaid some portion of rent to cover a period of eight months. Do you recollect that?

A. Yes.

Q. What was the first calendar month that counted for those eight?

A. August.

Q. So do I understand --

A. I'm sorry. September.

Q. Okay. So do I understand if it begins in September, that

the last discounted month will be April 2024?
A. Yes.
Q. And beginning in May of 2024, Skin Logic would owe the full amount of rent --
A. CORRECT.
Q. -- without abatement or discount?
A. Correct.
Q. Okay. This may have been my confusion earlier, and I mean that very sincerely. I don't know if you testified that Skin Logic has a written lease with BNG or just that Skin Logic has a written lease. Which is it?
A. I'm sorry. I --
Q. His Skin Logic --
MR. VERSTANDIG: Strike that.
Q. BNG, Bravo November Gulf, that's the landlord, correct?
A. It's landlord, yes.
Q. Did there come a time when BNG acquired the building from a third party?
A. When you say built -- I'm sorry.
Q. Did BNG buy the building from another company?
A. Yes.
Q. Okay. Approximately when was that?
Q. It was October 2020.
A. 2020? Okay. Was Skin Logic already a tenant at that point in time?

A. Yes. Skin Logic tenant from 2013.

Q. Okay. After BNG bought the building, did BNG enter into a new lease with Skin Logic or did BNG simply assume the existing lease?

A. Yeah. BNG assumes all existing lease, including Skin Logic.

Q. Okay. I want to move on to some of the testimony about credit card. You understand -- let me rephrase that. Do you understand that Skin Logic cannot borrow money while in bankruptcy unless Judge Kindred approves it?

A. Absolutely. I know it's impossible.

Q. Do you understand that that means that Skin Logic cannot use a credit card while it is in bankruptcy?

A. Correct.

Q. Since Skin Logic petitioned for bankruptcy relief on August --

MS. BENES: 23rd.

MR. VERSTANDIG: 23rd, thank you.

MS. BENES: You're welcome. You helped me earlier.

MR. VERSTANDIG: Thank you.

Q. Have you used a credit card on which Skin Logic is obligated to pay?

A. No.

Q. Okay. Do all yoga instructors show up on time for every shift?

A. I'm sorry. Again?
Q. Do yoga instructors sometimes not show up to work?
A. I can't hear questions. I'm sorry.
Q. It's okay.
A. If you ask a little loudly, I will --
MR. VERSTANDIG: Okay. Strike that.
Q. Prior to Skin Logic entering bankruptcy and prior to Ms. Gunkova entering bankruptcy --
THE COURT: Excuse me. Mr. Bogatin, move the mic away from your mouth, please.
Okay. Go ahead.
Q. Prior to Skin Logic entering bankruptcy and prior to Ms. Gunkova entering bankruptcy, did they share a lawyer in the state court litigation brought by Mr. Caman?
A. You're asking me (indiscernible) lawyer money? Is this what the question --
Q. No, no, no. I'm not asking if anyone is owed money. I'm asking, was Ms. Gunkova represented by the same lawyer as Skin Logic in the Louden County Circuit Court?
A. Correct.
Q. Okay.
A. Sean Rush (ph.) was the name of lawyer. Sean Rush.
Q. Sean Rush, got it.
MR. VERSTANDIG: Your Honor, for today, nothing further. Thank you.

THE COURT: All right. Thank you for testifying, Mr. Bogatin. You may step down.

All right. Do you have any final requests, Mr. VerStandig?

MR. VERSTANDIG: I'm sorry, Your Honor. I have no further evidence. I don't know if you want argument.

THE COURT: I do.

MR. VERSTANDIG: Okay.

THE COURT: Go ahead.

MR. VERSTANDIG: Your Honor, I think one of my objections probably gave more of a roadmap than I intended as to where this is going. This is going to be an interesting case. And there's no way to deny that in the wake of the record that was created today. But what we're hearing today is two discrete motions, cash collateral and leave to pay pre-petition wages to the noninsider employees.

To pay pre-petition wages -- and I might add, the sums we are seeking are all within the priority threshold, so these would be priority claims if not paid -- we need to reasonably show that the Court exercising its equitable powers should allow us to pay these pre-petition claims so as to facilitate the debtor's ongoing business and its likelihood of rehabilitation. And we need to show that paying these creditors will be a benefit not merely to them but to all creditors. And I believe the unrefuted testimony is that there

are employees who, if not paid, would risk the morale of the workplace and whose nonpayment would have a deleterious impact upon Skin Logic's ability to operate on a forward-looking basis.

The reason we single out Ms. Gunkova is twofold. It's not merely the optic of paying an insider. It's because I can't stand in front of you in good faith and say that if we don't pay the pre-petition portion of Ms. Gunkova's wages, she's going to up and quit. That would be absurd. She owns the business. I can't say she's going to go gossip. Same issues. She owns the business.

But the under refuted testimony, which was a very small amount of the testimony you heard today, does say that it is necessary to pay these wages or it would have a negative impact on the business. And I don't believe anyone has brought forth any contradicting evidence through testimony or otherwise that suggests no, these employees will be fine if they're not paid; nothing bad will happen if they're not paid.

I know there's some testimony that goes to the turnover ratio and whether or not employees regularly come and leave the business. But I respectfully urge that the idea that a bunch of people may quit and need to be replaced in the early days of a bankruptcy is not cause to deny a relatively ordinary and down-the-middle first-day motion.

If we're going to pay employees, we're going to need

cash collateral to do so. The amount of cash collateral in this case is vanishingly small. It is less than 5,000 dollars.

There are three creditors. Two of them are represented in your courtroom today. We don't have evidence as to their lien positions, but the assertions set forth on the schedules which are signed under oath put the United States of America in first position through the Small Business Administration, put Eagle Bank in second position, and put Cadence Bank in third position. And obviously the United States and Eagle Bank are both here today.

What's on the schedules, which you can take notice, shows that all three secured creditors are enormously oversecured. The debtor is more than two million dollars in assets and owes the three secured creditors, less than one million dollars in the aggregate.

I don't believe that 4,000 dollars and change or a hair under 5,000 dollars, I don't want to minimize the amount, could have any material impact upon each of those creditor's abilities to be repaid through this bankruptcy no matter what tomorrow holds. If we're back here in ninety days successfully confirming a plan, it's not going to turn on 5,000 dollars. And we will vehemently argue against if anyone argues for it, but if there is a suggestion that this ought to be converted to Chapter 7, 5,000 dollars is not going to be a material consideration in the liquidation value and what goes to secured

creditors. Same if a trustee were to be appointed and so on and so forth.

To the contrary, not allowing the debtor use of cash collateral, as supported by the testimony adduced from the sole witness today, would have a detrimental impact upon the debtor. That is money that is needed to pay the wages I spoke about a moment ago. Allowing those funds to be utilized will benefit not merely the three secured creditors but all creditors as a whole, because the debtor, based on the budget that was discussed and that has been uploaded as an exhibit, will produce more cash than it will spend.

We didn't move the budget into evidence, and I don't think it's properly evidence. It is conjecture and it is a hypothetical speculation as to what the future will hold. But our witness did testify that it is grounded in fact and experience and that the numbers there will lead to a net profit of more than 30,000 a month. So we can use less than 5,000 dollars of cash collateral to get to a net operating profit north of 30,000 a month. We are doing a benefit to all creditors and all parties-in-interest.

Those are the only things in front of you today. And cash collateral is obviously only in front of you on an interim basis. It is not lost on us that you will probably want to put a short leash on the debtor. And that cash collateral is perhaps the easiest place to summon us back. We've given you

an eight-week budget, but we have no objection to coming back at some point between now and then.

Obviously, we're asking for interim relief and only interim relief today. The cash collateral motion was properly served at the time of its filing, not just on the parties technically entitled, but given the brevity of the list in this case, we served the whole matrix with the motion itself. If we count out twenty-one days from there, that will give us several options. And we'd be thrilled to come back and visit with you in late September, whatever date the Court thinks opportune, to readdress that. But what I want to make sure is that the debtor continues to operate from now to then.

The adequate protection that I believe is appropriate is simply a replacement lien. Again, we have more than two million dollars in assets. We have less than a million dollars in secured liabilities.

Also, I don't mean to mock the amount, 5,000 dollars is a lot of money to any person, but I don't even know what an adequate protection payment on 5,000 dollars that is subject to the over secured liens of three people or three banks would look like. And that doesn't seem a productive thought.

We have worked with our creditors both pre and post-petition to try to create a mutual and consensual cash collateral order. And I'm sure after I'm done speaking, you'll hear from counsel for the United States and counsel for Eagle

Bank. But my hope would be that by giving them a rolling replacement lien, we can at least check the box on an interim basis. We can move ahead with the 341 meeting. And we can come visit with you again as we seek final relief and perhaps touch upon any of the other issues that cropped up today.

If you have any questions, I'm happy to answer them. Otherwise, I would simply reserve to rebut.

THE COURT: All right. I have no questions at this time.

Counsel for SBA?

MR. VERSTANDIG: Oh, I thought you said I have a question.

THE COURT: No. I said I had no questions.

MR. VERSTANDIG: Thank you, Your Honor.

MR. TROY: Thank you, Your Honor. Matthew Troy for the SBA.

I can tell Your Honor that late last night, the SBA indicated to me they were amenable to permitting the use of this small amount of cash collateral with certain provisions that I have run by Mr. VerStandig. And he has indicated to me the debtor is amenable to the request of changes that we've made to the proposed order. That consent, Your Honor, however, I would temper it based upon what we saw today, what we heard today, I do agree that it should be a short leash for the interim order, that we should be coming back to this Court

promptly to see where we stand and how the debtor is operating.

One concern that I do have, and I believe debtor's counsel is endeavoring to try to nail it down, is whether or not the debtor has proof of insurance for the premises that it's occupying, because the extent to which the SBA is allegedly oversecured is totally dependent upon that medical equipment principally that is housed in that location. So proof of insurance is of paramount concern to the SBA.

With that, Your Honor, the SBA does not object to and consents to the use of the cash collateral for the limited amount of 5,000 dollars and with the provisions that the debtor has agreed to be put into the order.

If you have any questions, I'm happy to answer them.

THE COURT: No questions at this time.

MR. TROY: Thank you.

THE COURT: Counsel for Eagle Bank?

MR. SMITH: Thank you, Your Honor.

Your Honor, nothing much of extensive substance. I'm going to echo counsel for the SBA's sentiments that the short leash is appropriate here. My concern is the focus on cash collateral is placed right now on the approximately 5,000 dollars.

But as I read Bankruptcy Code Section 363(a), cash collateral does mean cash deposit accounts, cash equivalents whenever acquired, whether before or after the commencement of

the bankruptcy case. And I think that's an important thing for the Court and for the parties to focus upon, because there are three known secured creditors that are UCC creditors that are going to have liens upon that cash collateral at a minimum. And with that in mind, I think it's imperative that the debtor remain under a microscope and under a short leash and that the Court take that into consideration when making its decision today. Thank you, Your Honor.

THE COURT: All right. Ms. Bennes? \

Mr. Troy?

MR. TROY: Mathew Troy again for the SBA.

I forgot to mention one thing. And counsel's comments just reminded me that I wanted to mention this to you. The third -- well, the lien -- the bank that is allegedly holding the third priority lien, Cadence Bank, that loan from Cadence is actually guaranteed by the SBA as well. So the SBA has a direct loan and is the loan holder on the first lien and is the guarantor on Cadence's loan. As of right now, though, however, cadence remains the noteholder on that note. But I just wanted to make you aware of that fact.

THE COURT: All right.

MS. BENES: Your Honor, the human being, the wife, the mother in me doesn't want any employee who has actually worked to not be paid. We are not here to object to a valid employee or worker not being paid and being able to feed their families

and pay their own bills. The concern that BNG and Mr. Caman have are as to the credibility of the information that is put before this Court that the employees are in fact employees, legitimate employees being paid, and they're not a ruse for monies to be siphoned to Ms. Gunkova or Mr. Bogatin.

So with those concerns, we agree that the microscope would be appropriate and for this to be fleshed out further and for us to come back at a later time. But for today, we do not object to paying those valid workers the valid wages that they have earned.

THE COURT: All right. Thank you.

Me. Metz, I know that you were only recently appointed. Do you have comments to make at this time?

MR. METZ: Yes. Thank you, Your Honor. Yes. I have only been recently appointed. I have had discussions with several of the counsel in the room prior to coming in today.

I do think that -- and today was an education and helpful for me going forward in the case. There's a lot going on in the case. There's a lot of allegations that I think need to be fleshed out.

I do think for purposes of today, the Court should approve the limited use of cash collateral for a couple of weeks and have us come back and approve the -- and grant the motion to approve the payment of the pre-petition wages. I think the Code supports that even under Rule 6003, which in the

first twenty-one days requires it to be done to avoid immediate and irreparable harm. I think -- obviously I think if the employees don't get paid, that's sort of the death knell to to a debtor. And I do think we're talking about a relatively small amount of cash collateral that the debtor is asking the Court for permission to use. And I do think that the granting of replacement liens is sufficient to protect the secured creditors.

Like I said, there's been a lot a lot said today. I had had a couple of questions in my own mind that most of which were answered and a couple -- and many questions to ask going forward in the case that didn't need to be posed today. But I assure you I will -- I'm sure I will be spending a decent amount of time getting that information from the debtor and from the creditors in this case.

THE COURT: All right. Thank you.

Mr. Freeman?

MR. FREEMAN: Your Honor, I would summarize our position right now is concerned. We have obviously -- we have not had an IDI. We have not had a 341. I don't have documentation. I will confirm we do not have proof of insurance.

And also very concerning is that the debtor designee is not present. I understand she's not here, but the debtor designee who filed this case and signed everything is not

present in the courtroom to present why this is so important.

We have concerns about part of the testimony today was it's not just the 5,000. I understand it's a lot of money to some people, it's not much in the scope of the business. But the margins that were presented are 30- to 40,000 dollars in profit per month which is not accounted for. And they came into bankruptcy with none of that. There was testimony about whether the -- what expenses are getting paid, on which cards.

All that being said, I understand that if you deny it today, then this case is over before it starts. I believe that a very short -- a couple of things. First is proof of insurance exponentially fast, especially even in light of the oversecure, we could quibble about what the schedule say versus what the actual security is, but I think proof of insurance is imperative.

Second is a very, very, very short window. And I think our 341 is around the 13th of the 14th --

THE COURT: Okay.

MR. FREEMAN: -- because the IDI was scheduled for Thursday. That is not going to happen. That is going to be probably next week instead in light of a lack of documentation. But picking the date as soon after the 341 is possible so our office can assess the viability of this case and going forward and what information has been provided.

So that being said, it's hard to say I can consent to

it. I can't consent. But at this point, I realize that it's probably imperative for them to get it granted just to survive and for people to be paid. I still have concerns and questions over who is being paid. And that is going to be a big question in the case and what's being paid.

But that being said, again, like everybody else, I don't want people who are not insiders to be harmed by the case itself and not get paid their wages to give the case a chance.

THE COURT: All right. The matter before the Court is the debtor's motion to pay pre-petition wages. And I'm going to grant that motion.

I don't have a problem with the payment of wages that have already been earned. So please present your order on that, counsel.

The motion to approve cash collateral, use of cash collateral, I'm going to grant the use of cash collateral on an interim basis through September 26th. That's the date when we expect you to come back in and explain why I should extend that deadline for the use of cash collateral.

Go ahead, Mr. VerStandig.

MR. VERSTANDIG: I’m sorry.

THE COURT: Were you going to say something?

MR. VERSTANDIG: No, Your Honor.

THE COURT: Oh, okay. All right. There are lots of questions. And of course, on the 16th of the 26th, I'll expect

the U.S. Trustee to have -- and Mr. Metz to have a lot more information about the health of the debt of the debtor.

Insurance, proof of insurance will have to be supplied no later than September 11th which is two days before the 341 meeting. So you should have it before that, before the 341 meeting.

All right. Mr. VerStandig, I'm going to have you prepare the order. And I want it signed by the U.S Trustee's office and Mr. Metz.

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: All right. We'll see where this goes.

MR. METZ: Your Honor, are we back here on the 26th?

THE COURT: Yes.

MR. METZ: At 11?

THE COURT: 11 o'clock.

MR. FREEMAN: Your Honor, if I may. Would it be better to set this a little bit later than 11? I would anticipate it's not going to be short.

S3: 11:00.

S2: Your Honor, if I may. Would it be better to set this a little bit later than eleven? I would anticipate it's not going to be short.

THE COURT: Well, we can set it at 1 o'clock. That's not a bad idea. Set it specially at 1 o'clock. You can put that in the order, Mr. VerStandig.

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: Okay.

MR. FREEMAN: Thank you, Your Honor.

THE COURT: You're welcome.

MR. TROY: Your Honor, could I just confirm that I'll be able to see the lawyer?

THE COURT: Yes. You can get the signatures of the attorneys who were present today on the order just as having seen it.

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: All right.

MR. TROY: Thank you, Your Honor.

THE COURT: You're welcome.

MR. VERSTANDIG: Can it be either Ms. Ohm or Ms. Benes and they can pick which one?

MS. BENES: One of us -- yes.

THE COURT: Exactly.

MR. VERSTANDIG: Thank you.

THE COURT: All right.

(Whereupon the proceedings were concluded at 3:05 p.m.)

I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| FOR THE DEBTOR: | | | | | |
| Jacob Bogatin | 4 | 12,17,23,50 | 59 | | |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Motion to pay pre-petition wages is granted. | 74 | 11 |
| Motion to approve use of cash collateral is granted. | 74 | 16 |

C E R T I F I C A T I O N

I, Michael Drake, the court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

September 4, 2023

MICHAEL DRAKE DATE

AAERT Certified Electronic Transcriber CER-513, CET-513

**$**

**$1,781.60 (1)** 52:5
**$26,720.30 (1)** 17:18

**A**

**abatement (1)** 60:6
**abilities (1)** 65:19
**ability (3)** 8:18;9:16;64:3
**able (3)** 8:21;70:25;76:6
**absent (1)** 56:16
**Absolutely (3)** 5:6;7:1;61:11
**absurd (2)** 58:17;64:9
**accent (1)** 5:14
**accents (1)** 5:13
**accept (1)** 22:19
**access (1)** 33:9
**accompanying (1)** 18:7
**account (34)** 17:2,5,6,6;30:1,6,6, 9,11,12,12,13,15,16, 17;33:3;35:5,5,8,22, 23;36:17;57:1,4,8,11, 17,18,21,22,24;58:2; 59:9,12
**accounted (1)** 73:6
**accounting (4)** 4:8;18:20;23:6; 33:3
**accounts (7)** 17:1;29:24;30:3; 35:2;57:19,23;69:24
**AccuPay (3)** 36:13,15,16
**accurate (2)** 53:5,6
**acquired (2)** 60:17;69:25
**actual (5)** 19:12;22:3;44:22, 24;73:14
**actually (4)** 34:9,19;70:16,23
**add (1)** 63:17
**addendum (1)** 32:15
**addendums (1)** 31:22
**addition (2)** 23:18;50:18
**additional (9)** 18:19;22:17;36:20; 37:19;38:2;39:19,21; 40:8,15
**adduced (1)** 66:4
**adequate (2)** 67:13,19
**Administration (1)** 65:8
**aesthetician (5)** 43:7;45:18,20,21; 51:7
**afternoon (10)** 3:3,14,16,20,22,23; 12:12;24:2;50:15,16
**again (27)** 6:12;8:19;9:18; 10:17;12:13;14:3; 16:6,18;17:22,24; 22:22;24:21,21; 28:12;32:1;36:12; 38:6,6,18;40:9,11; 48:23;62:1;67:14; 68:4;70:11;74:6
**against (2)** 35:9;65:22
**aggregate (1)** 65:15
**ago (12)** 39:16;48:1,2;50:19, 22,23;51:9,10;52:18, 23;55:13;66:7
**agree (4)** 21:17,19;68:24; 71:6
**agreed (3)** 32:18;56:23;69:12
**agreement (8)** 7:14;14:1,4;22:1,2, 3,6;57:11
**ahead (8)** 34:17;35:12;41:9; 44:1;62:11;63:9;68:3; 74:20
**allegations (1)** 71:19
**allegedly (2)** 69:6;70:14
**allow (1)** 63:21
**allowed (1)** 58:19
**allowing (2)** 66:3,7
**almost (1)** 52:14
**ambiguity (1)** 54:7
**amenable (2)** 68:18,21
**amended (1)** 32:11
**America (1)** 65:7
**American (4)** 24:24;25:1,15; 26:17
**amount (26)** 18:9;19:12;20:3,4, 8;21:22;32:23;37:24; 39:25;40:1,13,14; 43:12;53:18;54:4,11; 55:1;60:4;64:13;65:1, 17;67:17;68:19; 69:11;72:5,14
**Ands (1)** 13:19
**Anna (4)** 51:3,6,7,22
**answered (5)** 20:23;35:21;49:23, 24;72:11
**anticipate (3)** 50:17;75:18,21
**anymore (1)** 30:17
**apologize (3)** 8:19;27:6;50:2
**appears (1)** 50:24
**applied (2)** 31:2,4
**appointed (3)** 66:1;71:13,15
**appropriate (3)** 67:13;69:20;71:7
**approve (4)** 71:22,23,24;74:15
**approves (1)** 61:10
**Approximately (8)** 18:5;20:12;22:9; 52:17,23;56:5;60:22; 69:21
**April (2)** 21:4;60:1
**argue (1)** 65:22
**argues (1)** 65:22
**argument (3)** 4:12;17:8;63:6
**Aria (11)** 14:20,23,25;15:1,2; 35:9,13;46:9;47:22, 24;49:4
**around (3)** 7:19;12:20;73:17
**arranged (1)** 59:11
**arrangements (1)** 59:9
**assertions (1)** 65:5
**assess (1)** 73:23
**assets (2)** 65:14;67:15
**assigned (3)** 18:18;51:1,2
**assisted (3)** 30:23;31:7;38:23
**assume (2)** 15:13;61:3
**assumes (1)** 61:5
**assure (1)** 72:13
**attorneys (2)** 41:3;76:8
**Attorney's (2)** 3:12;17:12
**August (14)** 7:19;8:3,9,12;9:14; 20:17,19;21:3;28:21; 39:16,16,16;59:22; 61:16
**authorized (6)** 25:3,4,6,13,14,18
**automatically (1)** 58:4
**automobile (2)** 27:20,21
**average (5)** 39:2,3,8,9,11
**avoid (1)** 72:1
**aware (1)** 70:20
**away (3)** 10:15;48:3;62:9

**B**

**back (16)** 48:11,12,13,15,17; 56:3;57:8;65:20; 66:25;67:1,9;68:25; 71:8,23;74:18;75:12
**background (1)** 16:1
**bad (2)** 64:18;75:24
**balance (1)** 19:16
**Bank (45)** 3:15;9:13;17:1; 30:2;31:10;34:3,24, 24;35:2,8,22,23; 36:17;55:14,18;57:1, 4,9,11,12,17,17,18,18, 19,21,21,23,24,25; 58:2,2,3,4,4;59:9,12, 15;65:8,9,10;68:1; 69:16;70:14,15
**bankruptcy (26)** 7:20;8:3;9:14,23; 16:2,5,8;19:19;26:13, 24;27:13;30:7,10,20; 61:10,13,15;62:7,8, 12,13;64:23;65:19; 69:23;70:1;73:7
**banks (2)** 29:25;67:20
**Barker (5)** 41:25;42:2,3;51:13, 20
**based (5)** 43:6,21,22;66:9; 68:23
**basically (3)** 44:19;46:10;55:17
**basis (9)** 23:2;53:21,23; 54:17;55:10;64:4; 66:23;68:3;74:17
**BBG (1)** 32:20
**became (1)** 18:2
**begin (1)** 59:5
**beginning (1)** 60:3
**begins (1)** 59:25
**behalf (4)** 3:15,17,17;35:19
**behind (1)** 12:5
**Belarus (1)** 3:7
**belong (1)** 26:20
**belongs (1)** 27:16
**below (2)** 9:15,17
**benefit (3)** 63:24;66:7,19
**Benes (19)** 3:16,16;23:24;24:1, 7;26:3,8;34:16;35:24; 36:2;37:5;39:5;40:23; 50:4;61:17,19;70:22; 76:14,16
**Benesova (2)** 49:15,18
**Benjamin (1)** 3:14
**Bennes (1)** 70:9
**Bennett (2)** 50:6,7
**Bethany (1)** 3:16

**better (2)** 75:17,20
**beyond (1)** 56:21
**big (2)** 25:24;74:4
**bigger (1)** 39:17
**biggest (1)** 11:16
**bills (3)** 33:24;34:7;71:1
**bit (5)** 6:9;8:5;25:8;75:17,21
**block (1)** 29:21
**BNG (58)** 3:18,21;18:9,17,20,25;19:5,7,16;20:1,8;21:17,19;22:1,4,13,16,17,18;23:23;29:7,11,12,14,19,22;31:15,17,18;32:18,24;33:4,8,9,10,11;34:7,8,20,21,23,24,25;35:9,13,16,18,19;50:19;60:10,15,17,20;61:2,2,3,5;71:1
**BNG's (1)** 35:2
**Bogatin (28)** 3:5;4:18;5:1,2,3,13;9:9;10:13;12:12,12;17:16;24:2;25:19;28:20;35:17;36:18;40:2;44:16;50:15;55:25;56:25;58:18;59:3,8,16;62:9;63:2;71:5
**B-O-G-A-T-I-N (1)** 5:9
**Bolton (1)** 6:16
**bookkeeping (3)** 13:24;48:8;58:3
**borrow (1)** 61:9
**borrowed (1)** 34:1
**both (7)** 3:17;4:5;26:4,10;33:4;65:10;67:22
**bottom (1)** 22:24
**bought (1)** 61:2
**box (1)** 68:2
**boy (1)** 5:7
**Bravo (1)** 60:15
**breach (1)** 22:14
**break (2)** 58:9,10
**brevity (1)** 67:6
**brief (1)** 4:10
**brings (1)** 21:20
**Brooks (2)** 42:10,11
**brought (2)** 62:14;64:15
**budget (21)** 9:25;10:1,4,5,18;11:3,6,18,23;18:6,7;19:9,22;21:18;22:22;38:23;40:3;53:23;66:9,12;67:1
**build (4)** 8:15;11:7;18:17;19:6
**building (3)** 60:17,20;61:2
**built (3)** 21:20,21;60:19
**bunch (2)** 14:15;64:22
**business (21)** 13:1;14:22,23,24;15:6;24:24;25:1,6,10,11;26:16;29:5;40:11;53:20;63:22;64:10,11,15,21;65:7;73:4
**businesses (1)** 5:20
**business's (1)** 4:14
**busy (5)** 38:18,18,19,21;39:18
**buy (2)** 45:11;60:20
**buys (1)** 45:11
**Byline (1)** 31:10

## C

**Cadence (4)** 65:9;70:15,15,19
**Cadence's (1)** 70:18
**calculation (2)** 23:1;37:14
**calendar (1)** 59:20
**California (1)** 53:8
**call (1)** 4:18
**called (3)** 15:5;36:15;43:16
**Caman (8)** 3:17,21;33:7,9,10;35:16;62:14;71:1
**Caman's (1)** 33:15
**came (4)** 48:11,13,15;73:6
**can (51)** 4:10;5:4,23;9:18;10:12,14,17;11:8,22;12:12;13:15;14:3;15:13;16:6,18;17:22;18:6;19:21;22:15,17;25:23;26:6,9;28:12;32:1;36:12;37:23;38:9,11;40:11,19;42:24;43:1;47:4;48:23;54:15;59:5,10;65:11;66:17;68:2,3,3,17;73:23,25;75:23,24;76:7,14,15
**cap (1)** 44:22
**car (2)** 29:4,5
**card (23)** 24:20,22,22,24;25:1,4,6,9,9,13,15,18,25;26:1,16,16;27:9,16,17;28:9;61:8,13,21
**cards (8)** 13:12;24:14,23;25:7,12;26:14;27:14;73:8
**care (14)** 24:15;26:2;43:23,23;44:2,3,5,7,9,11,13,18,20,24
**Case (20)** 3:2;10:1;35:10;53:14;56:13;58:19;63:13;65:2;67:7;70:1;71:18,19;72:12,15,25;73:10,23;74:5,7,8
**cash (32)** 4:14;9:9,10,12;18:7;23:7;34:13,19;56:15;63:15;65:1,1;66:3,11,18,22,24;67:4,23;68:19;69:10,20,23,24,24;70:4;71:22;72:5;74:15,15,16,19
**cause (1)** 64:23
**center (5)** 5:21;15:1,1,2,2
**certain (2)** 42:20;68:19
**certainly (1)** 56:19
**chance (1)** 74:8
**change (2)** 55:3;65:16
**changes (1)** 68:21
**Chapter (2)** 16:2;65:24
**characterized (2)** 34:7;35:20
**check (2)** 34:22;68:2
**checking (4)** 17:3;30:5,6,14
**children (1)** 8:14
**chronological (4)** 51:1,2;52:22;53:1
**Circuit (1)** 62:19
**claims (2)** 63:19,21
**clarity (1)** 8:24
**clean (1)** 21:15
**cleaning (1)** 52:16
**clearly (1)** 48:23
**CLERK (5)** 3:1;4:20,23;5:4,10
**client (6)** 4:4;40:12,13;44:21;45:14;58:15
**clients (1)** 40:13
**close (2)** 24:5;33:22
**closed (5)** 17:5;30:6,7,8;57:22
**closer (2)** 10:14;55:7
**closing (1)** 57:23
**coach (1)** 21:1
**cocounsel (1)** 3:21
**Code (2)** 69:23;71:25
**collateral (23)** 4:15;18:7;56:15;63:15;65:1,1;66:4,18,22,24;67:4,24;68:19;69:10,21,24;70:4;71:22;72:5;74:15,16,16,19
**colorful (1)** 56:14
**combination (1)** 18:19
**coming (5)** 3:8;57:8;67:1;68:25;71:16
**commandeer (1)** 21:6
**commencement (1)** 69:25
**comments (2)** 70:12;71:13
**commission (5)** 43:9,11,16,16,20
**commissions (1)** 39:22
**companies (5)** 14:18,19,20;15:24;45:3
**company (40)** 4:8;5:18,19;8:15,18,20,22,25;9:3;12:13,15,18;13:22;14:22;15:12,22;18:17;21:19,19,21,21;23:7,18;36:15;38:7;42:13,17;43:7,20;45:3;47:3;48:11,16,17;49:19,21;50:21;52:14;53:19;60:20
**company's (1)** 23:15
**compensate (2)** 46:14;47:2
**compensated (4)** 12:22,24;46:8,23
**compensates (1)** 46:20
**compensation (3)** 46:22;55:1,3
**completely (1)** 15:19
**compromise (1)** 4:13
**concern (5)** 4:14;69:2,8,20;71:1
**concerned (1)** 72:19
**concerning (1)** 72:23
**concerns (3)** 71:6;73:2;74:3
**concluded (1)** 76:20
**conduct (1)** 38:20
**confirm (2)** 72:21;76:5
**confirmed (1)** 35:25
**confirming (1)** 65:21
**confusion (2)** 54:9;60:8
**conjecture (1)** 66:13
**consensual (1)**

67:23
**consent (3)**
68:22;73:25;74:1
**consents (1)**
69:10
**conservative (2)**
10:5;11:20
**consider (2)**
11:2;22:13
**consideration (2)**
65:25;70:7
**consistent (1)**
11:10
**construction (2)**
47:12,14
**consultant (18)**
3:5;5:25;12:18;13:20;15:23;16:11;29:6,7,8,11,12,14,17,22;30:22;31:19;32:5,8
**contend (2)**
33:2;35:14
**contested (2)**
33:7,11
**continue (6)**
9:20;19:24,25;21:16;23:10;58:13
**continues (2)**
9:22;67:12
**contract (5)**
7:13;14:1,4,5,7
**contractor (4)**
47:12,13,14,15
**contractors (1)**
7:11
**contradicting (1)**
64:16
**contrary (1)**
66:3
**control (2)**
13:21;14:19
**controls (2)**
14:15,18
**converted (1)**
65:23
**copies (1)**
45:4
**copy (4)**
40:19,23;41:3,5
**correctly (2)**
22:18;36:8
**counsel (19)**
3:4;21:15;34:14;35:11;37:5;40:21;50:18;55:7;58:6,19;59:5;67:25,25;68:10;69:3,16,19;71:16;74:14
**counsel's (2)**
40:24;70:12
**count (1)**
67:8
**counted (1)**
59:20
**counts (1)**
56:5
**County (5)**
33:15,24;35:9;53:8;62:19
**couple (4)**
71:22;72:10,11;73:11
**course (10)**
5:11,24;9:12;11:8;22:5;23:9;35:7;44:6;45:10;74:25
**COURT (102)**
3:9,19,22,25;4:6,9,17,19;6:12,14;9:7;10:6,10;12:2,7;17:9,13;18:11;20:15,17;21:8,13;23:22;24:5;26:2,6,9,12;27:2,5,7,12;33:22;34:14,17;35:11;36:1,3;39:4,6;40:21;41:1,3,4,6,7,9;42:19;49:24;50:1,6,10;54:10,13;55:7;56:23;58:6,9,12,15,18,23;59:1,3;62:9,14,19;63:1,7,9,20;67:10;68:8,13,25;69:14,16;70:2,7,9,21;71:3,11,21;72:6,16;73:18;74:9,9,22,24;75:11,13,15,23;76:2,4,7,11,13,17,19
**courtroom (2)**
65:4;73:1
**Court's (3)**
11:25;12:1;50:8
**cover (2)**
56:13;59:17
**covered (2)**
13:3,5
**covers (1)**
39:16
**create (2)**
54:9;67:23
**created (1)**
63:14
**credibility (2)**
56:20;71:2
**credit (25)**
13:11;24:14,20,22,22,23;25:4,7,9,9,12,13,25;26:1,14,16;27:9,14,16;28:9;55:14,18;61:8,13,21
**creditors (14)**
63:24,25;65:3,12,14;66:1,8,8,20;67:22;70:3,3;72:8,15
**creditor's (1)**
65:18
**crime (1)**
56:9
**crimes (1)**
56:6
**criminal (3)**
55:25;56:2,3
**cropped (1)**
68:5
**CROSS-EXAMINATION (4)**
12:10;17:14;23:25;50:13
**cultural (1)**
58:15
**cumulative (2)**
54:8,11
**currently (5)**
22:7;55:25;56:2,5,8

## D

**Dagmar (3)**
47:10;49:14,18
**data (1)**
13:23
**date (8)**
8:9;18:23;21:5,8;30:19;67:10;73:22;74:17
**day (4)**
8:1,3;38:20;46:19
**days (11)**
3:8;14:12,13,14;21:11;39:16;64:23;65:20;67:8;72:1;75:4
**deadline (1)**
74:19
**deal (1)**
4:7
**dealing (1)**
3:7
**death (1)**
72:3
**debit (1)**
30:11
**debt (1)**
75:2
**debtor (25)**
3:4,5;11:22;23:5;30:12;57:3,12;59:8;65:13;66:3,5,9,24;67:12;68:21;69:1,4,11;70:5;72:4,5,14,23,24;75:2
**debtor-in- (2)**
57:3;59:11
**debtor-in-possession (2)**
56:25;59:9
**debtor's (4)**
3:6;63:22;69:2;74:10
**debts (5)**
11:9;23:9,12,15,19
**December (1)**
11:15
**decent (1)**
72:13
**decision (2)**
57:25;70:7
**defense (1)**
56:16
**definitely (1)**
8:16
**deleterious (1)**
64:2
**deliver (1)**
58:4
**dental (2)**
24:15,18
**deny (3)**
63:13;64:23;73:9
**department (3)**
15:7;47:10,11
**depend (1)**
37:23
**dependent (1)**
69:6
**depends (8)**
14:13;38:8,19;39:22;40:11;43:4;53:2;55:4
**deposit (6)**
18:18,20;19:1;20:2;57:11;69:24
**designee (2)**
72:23,25
**desk (10)**
42:6,7;43:5,5;44:11,13,17,19;51:17,25
**detox (2)**
5:21;15:5
**detrimental (1)**
66:5
**developed (2)**
9:10;15:17
**difference (1)**
25:24
**different (15)**
5:20,25;14:16;15:11;17:20;21:25;37:22;38:7;40:1;45:2,3,4;49:3,20;51:13
**difficult (3)**
5:14;6:9;58:1
**difficulty (1)**
8:7
**diminution (1)**
4:13
**DIP (3)**
17:6;57:22,24
**DIRECT (2)**
4:24;70:17
**directly (5)**
13:8,9;36:16;39:13;46:12
**director (4)**
45:24;46:3,6,9
**disclosing (1)**
16:10
**discount (2)**
47:4;60:6
**discounted (1)**
60:1
**discrete (1)**
63:15
**discussed (2)**
57:10;66:10
**discussions (1)**
71:15
**disregard (1)**
33:16
**division (2)**
15:7,9
**docket (2)**
3:1;10:1
**document (2)**
32:18,20
**documentation (2)**
72:21;73:21
**dollars (34)**
9:15,17;17:19;18:4,8,10;19:9,21;21:18,22,23;23:3;31:16,17,18;32:19;34:2;39:24;43:14;65:2,13,15,16,17,21,24;66:18;67:15,15,17,19;69:11,22;73:5
**done (7)**
20:19;39:24,25;43:1;49:8;67:24;72:1
**down (5)**
20:2;22:1,19;63:2;69:3
**down-the-middle (1)**
64:24
**downtime (1)**
11:13
**Dr (1)**
47:2
**dramatic (1)**
5:15
**draw (1)**
22:19
**drive (3)**
27:18;28:1,3
**during (5)**
10:21,24;39:23;55:24;58:20
**duties (2)**
13:20;15:14

## E

**Eagle (15)**
3:15;34:2;55:14,18;57:11,12,17,18,24;58:2,4;65:8,10;67:25;69:16

**earlier (3)**
59:16;60:8;61:19
**early (1)**
64:22
**earned (2)**
71:10;74:13
**earnings (1)**
42:20
**easier (2)**
5:16;54:15
**easiest (1)**
66:25
**echo (1)**
69:19
**education (1)**
71:17
**educational (1)**
13:24
**effect (1)**
5:15
**eight (16)**
7:5;20:13,15,16,20,23;21:2;36:7;37:10,14,23;49:7,18;52:19;59:17,21
**eight-month (1)**
21:9
**eight-week (8)**
10:1,18;11:3,5,23;18:7;19:22;67:1
**either (5)**
10:8;18:14;39:5;54:12;76:14
**eleven (1)**
75:21
**Elizabeth (1)**
42:17
**else (4)**
10:15;11:11;58:20;74:6
**emails (1)**
29:21
**emergency (1)**
57:7
**employed (2)**
7:5,25
**employee (49)**
4:13;7:5,6,25;8:14,15,22,24;11:7;36:21;37:2,6,6,16,18,21,25;38:7,8,19;39:3,22;41:10,11,11;42:3;43:17;45:14,15;47:3,6,13;48:6;50:24,25;51:12,20,22;52:2,9,11,17,21,22;53:11,15,16;70:23,24
**employees (42)**
7:4,12,23;8:8,11,21;36:5,7,9,10,16,19,20,22;37:10,19;38:10,17,25;40:15;41:1,19;42:8,14,20;43:19;46:25;47:5,22;51:1;52:19;53:21,22;63:16;64:1,17,20,25;71:3,3,4;72:3
**employment (2)**
7:14;55:4
**end (6)**
4:4;21:5,8,10;30:20,20
**endeavoring (1)**
69:3
**enormously (1)**
65:12
**enough (1)**
20:5
**enter (1)**
61:2
**entered (2)**
32:14,15
**entering (5)**
13:23;62:7,8,12,13
**Enterprise (9)**
47:7,8,15,17,18;49:14,16,19,21
**Enterprises (1)**
49:1
**entities (1)**
14:16
**entitled (1)**
67:6
**entity (1)**
18:22
**equals (1)**
37:14
**equipment (1)**
69:7
**equitable (1)**
63:20
**equity (1)**
34:2
**equivalents (1)**
69:24
**escalation (1)**
17:23
**especially (1)**
73:12
**estimate (1)**
39:13
**even (5)**
22:25;26:20;67:18;71:25;73:12
**eventually (1)**
20:8
**Everybody (3)**
43:20;48:3;74:6
**everyone (2)**
47:23;52:25
**evidence (7)**
4:5;35:6;63:6;64:16;65:4;66:12,13
**Exactly (8)**
21:8;30:19;32:23;34:1;37:13,24;53:18;76:17
**EXAMINATION (2)**
4:24;59:6
**exception (1)**
53:3
**exchange (1)**
46:18
**excuse (10)**
4:21;10:6;24:5;27:2;33:22;34:14;35:11;39:9;40:21;62:9
**executive (17)**
3:5;5:25;13:20;15:23;16:10;29:6,7,8,10,12,14,16,22;30:22;31:19;32:5,7
**exercising (1)**
63:20
**Exhibit (22)**
36:11,13,18;37:15,20;38:1,10,16;39:1,14,15;40:4,19,20,22;42:19,19;44:11;45:15,25;47:6;66:10
**exhibition (1)**
44:20
**exist (1)**
14:24
**existing (2)**
61:3,5
**expect (2)**
74:18,25
**expense (2)**
18:8;34:4
**expenses (19)**
11:23;13:3,5,6,7,19;17:1;24:8,11,13;25:20;26:15;27:10,14;35:18;38:24;55:15,21;73:8
**experience (1)**
66:16
**explain (5)**
18:6;25:8;42:24;43:1;74:18
**exponentially (1)**
73:12
**Express (4)**
24:24;25:1,15;26:17
**extend (1)**
74:18
**extensive (1)**
69:18
**extent (1)**
69:5
**extra (1)**
15:18

**F**

**facial (4)**
39:24,24,25;46:19
**facilitate (1)**
63:21
**fact (6)**
31:12;32:21;33:14;66:15;70:20;71:3
**factors (1)**
11:2
**faith (1)**
64:7
**familiar (8)**
5:18;6:25;7:2;9:25;10:21,24;24:18;36:13
**families (1)**
70:25
**family (1)**
3:7
**Fargo (2)**
30:1,3
**fast (1)**
73:12
**February (1)**
31:1
**fee (5)**
43:2,10,12,12,18
**feed (1)**
70:25
**fees (2)**
42:22;55:15
**few (2)**
13:23;50:18
**fictitious (1)**
15:9
**fifteen (1)**
39:16
**fifty (2)**
19:5;47:4
**figure (2)**
38:25;40:2
**filed (13)**
9:14,25;19:19;26:13;30:7,10,20;35:9;36:11;40:4;42:19;56:3;72:25
**filing (4)**
16:7;26:22;27:13;67:5
**filling (1)**
16:4
**final (2)**
63:3;68:4
**finally (1)**
43:7
**finances (2)**
4:8;7:2
**financial (4)**
33:3;56:6;58:1;59:14
**financials (1)**
16:24
**fine (1)**
64:17
**finish (2)**
27:1;34:11
**first (12)**
4:1;11:7;23:6;29:2,2;31:21;32:4;59:20;65:7;70:17;72:1;73:11
**first-day (1)**
64:24
**five (14)**
14:12;21:11;36:19;37:23;38:2,5,10,14,15,20;39:19,21;40:15;52:14
**fleshed (2)**
71:7,20
**flow (1)**
9:10
**focus (3)**
11:7;69:20;70:2
**focused (1)**
11:5
**forgot (1)**
70:12
**form (5)**
25:22;49:22;54:6,25;56:10
**forth (4)**
40:3;64:16;65:5;66:2
**forty (1)**
56:5
**forty-five (1)**
43:14
**forward (3)**
71:18;72:12;73:23
**forward-looking (1)**
64:3
**four (3)**
14:14;22:23;38:20
**fraud (1)**
56:8
**free (2)**
46:21;47:5
**FREEMAN (14)**
3:10,10;12:7,9,11;17:7;18:13;21:7;23:20;72:17,18;73:19;75:16;76:3
**frequently (1)**
14:12
**front (13)**
42:6,7;43:4,5;44:11,13,17,19;51:17,25;64:7;66:21,22
**full (2)**
20:2;60:3
**funds (2)**
55:14;66:7
**further (8)**
12:4;17:7;23:21;50:4;58:5;62:25;63:6;71:7
**future (4)**

8:15;56:14,22;
66:14

G

gap (1)
58:15
gave (1)
63:11
Gaviitt (1)
48:18
Gavitt (8)
48:20,24;49:1,4;
50:19,20,23;52:23
G-A-V-I-T-T (2)
48:20,24
Gelsh (1)
5:2
generate (1)
46:11
George (1)
5:7
gets (1)
43:3
gift (1)
12:25
given (4)
21:5;50:24;66:25;
67:6
giving (2)
46:20;68:1
goal (1)
12:16
goes (3)
64:19;65:25;75:11
Good (12)
3:3,14,16,20,22,23;
12:12;24:2;41:4;
50:15,16;64:7
gossip (2)
41:2;64:10
grace (1)
21:11
grant (3)
71:23;74:11,16
granted (1)
74:2
granting (1)
72:6
greeting (1)
43:5
grounded (1)
66:15
grounds (1)
56:11
Group (3)
3:18;29:19,22
guaranteed (1)
70:16
guarantor (6)
31:25;32:2,9,12,15;
70:18
Gulf (1)
60:15
Gulnara (1)
52:12
Gunkova (38)
6:6,16;8:24;16:16,
19;19:5,18;24:12,22;
25:10,16;26:17;
27:16,22,23;28:8,24;
29:3,24;30:1,4,7;
31:24;32:6,21,23;
33:21,23;34:3;36:19;
43:3;50:24;57:7;62:8,
13,18;64:5;71:5
Gunkova's (9)
28:11,14,23;30:9,
14,16;33:16;34:6;
64:8
Gunokva (1)
34:1
guys (1)
9:18

H

hair (1)
65:17
half-year (1)
21:21
hand (2)
4:21;40:19
happen (3)
8:11;64:18;73:20
happy (3)
40:25;68:6;69:13
hard (3)
36:24;44:16;73:25
harm (1)
72:2
harmed (1)
74:7
Harry (2)
3:17,21
health (1)
75:2
hear (7)
6:9;10:16;36:8;
40:5;48:23;62:3;
67:25
heard (4)
36:1,6;64:13;68:23
hearing (2)
8:7;63:14
held (4)
29:10,14,16;57:12
help (4)
10:4,18;12:25;
15:17
helped (2)
11:2;61:19
helpful (1)
71:18
hire (6)
41:11;42:18;51:11;
52:9;53:18;58:2
hired (19)
41:10,15,16,20,21;
42:3,8,14,16;50:21;
51:8,14,18;52:13,17,
23,25;53:4,9
hires (1)
53:10
historically (1)
26:1
Hold (6)
20:13;25:4,22;
34:10;54:6;66:14
holder (1)
70:17
holding (1)
70:14
holds (1)
65:20
holidays (1)
11:17
honest (1)
10:9
Honor (54)
3:3,10,12,14,16,20,
23;4:3;6:10;9:4;12:4,
9;17:7,11;23:20,24;
26:3,11;33:18;34:16;
36:4;40:25;50:2,8,12;
56:11,24;58:5,14,24;
62:24;63:5,10;68:14,
15,17,22;69:9,17,18;
70:8,22;71:14;72:18;
74:23;75:10,12,16,20;
76:1,3,5,10,12
hope (1)
68:1
hour (2)
43:7,15
hourly (7)
54:8,10,17,18,22;
55:1,10
hours (2)
43:4,6
housed (1)
69:7
housekeeping (1)
43:5
human (1)
70:22
hunch (2)
12:5;18:15
hundred (1)
9:24
hypothetical (1)
66:14

I

I'm (1)
74:21
idea (2)
64:21;75:24
IDI (2)
72:20;73:19
idiosyncratic (1)
56:20
illustrated (1)
36:11
imagine (1)
56:14
immediate (1)
72:1
impact (6)
8:16,17;64:2,15;
65:18;66:5
impacted (2)
8:21,22
imperative (3)
70:5;73:15;74:2
important (3)
18:15;70:1;73:1
impossible (1)
61:11
inane (1)
4:11
includes (1)
36:19
Including (3)
31:10;53:14;61:5
income (4)
22:23,25,25;23:1
increase (4)
54:4,18,24;55:1
Increased (2)
18:4;53:24
indicate (1)
29:21
indicated (4)
29:6,24;68:18,20
indicates (1)
47:6
indictment (5)
55:25;56:2,3,4,19
indiscernible (18)
9:3;11:16;15:2,2;
18:25;20:1;21:12,23;
23:10;24:3;34:25;
35:8;39:23;44:4;45:3,
5;50:3;62:15
individual (2)
47:12;49:21
individually (1)
3:17
individuals (2)
37:15;47:1
indulgence (3)
11:25;12:1;50:9
informal (1)
14:6
information (4)
71:2;72:14;73:24;
75:2
insider (1)
64:6
insiders (1)
74:7
insinuation (1)
56:17
instance (3)
11:15;21:20;39:23
Instead (2)
22:16;73:21
institution (1)
59:14
instruct (1)
58:15
instructors (2)
61:24;62:2
insurance (7)
69:4,8;72:22;73:12,
14;75:3,3
integrity (1)
4:14
intend (1)
23:5
intended (1)
63:11
interesting (3)
56:12,13;63:12
interim (6)
66:22;67:3,4;68:2,
25;74:17
interrupt (1)
44:1
into (8)
32:14,15;56:20;
61:2;66:12;69:12;
70:7;73:7
inventory (2)
44:7,10
investigated (2)
56:5,8
involve (1)
5:19
involvement (2)
33:7,11
irreparable (1)
72:2
issues (2)
64:11;68:5
Items (1)
3:1

J

Jacob (4)
3:5;4:18;5:2;25:19
Jacob's (3)
15:3,13,16
job (4)
8:16;12:17;13:25;
39:23
joined (1)
3:4
joint (2)
17:6;30:14
Judge (1)
61:10

**judge's (1)**
20:23
**July (5)**
20:19;21:2,3;30:20,20
**June (12)**
17:18,19,21,21,22,25;18:2;20:17;21:4;35:9,13;42:16

## K

**keep (1)**
19:21
**Keisha (2)**
42:10,11
**kept (1)**
44:24
**kind (1)**
57:12
**Kindred (1)**
61:10
**knell (1)**
72:3
**known (2)**
5:18;70:3
**Kump (3)**
45:23,24;47:2

## L

**lack (1)**
73:21
**ladies (1)**
43:5
**lady (2)**
43:5;52:16
**landlord (5)**
19:4,7,8;60:15,16
**last (37)**
5:4;7:18,19,24;8:2,9,12;20:18,18;21:21;24:16;26:23,25;28:18;37:12,24;41:10,11,19,21;42:14;47:25;48:21,24;51:14;53:4,13,16,25;54:3,5,16,17,20,24;60:1;68:17
**late (2)**
67:10;68:17
**later (4)**
71:8;75:4,17,21
**laundered (1)**
56:17
**lawsuit (1)**
33:14
**lawyer (5)**
62:13,15,18,22;76:6
**lawyers (1)**
12:5
**Layla (1)**
45:24
**lead (1)**
66:16
**lease (16)**
22:3,14;31:19,21,25;32:2,4,4,7,11,14;60:10,11;61:3,4,5
**leases (1)**
31:22
**leash (4)**
66:24;68:24;69:20;70:6
**least (2)**
52:19;68:2
**leave (5)**
9:5;21:15;41:23;63:15;64:21
**left (6)**
41:16;42:17;48:11;51:11;53:8,19
**legal (5)**
14:23;15:12;33:24;34:4,6
**legitimate (1)**
71:4
**Leila (1)**
45:23
**less (4)**
65:2,14;66:17;67:15
**lessons (3)**
38:8,20,21
**Lexus (14)**
27:18,20,20,21,22,25;28:5,6,8,9,11,14,23,24
**liabilities (1)**
67:16
**license (1)**
37:9
**lien (6)**
65:5;67:14;68:2;70:14,15,17
**liens (3)**
67:20;70:4;72:7
**light (2)**
73:12,21
**likelihood (1)**
63:22
**likely (1)**
11:19
**limited (3)**
25:24;69:10;71:22
**line (5)**
22:24;34:2;45:7;55:14,18
**liquidation (1)**
65:25
**list (4)**
38:13;40:17,18;67:6
**listed (3)**
40:4;47:24;48:4
**lists (1)**
47:22
**litigation (2)**
33:24;62:14
**little (11)**
5:14;6:9;8:5;10:12;25:8;44:11,19;59:10;62:5;75:17,21
**live (3)**
6:21;16:20,23
**living (2)**
6:18,24
**LLC (23)**
3:2,18;5:18,19,22,24;6:6;15:10;18:9;24:14;25:6,16,19;26:14;27:15,17;28:13,20;29:7,9,19;32:2,8
**LLC's (3)**
25:2;27:9,14
**loan (7)**
31:2,7,12;70:15,17,17,18
**loans (6)**
30:23;31:2,5,6,8,15
**located (1)**
57:12
**location (2)**
17:17;69:7
**Logi (1)**
25:2
**Logic (183)**
3:2;5:18,19,22,24;6:1,2,6,6,8,17,25;7:2,4,5,7,23;8:1,3,8;9:9,10,12,13,16,19,22;10:2,19,21;11:12,13,16;12:15;13:5,7,7,11,13,17;14:2,4,7,10,15,17,18,19,22,24,25,25;15:1,8,11;17:18,19;18:9,16,16,18,20,23;19:2,10,18,21,23,25;20:2;21:24;22:7,14,15,15,16,19;23:17;24:4,8,12,14,21,23,24;25:6,7,8,9,11,14,16,19;26:14,16,20;27:9,14,15,17;28:5,6,8,10,13,20,24,25;29:4,7,9;30:22,23;31:7,13,20;32:2,8,14;33:4,23;34:4,6,9,20,21,22,24,25;35:1,18;41:10,20;42:5;44:5,7,9;45:11,14,23,24;46:4,11,13,13,17,20;47:1,1,3;48:8;50:20;51:4,18;53:16;55:15,17,20,21;56:25;57:3,5,15,17,21;58:13;59:11,16;60:3,10,10,13,24;61:1,3,6,9,12,15,21;62:7,12,19
**Logic's (8)**
10:24;11:10;17:16;21:17;25:5;32:19;57:10;64:3
**long (5)**
12:19;19:21,23,25,25
**look (1)**
67:21
**looking (2)**
20:6;22:23
**Looks (1)**
52:5
**lose (1)**
15:18
**loss (5)**
5:21;15:4,13,16,17
**lost (1)**
66:23
**lot (9)**
56:11,13;67:18;71:18,19;72:9,9;73:3;75:1
**lots (1)**
74:24
**Louden (1)**
62:19
**louder (2)**
8:5;59:10
**loudly (1)**
62:5
**Loudon (2)**
33:14,24
**Loudoun (1)**
35:9
**Luc (9)**
47:7,8,15;49:1,13,14,16,19,21
**L-U-C (2)**
47:7,18
**Lucas (15)**
48:18,20,20,22,22,24;49:1,4,10,12,12,19;50:19,21;52:23
**L-U-C-A-S (1)**
48:24
**lunch (3)**
58:10,17,20
**L-U-S (1)**
47:17

## M

**ma'am (1)**
28:17
**maintain (1)**
53:20
**maintenance (1)**
28:4
**making (1)**
70:7
**manage (1)**
33:4
**manager (1)**
47:10
**many (15)**
7:4;12:5;28:19,19;30:3;39:22;41:19;43:6;50:17;53:24;54:3,17,25;55:4;72:11
**margins (1)**
73:5
**marketing (3)**
13:24;42:11,13
**Marnishvili (1)**
52:12
**massage (2)**
43:8;48:7
**massages (1)**
46:19
**master (5)**
45:18,20,21;48:6;51:7
**material (3)**
8:17;65:18,24
**Mathew (1)**
70:11
**matrix (1)**
67:7
**matter (3)**
3:7;65:19;74:9
**Matthew (3)**
3:12;17:11;68:15
**Maurice (1)**
3:3
**may (11)**
4:4,23;5:13;6:22;37:16;60:3,8;63:2;64:22;75:16,20
**Maybe (6)**
24:19;28:4;32:10;43:17;48:17;54:15
**mean (7)**
5:14;21:5;44:1;55:4;60:8;67:17;69:24
**means (2)**
52:18;61:12
**Med (1)**
14:20
**medical (12)**
5:20;14:23,25,25;15:1;45:7,24;46:3,6,9;57:7;69:6
**meeting (3)**
68:3;75:5,6
**membership (1)**
33:15
**mention (2)**
70:12,13
**mentioned (3)**
14:8,15;15:3
**merely (3)**

63:24;64:6;66:8
**mess (1)**
21:16
**met (1)**
11:19
**METZ (8)**
3:23,24;71:12,14;
75:1,9,12,14
**mic (5)**
24:5;33:22;50:10;
55:8;62:9
**Michael (1)**
3:10
**microphone (3)**
6:11,13;10:15
**microscope (2)**
70:6;71:6
**might (2)**
45:16;63:17
**million (4)**
65:13,15;67:15,15
**mind (2)**
70:5;72:10
**minimize (1)**
65:17
**minimum (1)**
70:4
**minus (1)**
38:5
**minute (1)**
50:9
**mishear (1)**
55:15
**misheard (1)**
36:7
**mispronouncing (1)**
45:16
**missing (2)**
6:10,13
**mock (1)**
67:17
**mom (1)**
57:8
**moment (5)**
3:7;27:2;50:19;
55:13;66:7
**money (50)**
4:16;9:13,19,22;
18:16,17,18,19,20,25;
19:2,2,6;20:1;21:20;
22:15,15,16;23:5,8,
17,18;31:4;32:24;
33:2,23;34:1,6,8,9,21,
25;35:1,20,22;36:16;
37:22;39:25;43:4,6,
13;46:11,24;56:17;
61:9;62:15,17;66:6;
67:18;73:3
**monies (1)**
71:5
**Monkzal (1)**
45:16
**month (17)**
7:10;10:22,25;13:2;
19:22;22:9;23:3;
32:24;39:8,8,9,9;
59:20;60:1;66:17,19;
73:6
**monthly (4)**
17:16;23:1,1;35:7
**months (31)**
19:23;20:5,12,14,
15,16,20,23;21:2;
41:19,21;42:15;48:1,
2;50:21,23;51:9,10,
14;52:18,23;53:4,14,
17,25;54:3,16,17,20,
24;59:17
**morale (2)**
4:13;64:1
**more (12)**
10:12;16:15;17:6;
39:17;52:25;55:6;
63:11;65:13;66:11,
17;67:14;75:1
**Morris (3)**
48:4,6,9
**most (4)**
51:18,19;52:9;
72:10
**mother (1)**
70:23
**motion (11)**
4:1;18:7;36:11;
40:4;64:24;67:4,7;
71:24;74:10,11,15
**motions (2)**
4:5;63:15
**mouth (3)**
24:6;50:11;62:10
**Move (7)**
27:12;50:1;56:23;
61:7;62:9;66:12;68:3
**moved (1)**
53:8
**much (5)**
4:7;9:13;11:12;
69:18;73:4
**must (1)**
20:2
**mutual (1)**
67:23

**N**

**nail (1)**
69:3
**name (35)**
5:1,4;14:22,23;
15:9,11,12;24:14;
25:2,5,10,13,16;
26:17;29:15;30:8,9,
11,13,14,16;38:11;
45:16,25;47:7;48:19,
21,24;49:10,11,21;
51:5;52:11,20;62:22
**named (2)**
15:13,16
**names (5)**
38:14,15;39:20;
40:16,21
**nearer (1)**
50:10
**necessary (1)**
64:14
**need (18)**
4:12,15,20;9:9,12,
19;25:8;41:7;50:10;
53:19;55:7;58:2;
63:19,23;64:22,25;
71:19;72:12
**needed (1)**
66:6
**negative (4)**
8:16;22:24;23:6;
64:14
**negatively (1)**
8:20
**negatives (1)**
23:2
**neither (1)**
4:11
**net (6)**
22:23,25,25;23:1;
66:16,18
**new (14)**
19:6;41:10,11,15,
19,23;42:14;51:11;
53:7,9,10,16,18;61:3
**next (5)**
7:21,22;20:19;38:9;
73:21
**night (1)**
68:17
**ninety (1)**
65:20
**nobody (1)**
54:20
**none (1)**
73:7
**noninsider (1)**
63:16
**nonpayment (1)**
64:2
**nor (1)**
4:11
**normal (4)**
7:25;13:1,25;21:10
**normally (1)**
9:12
**north (1)**
66:19
**note (1)**
70:19
**noted (1)**
52:9
**noteholder (1)**
70:19
**notice (1)**
65:11
**noticed (3)**
48:4,18;50:23
**November (3)**
5:8;11:15;60:15
**Number (17)**
3:2;5:19;13:23;
23:17,17;40:12;43:4;
50:24,25;51:12,20,21;
52:10,17,22;55:11;
57:25
**numbers (7)**
17:20,24;22:24;
38:20;50:25;52:21;
66:16

**O**

**oath (1)**
65:6
**Object (7)**
25:22;49:22;54:6;
56:10;69:9;70:24;
71:9
**Objection (3)**
35:21;36:3;67:1
**objections (1)**
63:11
**obligated (1)**
61:22
**obtaining (2)**
30:23;31:8
**obviously (5)**
65:9;66:22;67:3;
72:2,19
**occupying (1)**
69:5
**occurred (1)**
30:18
**occurrence (1)**
7:20
**o'clock (3)**
75:15,23,24
**October (2)**
11:15;60:23
**Odd (1)**
22:24
**Office (7)**
3:11,13;14:8;17:12;
46:11;73:23;75:9
**often (1)**
7:7
**Ohm (3)**
3:20,20;76:14
**old (1)**
25:9
**one (41)**
10:15;15:7,11;
16:14,15;17:2,5;
20:13;25:15,15;27:2,
15;28:4;30:5,5,6,8;
32:20;34:10;35:5;
39:15,24,25;40:13;
41:16,24;42:3,7,14;
43:14;48:17;49:18;
53:3,14;54:12;63:10;
65:14;69:2;70:12;
76:15,16
**ongoing (1)**
63:22
**only (22)**
15:11;17:5;18:8;
21:23;22:2,14;24:24;
25:15,23;26:16;
27:15;30:8;36:18;
37:15;38:25;39:21;
58:14;66:21,22;67:3;
71:12,15
**open (4)**
57:5,22;59:9,11
**opened (4)**
17:6;56:25;57:3,9
**opening (2)**
4:3;57:24
**operate (9)**
8:18;9:9,12,16,23;
14:20;23:10;64:3;
67:12
**operating (4)**
9:20;55:21;66:18;
69:1
**operation (8)**
7:25;8:22;9:10;
25:10,11;29:5;55:20;
58:3
**operations (1)**
6:25
**opportune (1)**
67:10
**optic (1)**
64:6
**options (1)**
67:9
**order (8)**
67:24;68:22,25;
69:12;74:13;75:8,25;
76:8
**ordinary (3)**
10:22,25;64:23
**original (1)**
4:11
**otherwise (3)**
56:18;64:16;68:7
**ought (1)**
65:23
**out (13)**
9:5;16:4;23:3;
29:10,14,16;40:2;
48:16;56:12;64:5;
67:8;71:7,20
**outlined (1)**
11:23
**outlines (1)**
32:20
**outside (1)**
46:10

**outstanding (3)**
11:9;23:12,19
**over (9)**
4:20;11:12;31:16,18;52:21;58:17;67:20;73:10;74:4
**overseas (1)**
57:8
**oversecure (1)**
73:13
**oversecured (2)**
65:13;69:6
**overview (1)**
4:10
**owe (3)**
23:17;32:24;60:3
**owed (2)**
31:18;62:17
**owes (1)**
65:14
**own (6)**
6:5;19:5;32:21;46:11;71:1;72:10
**owned (2)**
15:19,21
**owner (5)**
6:6,7,17;13:17;25:18
**owns (4)**
6:2,4;64:9,11

**P**

**page (2)**
45:15;47:6
**paid (59)**
7:11,16;8:12,23;13:1;19:2,17,18;21:3,24;23:19;24:4,8,14,19;28:10,13,23,25;29:5;34:6;35:18;37:22;38:21,22;39:2;40:3,17,18;42:20,22,22;43:7,8,13,18;46:2;48:5;53:21,23;54:16,22,25;55:2,9,10;63:19;64:1,18,18;70:24,25;71:4;72:3;73:8;74:3,4,5,8
**papers (1)**
4:11
**paramount (1)**
69:8
**part (7)**
15:14;18:22;30:22;38:3;46:3;48:8;73:2
**parties (2)**
67:5;70:2
**parties-in-interest (1)**
66:20
**Partner (4)**
6:20,24;16:17,19
**party (1)**
60:18
**past (4)**
18:16,23;26:13;48:9
**pay (75)**
4:1,12,16;8:21;9:5;11:8;13:1,5,7,8,11,13,19;17:18,19;18:19,23,25;19:10,23,25;20:2;22:7,17;23:7,8,9,12,13,18,19;24:10,12,16;25:8,9;26:14;27:10,14;28:6,8,9,24;29:4;32:23;33:23;34:3;36:6,11;37:20;39:3,9,19;40:10;45:10;46:5,6,11,24;52:3,4;54:4,8;55:14,21;61:22;63:15,17,21;64:8,14,25;66:6;71:1;74:10
**paying (7)**
4:15;18:22;19:21;46:4;63:23;64:6;71:9
**payment (11)**
20:18,19;21:10,17;22:16;28:23;53:11;54:24;67:19;71:24;74:12
**payments (1)**
28:14
**payroll (38)**
7:7,8,12,13,18,19,21,22,24;8:2,9,12;9:24;11:7;12:21,23;23:7,8;36:13,15;37:12,24;38:9,9,24,25;39:2,2,3,8,9,10,11,15,17;46:3;48:9;52:5
**pays (4)**
13:9;22:14;25:7;28:5
**pending (1)**
33:14
**people (26)**
7:15;15:17;23:17;39:17,19;40:5,8,18;41:21,23,23;43:3,5;51:11,11;53:4,9,16,18,19,19;64:22;67:20;73:4;74:3,7
**per (3)**
40:23;43:7;73:6
**percent (6)**
6:6;9:24;19:5;25:11;43:16;47:4
**perform (5)**
8:2,8;43:14;47:1;55:6
**performed (4)**
7:23;43:13;55:5,11
**performs (1)**
46:13
**perhaps (2)**
66:25;68:4
**period (8)**
9:6;11:12,13;21:9,11;28:17;37:23;59:17
**permission (1)**
72:6
**permitting (1)**
68:18
**person (18)**
41:16,16,18;42:6,7,11,17;43:13;49:20;51:17,18,19;52:20;53:2,3,15;58:3;67:18
**personal (15)**
13:13;24:8,11;25:20;26:14;27:10,14;29:4;30:1;32:8,12,15;33:23;34:3;49:19
**petition (6)**
16:5,7;30:7,21;63:16;67:23
**petitioned (1)**
61:15
**ph (7)**
5:2;42:10;45:16;49:15;51:3;52:12;62:22
**pick (1)**
76:15
**picking (1)**
73:22
**place (1)**
66:25
**placed (1)**
69:21
**plan (1)**
65:21
**Please (10)**
4:19;5:1,5;10:17;27:1;33:22;39:6;59:3;62:10;74:13
**plus (4)**
18:20;33:1;34:4;37:14
**pm (3)**
59:2,2;76:20
**point (5)**
9:5;23:20;60:24;67:2;74:1
**portion (3)**
19:10;59:17;64:8
**posed (1)**
72:12
**position (7)**
12:19;14:6;16:10;65:7,8,9;72:19
**positions (1)**
65:5
**positive (1)**
22:25
**positives (1)**
23:2
**possession (2)**
57:4;59:12
**possible (1)**
73:22
**post- (1)**
67:22
**post-petition (1)**
25:25
**powers (1)**
63:20
**pre (1)**
67:22
**pre- (1)**
63:15
**premises (1)**
69:4
**premium (1)**
24:4
**prepaid (20)**
18:9,10,18,20,25;19:2,11;20:2,4;33:2;34:7,8,9,20,22;35:4,14,18,20;59:17
**prepare (2)**
10:18;75:8
**prepared (1)**
53:24
**preparing (1)**
38:24
**prepayment (2)**
20:9;22:20
**pre-petition (9)**
4:1;9:6;25:24;28:18;63:17,21;64:8;71:24;74:10
**present (6)**
26:5;72:24;73:1,1;74:13;76:8
**presented (1)**
73:5
**pretty (1)**
11:12
**previous (1)**
42:17
**previously (3)**
38:23;57:10,19
**principal (1)**
3:6
**principally (1)**
69:7
**principal's (1)**
9:5
**Prior (10)**
26:13,22;28:18,20;29:24;62:7,7,12,12;71:16
**priority (3)**
63:18,19;70:15
**Probably (15)**
20:13;21:23;25:11;30:19;48:1;50:21;51:9,10;53:7;55:24;56:21;63:11;66:23;73:21;74:2
**problem (1)**
74:12
**proceedings (1)**
76:20
**process (4)**
7:7,8;36:15;51:23
**processed (2)**
37:12,24
**produce (1)**
66:11
**product (17)**
43:15,21,23,23;44:2,3,4,18,20,22,24;45:3,4,6,7,11,11
**productive (1)**
67:21
**products (6)**
43:22;44:5,7,9,12,13
**professional (1)**
55:15
**profit (3)**
66:16,18;73:6
**program (1)**
15:17
**projected (1)**
23:1
**projection (1)**
11:20
**projections (1)**
11:18
**promptly (1)**
69:1
**proof (6)**
69:4,8;72:21;73:11,14;75:3
**properly (2)**
66:13;67:4
**proposed (2)**
3:4;68:22
**protect (1)**
72:7
**protection (4)**
8:4;9:14;67:13,19
**provide (2)**
46:15;57:25
**provided (1)**
73:24
**provides (1)**
46:17
**provision (1)**
32:11
**provisions (2)**
68:19;69:11
**public (2)**
41:1;45:13
**pull (1)**
22:15
**purposes (2)**
56:15;71:21
**pursuant (1)**
31:19
**Put (9)**

24:5;50:10;65:6,8,8;66:23;69:12;71:2;75:24

**Q**

**quibble (1)** 73:13
**QuickBook (1)** 33:9
**QuickBooks (2)** 33:3,4
**quit (2)** 64:9,22
**quite (1)** 13:15

**R**

**Rachford (1)** 45:16
**Raise (1)** 4:21
**raises (1)** 56:16
**Ramodia (5)** 51:3,4,6,7,8
**Ramodia's (1)** 51:12
**Rate (10)** 17:23;18:10;48:18;52:5;54:8,17,18,24;55:3,3
**rates (1)** 54:10
**ratio (1)** 64:20
**read (1)** 69:23
**readdress (1)** 67:11
**realize (1)** 74:1
**reason (2)** 23:6;64:5
**reasonable (1)** 11:21
**reasonably (2)** 11:19;63:19
**rebut (1)** 68:7
**recall (17)** 16:4,7,10,14;24:16,19;29:3,23;31:2;32:10,17;35:15;37:12;42:16;47:25;53:18;57:16
**receive (7)** 39:25;40:1;43:6,14,16;47:4;53:22
**received (12)** 20:8;22:20;36:16;37:21;39:22;40:23;43:4,20;54:4,18,22;55:1
**recent (3)** 51:18,19;52:9
**recently (7)** 31:1;42:3,8;52:13,25;71:12,15
**recess (2)** 58:12;59:2
**recognize (1)** 4:3
**recollect (1)** 59:18
**reconvene (1)** 58:21
**record (3)** 5:1;36:14;63:14
**records (2)** 41:1;48:9
**redacted (1)** 41:1
**redirect (4)** 12:4;58:7;59:5,6
**reduce (2)** 32:19,23
**reduced (1)** 32:21
**referred (1)** 43:10
**referring (1)** 36:20
**reflected (3)** 21:18;37:20;38:16
**reflects (2)** 36:18;38:1
**refuted (1)** 64:12
**regular (2)** 42:20;53:23
**regularly (3)** 24:4,8;64:20
**rehabilitation (1)** 63:23
**related (1)** 29:4
**relating (2)** 33:15;35:13
**relationship (8)** 5:22,24;6:7,16,23;12:13,14;16:16
**relatively (2)** 64:23;72:4
**relevance (1)** 56:21
**relevant (1)** 56:11
**relief (4)** 61:15;67:3,4;68:4
**remain (1)** 70:6
**remained (1)** 32:12
**remains (1)** 70:19
**remember (10)** 24:19;27:11,15;29:2;30:19;32:13;34:1;38:17,18;48:16
**reminded (1)** 70:13
**remove (1)** 48:3
**removed (5)** 30:9,11,13,14,16
**removing (1)** 32:15
**renewal (1)** 31:12
**rent (28)** 17:16,25;18:9,18,19,22,25;19:9,11,12,16;22:17;31:15,17,18;32:19,21,23;34:7,20,22;35:4,10,13,14,18;59:17;60:4
**rental (5)** 18:8;21:17;22:2,3,6
**repaid (1)** 65:19
**repeat (16)** 5:23;9:18;10:12,17;13:15;14:3;16:6,18;28:12;32:1;36:12;38:6,6;39:7;40:11;48:23
**rephrase (5)** 7:15;53:22;54:13,13;61:8
**replace (2)** 41:24;58:1
**replaced (1)** 64:22
**replacement (4)** 42:18;67:14;68:2;72:7
**report (1)** 35:8
**Representative (1)** 23:22
**represented (4)** 31:15;48:9;62:18;65:4
**representing (1)** 17:9
**request (2)** 40:24;68:21
**requests (1)** 63:3
**requires (1)** 72:1
**reserve (1)** 68:7
**resources (2)** 34:3,4
**respectfully (2)** 56:18;64:21
**response (3)** 10:7;39:6,7
**rest (2)** 21:23;43:3
**restructure (1)** 23:10
**returned (2)** 48:12,17
**returning (1)** 3:8
**revenue (4)** 10:24;11:8,10,16
**right (87)** 3:9,19,25,25;4:6,9,17,21;10:10;12:7,19;13:3,11;14:6,16;15:3,6,25;16:4,15,22;17:13;18:10;20:5;23:22,22;24:9,15;25:2,5,7;27:5,18;29:7,25;30:8,24;31:1,8,13,16,20;32:3,12,16;33:4,5,12,17,25;34:15,17;35:10;39:20;40:6,7;45:13;47:14;48:3;50:6;51:22;53:10;54:14;57:7;58:4,6,13,18,18,23;59:3;63:1,3;68:8;69:21;70:9,18,21;71:11;72:16,19;74:9,24;75:7,11;76:11,19
**rights (2)** 33:15,16
**risk (1)** 64:1
**roadmap (1)** 63:11
**role (6)** 12:13,15,17,18;30:22;42:4
**rolling (1)** 68:1
**romantic (1)** 6:23
**room (1)** 71:16
**roughly (1)** 21:4
**rule (2)** 47:3;71:25
**run (5)** 7:18,21;12:25;15:22;68:20
**ruse (1)** 71:4
**Rush (3)** 62:22,22,23

**S**

**S2 (1)** 75:20
**S3 (1)** 75:19
**salary (2)** 42:22;43:3
**sale (1)** 45:10
**same (10)** 7:11,13,16,17;25:18;34:24;49:2;62:18;64:10;66:1
**saving (1)** 30:5
**savings (1)** 17:3
**saw (2)** 10:3;68:23
**saying (8)** 13:9;22:18;26:4;39:14,15;50:25;52:9,10
**SBA (13)** 3:13;17:9,12;31:12;68:10,16,17;69:5,8,9;70:11,16,16
**SBA's (1)** 69:19
**schedule (3)** 37:24;38:8;73:13
**scheduled (4)** 7:21,22;38:22;73:19
**schedules (4)** 16:4,7;65:6,11
**scope (1)** 73:4
**Sean (3)** 62:22,22,23
**season (1)** 11:11
**seat (1)** 4:23
**second (4)** 20:13;34:10;65:8;73:16
**secondly (2)** 11:8;29:3
**Section (1)** 69:23
**sectional (1)** 39:24
**secured (8)** 65:12,14,25;66:8;67:16,20;70:3;72:7
**security (1)** 73:14
**seek (4)** 36:5,10;40:10;68:4
**seeking (5)** 9:5;30:23;31:7;37:19;63:18
**seem (2)** 58:17;67:21
**seems (1)**

4:15
**sell (6)**
43:15;44:10;45:3,4,12,14
**sells (3)**
44:5,13,17
**semi-monthly (1)**
7:8
**sentiments (1)**
69:19
**separate (4)**
7:12;15:10;26:6,9
**September (9)**
7:22;11:15;20:20;39:17;59:24,25;67:10;74:17;75:4
**serve (4)**
15:23;40:12,12,13
**served (3)**
12:19;67:5,7
**service (10)**
42:22;43:2,10,12,12,13,18;46:15;47:4,5
**services (8)**
46:13,16,17,21;47:1;55:4,11;58:1
**set (6)**
40:3;65:5;75:17,20,23,24
**seven (2)**
53:3,16
**seventy (1)**
25:11
**several (2)**
67:8;71:16
**share (6)**
16:24,25;17:2,3;40:25;62:13
**shared (1)**
41:2
**Sheila (2)**
48:4,6
**shift (1)**
61:25
**short (8)**
66:24;68:24;69:19;70:6;73:11,16;75:18,22
**short-term (3)**
31:4,5,6
**show (6)**
22:24,25;61:24;62:2;63:20,23
**shown (1)**
39:1
**shows (4)**
37:15;38:24;42:19;65:12
**sic (2)**
19:14;22:13
**sidenote (1)**
9:4
**signature (1)**
29:21
**signatures (1)**
76:7
**signed (10)**
31:19,21,24;32:4,6,7,8;65:6;72:25;75:8
**simple (1)**
26:21
**simply (4)**
4:12;61:3;67:14;68:7
**sincerely (1)**
60:9
**single (1)**
64:5
**siphoned (1)**
71:5
**site (2)**
14:8,10
**six (8)**
20:5,12;53:25;54:3,16,17,20,24
**sixty (1)**
39:23
**Skin (206)**
3:1;5:18,19,22,24;6:1,2,5,6,8,17,25;7:2,4,5,7,23;8:1,3,8;9:9,10,12,13,16,19,22;10:2,18,21,24;11:10,12,13,16;12:15;13:5,7,7,11,13,17;14:1,4,7,10,15,17,18,19,22,24,25,25;15:1,7,11;17:16,18,19;18:9,16,16,18,20,23;19:2,10,18,21,23,25;20:2;21:17,24;22:6,13,15,15,16,19;23:17;24:4,8,12,14,20,21,23,24;25:1,4,6,7,8,9,11,14,16,19;26:14,16,20;27:9,13,15,16;28:5,6,8,10,13,20,24,25;29:4,6,9;30:22,23;31:7,12,20;32:2,8,14,19;33:4,23;34:4,6,9,20,21,22,24,25;35:1,18;41:10,19;42:5;43:23,23,24;44:2,3,5,5,7,7,9,9,11,13,17,20,24;45:11,14,23,24;46:4,11,13,13,17,20;47:1,1,3;48:8;50:20;51:4,18;53:16;55:15,17,20,21;56:25;57:3,5,10,15,17,21;58:13;59:11,16;60:3,9,10,13,24;61:1,3,5,9,12,15,21;62:7,12,18;64:3
**slightly (1)**
9:17
**slowly (3)**
5:15;10:12;39:6
**small (5)**
64:13;65:2,7;68:19;72:5
**Smiles (1)**
24:18
**SMITH (10)**
3:14,15;50:8,12,14;54:12,14;56:24;58:5;69:17
**sold (4)**
43:21,22;44:20;45:8
**sole (1)**
66:4
**somebody (1)**
41:15
**sometime (4)**
12:25;13:19;19:18;42:16
**sometimes (5)**
13:7;14:13,13;24:12;62:2
**soon (1)**
73:22
**sorry (66)**
5:4,23;6:5;7:15;8:5,5;9:18;11:25;13:4;14:3,8,9;15:15,20;16:6,18;17:21,22,24;18:12;20:22;21:4,6;22:11;23:11;24:10,21;26:8;27:4,19;28:12,17;29:15;32:1;36:12,23;37:3,17;40:11;41:13;42:1,21;44:1,8,15,17;45:1,19;48:14;49:9,17;50:12;51:5,13;52:8;54:1;56:1;57:2;59:10,24;60:12,19;62:1,3;63:5;74:21
**sort (1)**
72:3
**sought (2)**
8:3;31:12
**sound (1)**
24:18
**source (2)**
13:13,14
**spa (11)**
5:20;14:21,23,25,25;44:24;45:6,7,12;46:19,21
**speak (3)**
5:15;39:6;58:16
**speaking (1)**
67:24
**specially (1)**
75:24
**specific (3)**
6:22;23:8;55:10
**specifically (1)**
13:1
**specifics (1)**
56:20
**speculation (1)**
66:14
**spell (1)**
5:4
**spend (3)**
18:16;19:6;66:11
**spending (1)**
72:13
**spends (1)**
10:21
**spent (2)**
20:9,11
**spoke (2)**
51:12;66:6
**stable (2)**
11:12;36:22
**stand (5)**
4:4,23;59:4;64:7;69:1
**start (2)**
34:15;50:20
**started (2)**
41:11,13
**starting (1)**
17:18
**starts (1)**
73:10
**state (3)**
5:1;29:8;62:14
**statement (1)**
35:15
**States (4)**
3:8;65:6,10;67:25
**stay (2)**
11:10,22
**step (3)**
10:14,15;63:2
**Steve (1)**
3:23
**still (4)**
45:23;46:2;53:10;74:3
**stolen (1)**
56:17
**store (2)**
44:9;45:6
**strange (1)**
5:13
**Strike (2)**
60:14;62:6
**student (5)**
37:7;51:23,24,25;52:10
**studio (2)**
38:19,19
**Subchapter (1)**
3:24
**subject (2)**
12:4;67:19
**submit (1)**
56:18
**substance (1)**
69:18
**successfully (1)**
65:20
**sue (1)**
35:13
**sufficient (1)**
72:7
**suggestion (2)**
25:25;65:23
**suggests (1)**
64:17
**suit (1)**
35:9
**sum (1)**
9:17
**summarize (1)**
72:18
**summon (1)**
66:25
**sums (1)**
63:17
**supplied (1)**
75:3
**support (2)**
13:25;39:14
**supported (1)**
66:4
**supports (1)**
71:25
**supposed (1)**
22:7
**Sure (14)**
8:6;9:19;11:8;20:22;23:11;35:19;38:14;43:3;54:7;56:7;58:16;67:11,24;72:13
**surmise (1)**
6:22
**survive (2)**
22:17;74:2
**suspicion (1)**
8:15
**sustained (3)**
36:3;49:24;56:23
**switch (1)**
58:2
**sworn (2)**
4:19,22
**synergy (1)**
4:5

**T**

**talk (3)**
27:2;32:25;58:19
**talking (5)**
25:12;53:6;54:1;55:18;72:4
**tax (1)**
45:10
**TD (11)**

34:24;35:22,23;57:9,19,21,23,25;58:3,4;59:15
**teach (2)** 37:7;51:25
**teacher (23)** 37:7,22;38:21,22;43:14;47:11,17,19,20;48:25;49:5,10,11,14,15,16,18,18,20;50:20;53:6,7,8
**teachers (5)** 36:22;38:11,15;49:6,7
**teaching (1)** 51:23
**technical (1)** 13:25
**technically (1)** 67:6
**technologist (1)** 43:8
**telling (1)** 52:18
**temper (1)** 68:23
**temporally (1)** 25:23
**ten (4)** 12:20,21;39:24;40:12
**tenant (4)** 18:17;21:20;60:24;61:1
**tenants (2)** 19:6;21:22
**term (3)** 23:7,7;43:17
**terminated (1)** 48:10
**testified (8)** 16:16,19;38:3,23;55:13;57:19;59:16;60:9
**testify (1)** 66:15
**testifying (1)** 63:1
**testimony (25)** 20:11;24:23;28:10,13,25;35:1,17,19,22,24;36:6;44:14,17;46:14;52:19;58:17;61:7;63:25;64:12,13,16,19;66:4;73:2,7
**therapist (3)** 43:8,8;48:7
**third (4)** 60:18;65:9;70:14,15
**though (1)** 70:18
**thought (3)** 6:5;67:21;68:11
**three (22)** 14:13;21:22;50:21,23;51:9,10;52:17,23;53:4,7,8,9,13,17;57:21;65:3,12,14;66:8;67:20,20;70:3
**threshold (1)** 63:18
**thrilled (1)** 67:9
**throughout (1)** 11:10
**Thursday (1)** 73:20
**Tina (7)** 41:25;42:2,3;51:13,15,19,20
**today (27)** 3:6;7:24;41:3;56:12,21;62:24;63:14,14;64:13;65:4,10;66:5,21;67:4;68:5,23,24;70:8;71:8,16,17,21;72:9,12;73:2,10;76:8
**today's (1)** 56:15
**together (5)** 4:5;6:18,21,24;16:23
**Tom (1)** 5:8
**tomorrow (1)** 65:20
**topic (1)** 22:22
**total (4)** 19:12;21:22;36:9,10
**totally (1)** 69:6
**touch (1)** 68:5
**towards (1)** 19:11
**Tracey (1)** 3:20
**traditionally (1)** 44:20
**transfer (1)** 34:25
**transferred (5)** 34:19,21;35:1,22;52:13
**transitioned (1)** 53:15
**tried (1)** 37:21
**Troy (16)** 3:12,12;17:9,11,11,15;18:12,14;68:15,15;69:15;70:10,11,11;76:5,12
**true (1)** 48:8
**Trustee (3)** 3:24;66:1;75:1
**Trustee's (2)** 3:11;75:8
**try (3)** 21:25;67:23;69:3
**trying (3)** 21:1,7;40:2
**turn (2)** 22:22;65:21
**turnover (1)** 64:20
**twelve (1)** 19:23
**twenty (6)** 7:5;36:7;37:10,14;39:25;40:13
**twenty-eight (8)** 36:9,10;37:15;38:3,5,9,17,25
**twenty-one (2)** 67:8;72:1
**twenty-three (7)** 36:18;37:15,16;38:1,5,9;39:1
**Twice (1)** 7:10
**two (28)** 16:15;17:20;19:22;22:23;23:2,2;24:16;26:6,9,23,25;38:7,24;41:19,21,21,22;42:7,14;48:17;49:6;51:11,14;63:15;65:3,13;67:14;75:4
**twofold (1)** 64:5
**type (4)** 5:25;31:7;38:7;45:2
**types (1)** 55:9

**U**

**UCC (1)** 70:3
**under (13)** 22:6;25:1,10;53:23;55:25;56:2,4;64:12;65:6,17;70:6,6;71:25
**Understood (3)** 34:16;55:13;58:16
**unfortunately (1)** 10:16
**United (4)** 3:8;65:6,9;67:25
**unless (1)** 61:10
**unpaid (2)** 35:10,13
**unredacted (3)** 40:23;41:3,5
**unrefuted (1)** 63:25
**up (14)** 3:25;4:4;18:2,17;19:6;21:16,21;54:8,8;56:22;61:24;62:2;64:9;68:5
**uploaded (1)** 66:10
**upon (10)** 37:23;38:8;64:3;65:18;66:5;68:5,23;69:6;70:2,4
**upset (1)** 8:14
**uptime (1)** 11:13
**urge (1)** 64:21
**use (19)** 9:17;22:16;23:9,18;25:20;26:14;27:9;34:4;43:17;61:13;66:3,17;68:18;69:10;71:22;72:6;74:15,16,19
**used (15)** 9:22;25:10,25;26:1;27:13;33:21,23;34:3;49:19;55:14,20,21,24;56:18;61:21
**user (6)** 25:3,4,6,13,14,19
**uses (2)** 18:18;29:5
**using (2)** 23:9;26:5
**usually (1)** 36:21
**utilization (1)** 9:19
**utilized (1)** 66:7

**V**

**Valeria (26)** 6:6;12:25;13:7,9,13,17;15:19,21,22;19:5;21:24;24:12,22;25:10,16;26:17;27:16;28:8,24;29:3,5;30:7;31:24;32:6;43:3;57:7
**valid (3)** 70:24;71:9,9
**value (1)** 65:25
**vanishingly (1)** 65:2
**vary (2)** 11:11;22:24
**vehemently (1)** 65:22
**vehicle (1)** 28:1
**vendor (1)** 45:12
**vendors (3)** 44:25;45:1,2
**VERSTANDIG (64)** 3:3,4;4:2,7,10,18,25;5:6,9,11,12;6:10,13,15;9:4,8;10:8;11:25;12:3;20:22;21:1,4;25:22;26:4,11;28:22;33:18,20;35:21;36:4;37:4;40:25;41:5,8;49:22;54:6;56:10;58:8,11,14,24;59:7;60:14;61:18,20;62:6,24;63:4,5,8,10;68:11,14,20;74:20,21,23;75:7,10,25;76:1,10,14,18
**versus (1)** 73:13
**viability (1)** 73:23
**visit (2)** 67:9;68:4

**W**

**W-2 (18)** 7:5;36:21,22;37:2,4,5,10,16,18,19,21;38:7;39:21;43:19;52:14;53:2,15,21
**wages (19)** 4:1,11,15,16;8:21;9:6;53:24;54:1;56:16;63:16,17;64:8,14;66:6;71:9,24;74:8,10,12
**wake (1)** 63:13
**water (2)** 43:15,25
**way (5)** 4:3;9:4;21:25;56:18;63:13
**ways (1)** 26:5
**website (3)** 47:22,24,25
**week (8)** 10:22,25;11:11;14:12;23:8;26:13;28:18;73:21
**week-periods (1)** 22:23
**weeks (5)**

14:13;22:24,25;
38:24;71:23
**weight (6)**
5:21;15:3,13,16,17,
18
**welcome (5)**
37:6;59:1;61:19;
76:4,13
**wellness (3)**
5:20;15:1,1
**Wells (2)**
30:1,3
**What's (7)**
35:12;46:17;48:19;
51:5;52:20;65:11;
74:5
**whenever (1)**
69:25
**Whereupon (1)**
76:20
**whole (2)**
66:9;67:7
**Who's (1)**
17:9
**whose (2)**
45:15;64:2
**wife (1)**
70:22
**window (1)**
73:16
**wire (1)**
56:8
**wish (1)**
23:23
**within (5)**
11:22;51:14;53:4,
25;63:18
**without (3)**
6:22;9:16;60:6
**witness (23)**
3:6;4:4,22,23;5:7;
12:6;17:10;20:16,18,
25;21:3,10;27:4,6,8;
33:19;34:18;49:25;
50:2;54:15;58:22;
66:5,15
**work (12)**
7:24;8:2,8,12;14:8,
10;41:11;43:6;45:23;
46:8;51:25;62:2
**worked (5)**
5:25;43:20;52:14;
67:22;70:23
**worker (1)**
70:25
**workers (12)**
37:11;38:1,2;43:18;
46:25;53:24;54:3,16,
25;55:9,9;71:9
**working (5)**
7:25;41:13;46:10,
10;50:20
**workplace (1)**
64:2
**works (1)**
47:24
**written (7)**
14:1;22:1,3;32:18;
34:22;60:10,11
**wrongful (1)**
56:18

**Y**

**year (7)**
10:22,25;11:11,12;
31:1;48:15,17
**years (10)**
12:20,21;24:16;
26:25;28:19;33:7,11,
15;48:17;52:14
**yesterday (3)**
41:12,14,15
**yoga (39)**
5:20;36:21;37:7,7,
22;38:11,15,19,19,21,
22;43:8,13,14,15;
47:10,11,17,19,20;
48:25;49:5,6,7,10,11,
14,15,16,18,18,20;
50:19;53:6,7,8,11;
61:24;62:2
**you're (1)**
13:13

**Z**

**zero (2)**
48:18;54:19
**Zula (1)**
45:18

**1**

**1 (4)**
13:23;50:25;75:23,
24
**1,000 (1)**
18:4
**1:39 (1)**
59:2
**100 (1)**
6:6
**1099 (14)**
7:5,11;36:21,22;
37:6,6,10;38:7,8;
43:18;47:13;52:13;
53:2,15
**1099s (3)**
7:15;36:8;37:9
**11 (3)**
75:14,15,17
**11:00 (1)**
75:19
**11th (1)**
75:4
**12,000 (6)**
18:8;19:9,21;21:17;
22:14,19
**12,030 (1)**
32:19
**13th (1)**
73:17
**14th (1)**
73:17
**15 (1)**
3:1
**16 (3)**
3:1;39:16,16
**16th (2)**
7:19;74:25
**181 (3)**
50:24;52:17,22
**187 (1)**
51:21
**188 (4)**
51:13,13,20;52:10

**2**

**2 (1)**
45:15
**2:30 (3)**
58:12,13,25
**2:39 (1)**
59:2
**2013 (4)**
31:21;32:4,7;61:1
**2015 (1)**
32:5
**2017 (1)**
32:5
**2020 (4)**
48:10;56:3;60:23,
24
**2021 (2)**
48:11;55:24
**2022 (1)**
55:24
**2023 (7)**
7:19,22;8:9,13;
17:18;28:23;31:8
**2024 (3)**
21:5;60:1,3
**23-11352 (1)**
3:2
**23rd (4)**
28:22,23;61:17,18
**24th (4)**
8:3,9,12;9:14
**25,000 (2)**
31:16,18
**250,000 (1)**
34:2
**26,720 (2)**
18:1;31:17
**26th (3)**
74:17,25;75:12
**27,000 (2)**
22:10,12
**27,400 (2)**
18:3;19:13
**27,430 (1)**
17:19
**28th (8)**
20:19,19,20;21:2,3,
5,11;28:21
**29,600 (3)**
38:24;39:13;40:3
**29th (1)**
21:11
**2nd (2)**
7:22;39:17

**3**

**3 (1)**
47:6
**3.5 (1)**
43:16
**3:05 (1)**
76:20
**30- (1)**
73:5
**30,000 (2)**
66:17,19
**30th (1)**
21:11
**32,000 (1)**
23:3
**341 (7)**
56:14;68:3;72:20;
73:17,22;75:4,5
**35,000 (1)**
19:16
**363a (1)**
69:23

**4**

**4,000 (1)**
65:16
**40,000 (1)**
73:5
**47,000 (3)**
19:14;22:9,13

**5**

**5,000 (12)**
9:15,17;65:2,17,21,
24;66:17;67:17,19;
69:11,21;73:3
**50,000 (1)**
21:23
**500,000 (1)**
21:22

**6**

**6003 (1)**
71:25

**7**

**7 (2)**
16:2;65:24

**9**

**98,000 (1)**
20:13
**98,400 (1)**
18:10