# **EXHIBIT A**

**DEED OF LEASE**
**[FULL SERVICE OFFICE LEASE AGREEMENT]**

**COVER LETTER**
DATED:    February 25, 2013

This Deed of Lease (the "Lease") is made by and between CSG Countryside, LLC ("Landlord") and Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin Care Center ("Tenant"), and consists of this Cover Letter, the attached General Terms and Conditions of the Full-Service Office Lease Agreement, and any exhibits and/or riders hereto. For purposes of this Lease, the following terms, when used in the attached General Terms and Conditions of Office Lease Agreement, shall have the meaning set forth below.

1.    THE PARTIES:

   A. Tenant:                    Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin care Center, a Virginia Limited Liability Company

   B. Tenant's Current Address:    20701 Riptide Sq Sterling. VA 20165

   C. Tenant's Address and Contact at the Premises:

   Name:                    Valeria Gunkova
   Address:                2 Pidgeon Hill Drive, Suite 100
                            Sterling, VA  20165

   D. Landlord:                CSG Countryside, LLC

   E. Landlord's Address:        7127 Ambassador Road, Suite 100
                            Baltimore, MD  21244

   F. Tenant's Representative:    Andrei J. Kublan, Esquire
                            Kublan & Austin PLC
                            6521 Arlington Blvd., Suite 503
                            Falls Church, VA 22042

   G. Landlord's Representative:    Sherri Kraemer
                            Property Management Associates, LLC
                            7127 Ambassador Road, Suite 100
                            Baltimore, MD  21244

                            With a copy to:

                            Matthew W. Steinmeier, Esq.
                            CSG Partners, LLC
                            7127 Ambassador Road, Suite 100
                            Baltimore, MD  21244

   H. Managing Agent:            Property Management Associates, LLC
                            7127 Ambassador Road, Suite 100

Baltimore, MD  21244

2.   **DESCRIPTION OF PREMISES**:

    A.   <u>Premises</u>:            2,677 rentable square feet of the Building, known as Suite 100, as shown on **Exhibit A**.

    B.   <u>Building</u>:            2 Pidgeon Hill Drive
Sterling, VA  20165

    C.   <u>Real Property</u>:      The Building of which the Premises form a part, and the legal lot upon which the Building is situated.

    D.   <u>Project</u>:             Countryside Professional Center, which consists of two (2) Buildings:
2 Pidgeon Hill Drive
6 Pidgeon Hill Drive
Sterling, VA  20165

    E.   <u>Permitted Uses</u>:    Tenant shall use the Premises solely for purposes of Medical and Esthetician SPA services, laser skin care, LED skin Treatments, IPL photorejuvenation, eMatrix, skin analysis and consultation, chemical peels, botox, dermabrasion/microdermabrasion, ultrasonic cellulite redaction and other facial skin care treatments, body scrub, wrap, massage, wax,  manicure, pedicure and other ancillary laser, facial,  skin and body treatments, and for no other purpose whatsoever.
Tenant shall be responsible for confirming prior to the Lease Commencement Date, as that term is defined below, that the use is permissible under the Building's current zoning (PD-H3, 1993).

    G.   <u>Building Hours</u>:    7:00 A.M. to 6:00 PM, Monday thru Friday
8:00 A.M. to 1:00 P.M. Saturdays
Federally approved holidays excepted

    H.   Business Hours:    8:00 A.M. to 9:00 PM, Monday thru Friday
8:00 A.M. to 6:00 P.M. Saturdays and Sundays

3.   <u>TERM</u>:

    A.   Initial <u>Term</u>:      Three (3) years and three (3) months

    B.   Additional Terms:    Tenant shall have the right to extend the Initial Term one (1) time for five (5) years, as provided for in Paragraph 39 of the Lease.

    C.   <u>Lease Commencement Date (or "Commencement Date")</u>:    March 15, 2013

    D.   <u>Rent Commencement Date</u>:    June 15, 2013

JUNE 30, 2016   A6

E.   Expiration Date:   ~~Junl 14, 2016~~

4.   RENT:

A.   Total Basic Rent Schedule:

|  | Period | Rate Per Square Ft | Rentable Square Ft | Monthly Installment of Basic Rent | Period Total |
|---|---|---|---|---|---|
| Months | 1-3 | $0.00 | 2,677 | $0.00 | $0.00 |
| Months | 4-15 | $19.00 | 2,677 | $4,238.58 | $50,863.00 |
| Months | 16-27 | $19.27 | 2,677 | $4,298.82 | $51,585.79 |
| Months | 28-39 | $19.85 | 2,677 | $4,428.20 | $53,138.45 |

B.   Total Basic Rent:   $155,587.24

C.   Advance Rent:   $4,238.58

D.   Security Deposit:   $4,428.20

5.   RENT ADJUSTMENTS:

A.   Proportionate Share:   4.46% (2,677 / 59,964)

B.   Operating Expenses Base Amount:   Operating Expenses for the period from January 1, 2013 through December 31, 2013.

6.   MISCELLANEOUS.

A.   Broker:   Property Management Associates, LLC for Landlord. No Broker for Tenant.

B.   Exhibits:   This Lease includes the following Exhibits:

Exhibit A – Premises (Floor Plan)
Exhibit B – Proposed Tenant Improvements (Plumbing Plan)
Exhibit C – Rules and Regulations
Exhibit D – Broom Clean Conditions and Repair Requirements
Exhibit E – Lease Guaranty

C.   Tenant Improvements:   Tenant accepts the Premises as is.  Landlord, via a credit to Tenant's rental account, shall provide Tenant with a Tenant Improvement Allowance (the "TIA") equal to $13,385.00 ($5.00 psf x 2,677 sf).  Tenant shall pay any and all costs above the TIA, including a construction management fee to Landlord (or its affiliates) of $1500.
Tenant, at its sole cost and expense, shall be responsible for delivering all Tenant Improvements in accordance with construction documents (the "Tenant Improvement CD's"), such Tenant Improvement CD's to include architectural, mechanical, electrical and plumbing

drawings showing the design of the improvements as generally provided for in Exhibits A and B attached hereto. Any changes to the Tenant Improvement CD's shall be documented via construction documents and submitted  to Landlord for its review and approval prior to the commencement of construction of said changes. Landlord's approval shall not be unreasonably withheld; provided, however, that Landlord may, at its sole and absolute discretion, disapprove of any tenant improvement construction that is either structural in nature or is connected to or effecting any Building systems, including but not limited to, mechanical, electrical and plumbing systems.

D.    Landlord's Agent in
      Virginia:

Gene Schleppenbach, Esquire
[VA Code 55-218]
Miles & Stockbridge P.C.
1751 Pinnacle Drive, Suite 500
McLean, Virginia  22102-3833

WITNESS/ATTEST:

LANDLORD:
**CSG Countryside, LLC**

By:_____(SEAL)

Name:_____
      Alan C. Grabush
      Authorized Person

Title:_____

Date:_____3/1/13_____

TENANT:
Skin Logic, LLC d/b/a ARIA Skin Care SPA
and ARIA Laser Skin Care Center

By:_____Valeria Gunkova_____(SEAL)

Name:_____VALERIA  GUNKOVA_____

Title:_____President_____
      (Please print or type)

Date:_____02/25/2013_____

## GENERAL TERMS AND CONDITIONS
## OF FULL SERVICE OFFICE LEASE AGREEMENT

**THIS LEASE**, made as of the __25 day of February, 2013, by and between Landlord and Tenant.

**WITNESSETH**, that the parties agree as follows:

1.    **LEASED PREMISES**.  Landlord leases to Tenant, and Tenant rents from Landlord, the Premises, as shown on **Exhibit A**, together with the rights of ingress and egress over the driveways and sidewalks leading to and from the Building.

1.1    Granting Clause.  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the Initial Term and any Additional Terms, subject to the terms, covenants and conditions of this Lease.

2.    **ACCEPTANCE OF PREMISES**.  Except as may otherwise be expressly provided in **Exhibit C** attached hereto and/or elsewhere in the Lease; Tenant shall accept the Premises on the Commencement Date in its "AS-IS" condition, subject to all applicable laws, ordinances, regulations, covenants and restrictions, and Landlord shall have no obligation to perform or pay for any repair or other work therein.  Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's Permitted Uses, as defined in the Cover Letter. Tenant acknowledges that it has inspected and accepts the premises in an "as is, where is" condition (unless otherwise expressly provided in a construction addendum attached hereto, if any).  Except as provided in Paragraph 11, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use.  The taking of possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in acceptable condition at the time possession was taken except for items that are Landlord's responsibility under Paragraph 11 and any punchlist items agreed to in writing by Landlord and Tenant.

So as not to violate against perpetuities, if the Commencement Date has not occurred within three (3) years of the Commencement Date, this Lease shall automatically terminate.

3.    USE.  The Premises shall be used only for the purposes set forth in the Cover Letter of this Lease, which uses are deemed approved by the Landlord. Tenant acknowledges that the Premises leased to Tenant consists solely of the area within the Building. Loading and unloading of trucks shall be limited to those areas designated by Landlord. Any use of the Premises by Tenant or its agents other than the Permitted Uses (as defined in the Cover Letter) shall be considered a material violation of this Lease and Landlord shall have all rights and remedies available to it under this Lease in regard to such violation.

4.    **RENT AND RENTAL ADJUSTMENTS**

4.1    <u>Basic Rent</u>:  Tenant shall pay Landlord the Total Basic Rent for the Initial Term or any Additional Term thereafter, without any deductions or set-offs, and without demand, in the amounts set forth in the Cover Letter of this Lease.

(a)  Tenant shall pay to Landlord, concurrently with its execution hereof, the Advance Rent. Tenant shall pay the balance of the Total Basic Rent in accordance with the Total Basic Rent Schedule, in advance, commencing on the Rent Commencement Date and on the first day of each month thereafter. If the Rent Commencement Date of this Lease is other than the first day of the month, the Monthly Installment of Basic Rent for the portion of the month in which the Rent Commencement Date occurs shall be prorated.

4.2    <u>Additional Rent</u>:  Unless specifically stated otherwise in this Lease, the term "Additional Rent" will include all payments or installments due under this Lease, other than the Basic Rent. Additional Rent shall include those amounts of Real Estate Taxes, Insurance, Utilities, and Operating Expenses which are in excess of Operating Expenses Base Amount. Additional Rent shall be payable based on Tenant's Proportionate Share (as that term is defined below and specified in the Cover Letter of this Lease) of the increase, each whole or partial lease year. For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the expiration of this Lease. Tenant covenants to pay all Additional Rent within thirty (30) days after Landlord has notified Tenant of the amount due or as provided in this Lease Agreement. Tenant's obligation for Additional Rent and any unpaid Basic Rent will remain in effect after the termination or expiration of this Lease.

4.3    All Basic Rent, and any other sums or Additional Rent, accruing under this Lease and not paid within six (6) days after its due date, a late charge equal to the greater of $300.00 or five percent (5%) of such delinquent sum shall be due on demand.  Any amount not paid by Tenant within six (6) days after its due date in accordance with the terms of this Lease shall also bear interest from such due date until paid in full at the lesser of (i) the highest rate permitted by applicable law; or (ii) eighteen percent (18%) per year until paid. The provisions for such late charge and interest due shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

4.4    <u>Definitions</u>.

"Real Estate Taxes" shall mean any present or future taxes, general and special, including community association charges, which are levied or assessed against the Real Property, consisting of, without limitation:  (a) a tax, assessment, imposition or charge, wholly or partially as [...]tal levy or otherwise, on the rents payable hereunder; (b) a tax, assessment, (including but not [...]d to any municipal, State, or Federal levy), imposition or charge measured by, or based in [...] or in part upon, the Premises and imposed upon the Landlord; or (c) a license fee measured [...] Basic Rent payable under this Lease. Any reasonable expenses incurred by Landlord in [...]ting any tax alteration or increase shall also be included as an item of Real Estate Taxes.

"Proportionate Share" shall mean the share of Operating Expenses, Real Estate [...], utilities, or Insurance premiums that are reasonably attributable to Tenant based upon the [...]t's use of and improvements to the Premises. The Proportionate Share shall be the percentage [...]ied in the Cover Letter of this Lease; provided, however that Landlord shall have the right to [...]asure the Building and/or Premises in accordance with BOMA standards.  In the event such

*LATE FEES
4.3.*

re-measurement results in a change to the size of the Premises and the Proportionate Share, Landlord shall notify Tenant and memorialize such change accordingly.

"Insurance" shall mean all insurance of whatsoever nature kept or caused to be kept by Landlord in connection with its ownership of the Real Property and the Project, equipment, fixtures and other improvements installed and/or owned by Landlord and used in connection with the Building, and/or all alterations, replacements and additions thereto, including, but not limited to, insurance insuring the same against loss or damage by, or abatement of rental income resulting from, fire, and other such hazards, casualties and contingencies (including, but not limited to, liability and indemnity insurance).

"Operating Expenses" shall mean all costs and expenses incurred by Landlord with respect to the ownership, maintenance, repair, replacement and operation of the Premises, Building and Project (as each may be applicable) including, but not limited to: (i) maintenance, repair and replacement of the heating, ventilation, air conditioning, plumbing, electrical, mechanical, utility and safety systems, paving and parking areas, roads and driveways; (ii) maintenance of exterior areas such as gardening and landscaping, snow removal and signage; (iii) maintenance and repair of the Building's roof membrane, flashings, gutters, downspouts, roof drains, skylights and waterproofing; (iv) painting of the Premises and the Building; (v) charges related to (a) lighting; (b) cleaning; (c) refuse removal; (d) security; (e) utility services; and (f) water charges attributable to the Building's common areas and the Premises; (vi) all applicable Real Estate Taxes (as defined above) and Insurance costs (as defined above); (vii) direct personnel costs and administrative allocations related thereto; (viii) rentals or lease payments paid by Landlord for rented or leased personal property used in the operation or maintenance of the Property; (ix) fees for required licenses and permits; (x) a property management fee (not to exceed five percent (5%) of the gross rents of the Property for the calendar year); and (xi) the cost of any repairs or replacements which are classified as capital improvements under generally accepted accounting principles shall be amortized with interest of ten percent (10%) over the lesser of the useful life of the improvement or ten (10) years and included in Operating Expenses only to the extent of the amortized amount for the respective calendar year. Operating Expenses do not include: (i) debt service under mortgages or ground rent under ground leases; (ii) costs of restoration to the extent of net insurance proceeds received by Landlord;; (iii) leasing commissions and tenant improvement costs; and (iv) litigation expenses relating to disputes with tenants.

In the event the Building is less than 95% occupied, Operating Expenses shall be grossed up to reflect 95% occupancy. If the sum of all Operating Expenses for any future year exceeds the Operating Expense Base Amount set forth in the Cover Letter of this Lease Tenant shall pay to Landlord, as Additional Rent within thirty (30) days after such demand, amount equal to Tenant's Proportionate Share of the increase, for each whole or partial lease ye For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall me a calendar year except the first year, which shall begin on the Commencement Date, and the l year, which shall end on the expiration of this Lease. Landlord may estimate in advance and char to Tenant Tenant's Proportionate Share of Operating Expenses, which Tenant will pay with Base Rent on a monthly basis throughout the Lease Term. Landlord may adjust its estimates Operating Expenses at any time. Such adjustments will be due with the next Base Rent paym date after notice to Tenant.

Notwithstanding anything in this Lease to the contrary, in Landlo reasonable opinion, should Landlord determine that Tenant is utilizing water, trash removal utility usage in excessive amounts relative to other tenants in the Building, Landlord shall

allowed to allocate the reasonable costs of such Operating Expenses based on actual use of such services by Tenant.

5. **UTILITIES** As long as Tenant is not in default under any of the covenants of this Lease, Landlord shall (a) furnish heat or air conditioning to the Premises, during normal Building Hours in order to maintain reasonable amounts and temperatures inside the Building and Premises (b) furnish Tenant with water (hot and cold) at those points of supply provided for Tenant's Permitted Use; provided, however that Tenant's Permitted Use does not require an excessive amount of water (hot and cold); (c) furnish elevator service in elevator-served buildings during normal Business Hours; (d) furnish daily janitorial services on non-holiday weekdays; (e) furnish Tenant with (i) sufficient amount of electric current to provide for lighting of the Premises and for use of professional equipment (such equipment not to contain unusually high electrical loads) used by the Tenant as part of its business (the "Basic Current") , space heaters being prohibited, and (ii) such additional amounts of electric current as is required for any computers or similar machines of high electrical consumption used by Tenant in the Premises subject to the express approval of Landlord pursuant to this Section 5, and the agreement of Tenant to bear the utility costs occasioned by the use of any such permitted high electrical consumption machines; (f) furnish electric lighting service for all public areas and special service areas of the Building during Building Hours in the manner and to the extent deemed reasonable by Landlord; and (g) furnish public bathrooms in the lobbies of the Building.  The cost of all such services is included in the Operating Expenses.

5.1 Landlord shall not be under any obligation to furnish electric power other than the Basic Current, and Tenant shall not be permitted to install or use on the Premises any electric equipment or appliance requiring more electrical current than the Basic Current, unless the installation and use of such additional electrical equipment or appliance shall have been undertaken under terms and conditions acceptable to Landlord, and embodied in a separate written agreement between Landlord and Tenant.

5.2 If any portion or all Tenant's equipment shall require electricity consumption in excess of the capacity of the Building's or Premises' electrical system whichever is applicable, any and all additional transformers, distribution panels and wiring that may be required to provide the amount of electricity required for Tenant's equipment shall be installed by Landlord at the cost and expense of Tenant.  If Tenant's equipment shall be consistently operated beyond the Building Hours, Landlord may install, at its option but at Tenant's sole cost and expense, (i) a separate electric meter (or sub-meter) for the Premises, or (ii) a separate meter (or sub-meter) for the specific equipment causing Tenant's excessive consumption of electricity.  Tenant shall then pay the cost of electricity it consumes beyond the Building Hours as recorded by such meter directly to the electric company, or in the event of a sub-meter, directly to Landlord as Additional Rent.

5.3 Tenant agrees to limit use of water and sewer for normal restroom and general office use and use associated with its everyday business; provided, however, that if Tenant is consistently using water and sewer greater than that of a general office use, Landlord, at Tenant's sole cost and expense, shall have the option to install a separate meter (or sub-meter) to measure Tenant's use of water and sewer. In such case, Tenant shall then pay the cost of water and sewer it consumes in excess of a general office use and as recorded by such meter (or sub-meter) directly to the utility company, or, in the event of a sub-meter, directly to Landlord as Additional Rent.  No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Notwithstanding the forgoing, in the event the interruption or failure of utilities is due to Landlord's fault, Landlord shall use its best efforts to correct such defect.

5.4 In the event that Tenant requires and uses the Building air conditioning or heating service at times other than during Building Hours, Tenant will pay to Landlord promptly upon receipt of a statement therefore, any and all costs arising out of such additional usage. As of the date hereof, after Building Hours HVAC is available at an additional charge of $50.00 per hour, with a four (4) hour minimum charge. This charge is subject to adjustment from time to time without notice to Tenant.

5.5 Landlord reserves the right to stop service of the heating, air conditioning, plumbing and electric systems, when necessary, by reason of accident, or emergency, or for repairs, alterations, replacement or improvements, which in the judgment of Landlord are desirable or necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed. Landlord shall have no responsibility or liability for failure to supply heat, air conditioning, plumbing, cleaning and electric service during said period or when prevented from so doing by energy shortages, laws, orders or regulations of any federal, state, county or municipal authority or by strikes, accidents or by other cause whatsoever beyond Landlord's control. In the event of any cessation of any service herein provided due to any such cause, such cessation shall not be construed to be a constructive eviction of Tenant and shall not excuse Tenant's failing to pay Basic Rent or any other of Tenant's obligations under this Lease. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Notwithstanding the forgoing, in the event the interruption or failure of utilities is due to Landlord's fault, Landlord shall use its best efforts to correct such defect.

5.6 Landlord reserves the right to charge Tenant the reasonable cost of the removal of trash to the extent Tenant's trash disposal exceeds typical usage for an office tenant.

Notwithstanding anything in this Section 5, Tenant, at its sole cost and expense, shall install a separate utility meter which shall exclusively service Tenant's installed HVAC and sauna. Tenant shall pay such utility expense directly to the electric company and said utility meter shall not adversely affect any building systems.

6.    **SECURITY DEPOSIT**. Tenant shall deposit with Landlord upon the execution of this Lease, the Security Deposit for Tenant's full and faithful performance of the terms of this Lease. During the Term, for whatever cause, Landlord may use or apply, or retain the whole or any part of the Security Deposit for any obligation of Tenant arising under the terms of this Lease. Any unused portion of the Security Deposit shall be refunded to Tenant after termination of the tenancy and delivery of possession of the Premises to Landlord in accordance with **Exhibit D** . Tenant shall not be entitled to any interest on the Security Deposit. In the event that any part of the Security Deposit is ever utilized by Landlord, Tenant shall immediately upon demand, deposit with Landlord, a sum equal to the utilized amount.

The Security Deposit may not be used by Tenant as rent, or as a deduction from the last month's rent. Tenant may not indemnify itself with respect to any violation or default by resort to the Security Deposit.

In the event of a bona fide sale of the Building, Landlord shall transfer the Security Deposit to the purchaser of the Building for the benefit of Tenant, at which time Landlord shall be released by Tenant from all liability for the return of the Security Deposit. Tenant agrees to look solely to the new landlord or any subsequent successor landlord for the return of the Security Deposit.

Any reentry of the Premises by Landlord prior to the expiration of the Term of the Lease, where occasioned by default on the part of the Tenant, shall entitle the Landlord, where appropriate, to retain the Security Deposit as an additional remedy for such default.

7.      **PARKING.**  Tenant shall be entitled to park in common with other Tenants of the Project in those areas designated for nonreserved parking.  Landlord may allocate parking spaces among Tenant and other tenants in the Project at Landlord's sole discretion, provided the Tenant continues to have access to at least eight (8) parking spaces in order to conduct its regular business.

7.1      Tenant shall not permit the parking of Tenant or its invitees vehicles so as to interfere unreasonably with the use of any driveway, corridor, footwalk, parking lot or other common area used by other tenants. Landlord reserves the right to tow, at Tenant's expense, any vehicle violating the parking provisions of this Article.

8.      **SIGNS**.  All signs, decorations, advertising media, blinds, draperies and other window treatment visible from outside the Premises shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld, and shall conform in all respects to Landlord's requirements.  Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, security systems, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent.  Landlord shall not be required to notify Tenant of whether it consents to any sign until it (a) has received detailed, to-scale drawings thereof specifying design, material composition, color scheme, and method of installation, and (b) has had a reasonable opportunity to review them, which in any event shall not be longer than 10 days after receiving such drawing from Tenant.  Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached.  Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. Tenant shall maintain any such signs in good condition and repair at all times and pay any taxes imposed thereon.

Notwithstanding the preceding paragraph, Tenant will be provided with building standard signage on the main directory in the building lobby and on the suite entrance door.

9.      **CONSTRUCTION OF TENANT IMPROVEMENTS**.  Landlord shall not be liable, nor shall Tenant have the right to rescind this Lease, for delays in construction of Tenant improvements beyond Landlord's control, including (but not limited to) delays caused directly or indirectly by the unavailability of labor or materials, acts of God, acts of any Federal, State or local governmental agency or authority, war, acts or force majeure, such as fire, explosion, storm, extreme cold, or by any other casualty of a substantial enough nature to cause delay.

9.1      The Proposed Tenant Improvements  may be modified by the parties provided they mutually agree to (a) the modifications to be made; and (b) the manner in which any additional cost shall be paid or reflected in the Total Basic Rent.

10.      **COMPLIANCE WITH REGULATIONS**

10.1      Compliance with Governmental Regulations:  Tenant shall at its sole expense,  continually  comply  with  all  Federal,  State,  and  local  laws,  codes,  ordinances,

administrative and court orders and directives, rules, and regulations applicable to Tenant's use and occupancy of the Premises, as are now or may be subsequently in effect during the Term.

10.2    Compliance with Rules and Regulations: Tenant shall also comply with all rules and regulations announced by Landlord from time to time, including those set forth in **Exhibit D.**

11.    **MAINTENANCE AND REPAIRS**

11.1    Tenant's Obligations.

(a)    Tenant shall, at its sole expense, maintain the Premises, fixtures and appurtenances including, without limitation, the repair and replacement of appliances and equipment installed specifically for Tenant such as refrigerators, disposals, trash compactors and computer room air conditioning. Tenant shall take good care of the Premises, fixtures and appurtenances, and shall suffer no waste or injury to the Premises.

(b)    In order that the Premises may be kept in a good state of preservation and cleanliness, Tenant shall, during the Term of this Lease, permit the Landlord or the contractor designated by Landlord, at Landlord's expense (as part of Operating Expenses), to take care of and clean the Premises. Landlord shall not be responsible to Tenant for loss of property or for any damage done to the furniture or other property of Tenant by the Landlord or any of its employees or agents or any other persons or firms except where proof of Landlord's responsibility for such damage or loss of property is established.

(c)    Landlord shall, at Tenant's expense, make all repairs to the Premises, fixtures and appurtenances necessitated by the fault of the Tenant, its agents, employees or invitees; provided, however, that, prior to Landlord entering the Premises and perfecting such repair, Tenant shall have fifteen (15) days following notice from Landlord that such repair is required. During the Term, as reasonably determined by Landlord, any and all damage to the Premises or the Building, caused by the installation or removal of furniture or other property, shall be repaired by Landlord at Tenant's expense; provided, however, that, prior to Landlord entering the Premises and perfecting such damage, Tenant shall have fifteen (15) days following notice from Landlord that such damage shall be repaired. The cost of any repairs to be made by Landlord under this Lease resulting from the fault or negligence of Tenant shall include a reasonable fee for Landlord's supervision of such repairs.

(d)    Tenant shall, at its sole cost and expense, (i) maintain a preventive maintenance contract on all Tenant installed mechanical, electrical and plumbing systems and/or equipment; and (ii) be responsible for all repairs and/or replacements for all Tenant installed mechanical, electrical and plumbing systems. Landlord does not warrant that the Building systems support and extraordinary Tenant installed equipment, including but not limited to, supplemental mechanical units and sauna.

11.2    Landlord's Obligations.

(a)    Landlord will maintain the HVAC equipment servicing the Building (the "HVAC Contract"), and will make all necessary repairs or replacements to the HVAC system, the cost of which maintenance and repair is included in the Operating Expenses. Notwithstanding the preceding sentence, any maintenance or repair to the Building HVAC system which is required, directly or indirectly, because of any negligent act or use of the Building HVAC system by Tenant,

or Tenant's agents, employees or invitees, or as a result of Tenant's use of the Building HVAC system in excess of normal Business Hours, will be made by Landlord at Tenant's sole cost.

(b)  In the event Landlord is obligated to make such repairs, alterations, or improvements (hereinafter collectively the "Repairs") as are necessary for the safety or preservation of the Building, Basic Rent will not abate while Landlord is conducting the Repairs.

(c)  Landlord agrees to make all necessary repairs to keep the Premises and appurtenances thereto in good order and condition within fifteen (15) days after it shall receive written notice from the Tenant of the need of such repairs; provided however, (i) that when such repairs are necessitated by the fault of the Tenant, its agents, employees, licensees, or invitees, Landlord shall, pursuant to Article 11.1(c) hereof, make such repairs at Tenant's sole cost and expense; and (ii) such fifteen (15) day period can be extended by Landlord as reasonably may be required. Tenant shall also be obligated to reimburse Landlord on demand for the cost of any repairs of damage to any paved surface or grounds on the Real Property which are caused by the excessive weight of vehicles or the use of chains on vehicles owned or operated by Tenant, its agents, servants, employees, licensees, or guests or by any subcontractor engaged by or on behalf of Tenant.

11.3    Landlord's Failure to Repair.  Anything contained in this Lease to the contrary notwithstanding, Landlord shall not be obligated to make any repairs, nor shall it be liable to Tenant or any other person, for any claim or injury arising out of Landlord's failure to make any repairs under the terms of this Lease, unless Tenant gives Landlord prompt written notice of the condition requiring repair upon discovery and Landlord has not made a timely effort to effect the needed repair.

12.    **ACCESS BY LANDLORD.**  Landlord and its agents shall have the right at all reasonable times, and at any time in the event of an emergency, during the Term to enter the Premises for the purpose of inspecting the Building, performing maintenance and repairs or for any other reasonable purpose. Landlord may show both the interior and exterior of the Premises to prospective tenants or purchasers and place "For Rent" signs on the Premises during the last six (6) months of the Term, or "For Sale" signs on the Premises at any time during the Term.

13.    **SUBORDINATION.**  This Lease shall be subject to and subordinate at all times to the lien of any mortgage, deed of trust, or financing statement now or hereafter made on the Premises, and to all advances made or hereafter to be made. This subordination provision shall be self-operative and no further instrument of subordination shall be required.

Notwithstanding any provision of this Lease to the contrary, Landlord will use commercially reasonable efforts to deliver to Tenant a subordination, non-disturbance and attornment agreement ( the "SNDA") executed by the holder of any future mortgage, deed of trust or a ground lease (on a form approved by such holder) encumbering the Premises, in which case, upon full execution and delivery thereof, the obligations of such parties with respect to subordination, non-disturbance and attornment and the applicable encumbrance will be governed by such SNDA.  Tenant shall be responsible for all costs associated with delivering SNDA.

13.1    Attornment.  Tenant shall, upon the termination of Landlord's interest in the Premises and upon request, attorn to the person or entity that holds title to the reversion of the Premises (the "Successor") and to all subsequent Successors. Tenant also will pay to the Successor all rents and other sums required to be paid by Tenant, and perform all of the other covenants, agreements and terms required of Tenant under this Lease.

14.    **ESTOPPEL CERTIFICATE**.    Tenant shall, during the Term of this Lease, execute, acknowledge and deliver to Landlord, or to any entity Landlord shall designate, within ten (10) days of written request by Landlord, a certified written estoppel certificate in the form required by Landlord's lender or any prospective lender or purchaser. Any statement delivered pursuant to this Article 14 may be relied upon by any mortgagee or prospective mortgagee of the Building or of Landlord's interest, or any prospective assignee of any mortgagee. If Tenant fails to deliver the statement to Landlord within ten (10) days of Landlord's request, Tenant shall be deemed to have acknowledged that this Lease is in full force and effect, without modification except as may be represented by Landlord and that there are no uncured defaults in Landlord's performance. Furthermore, in the event Tenant's failure to deliver the statement to Landlord within the ten (10) day period results in (i) Landlord being placed in default by its lender under its financing for the Building or (ii) Landlord's inability to close any loan which it is negotiating, Tenant may, at Landlord's sole discretion, be deemed in default of this Lease and Landlord shall have all rights and remedies available to it under this Lease in regard to a default.

15.    **ASSIGNMENT OR SUBLETTING**

(a)    Without Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises (each being a "Transfer") and any attempt to do any of the foregoing shall be void and of no effect. Notwithstanding anything to the contrary set forth in this Lease, at Landlord's sole option, Landlord shall have the right to refuse to consent to any proposed assignment or sublease (and as a result of any such refusal, Landlord shall not be deemed to be unreasonably withholding its consent thereto) if the proposed assignee or subtenant is at the time of such proposal (i) a person or entity with whom Landlord has already spoken to about leasing space at the Building, or (ii) a tenant or occupant of all or any part of the Building. For purposes of this Paragraph 15, a transfer of the ownership interests controlling Tenant shall be deemed a Transfer of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), without the prior written consent of Landlord; provided, however, (i) Tenant shall provide at least ten (10) days written notice prior to assigning this Lease to, or entering into any sublease with, any Tenant Affiliate, (ii) the net worth of such Tenant Affiliate shall be reasonably satisfactory to Landlord, and not less than that of Tenant's net worth, (iii) the Tenant Affiliate assumes in writing in a form reasonably satisfactory to the Landlord all obligations of Tenant hereunder and (iv) Landlord shall be furnished with a copy of such assignment within 10 days prior to the effective date of such Transfer. Tenant shall pay Landlord $1,000 for its costs associated with reviewing any proposed Transfer. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

(b)    Notwithstanding any Transfer (including a Transfer to a Tenant Affiliate), Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such Transfer). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus

or other consideration therefore or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant.

(c)     If this Lease is assigned or if the Premises is subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding subparagraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers.

16.     **QUIET ENJOYMENT.** Upon payment of Basic Rent and Additional Rent and performance by Tenant of all covenants on Tenant's part to perform under this Lease, Tenant shall have and hold the Premises, free from any interference from Landlord except as may be otherwise provided.

17.     **Intentionally deleted**.

18.     **TENANT-MADE ALTERATIONS AND TRADE FIXTURES**.

(a) Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises after the completion of the Proposed Tenant Improvements as provided for in Exhibit B attached hereto ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent, which consent shall not be unreasonably withheld; provided, however, that Landlord may, at its sole and absolute discretion, disapprove of any alteration, addition or improvement that is either structural in nature or is connected to or effecting any Building systems, including but not limited to, mechanical, electrical and plumbing systems. Tenant shall cause, at its expense, all Tenant-Made Alterations to be built and comply with insurance requirements and applicable law and building code.

(b) All Tenant-Made Alterations shall be constructed in a good and workmanlike manner either by Landlord's designated contractor and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction not to exceed five percent (5%) of the total cost of such Tenant Made Alterations. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations.

(c) If Landlord permits Tenant to engage a contractor other than Landlord's designated contractor, Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such

construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law and Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction not to exceed seven percent (7%) of the total cost of such Tenant Made Alterations. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors and as-built plans.

(d) Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Prior to the expiration or termination of this Lease, Tenant, at its sole expense, shall repair any and all damage caused by such removal. Landlord may deduct from the Security Deposit, any costs incurred by Landlord by reason of Tenant's failure to comply with this Paragraph 12 (including repair costs, costs of remaining alterations, costs of restoration, costs of storage and the like).

(e) Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all applicable laws and with Landlord's requirements set forth above. After the expiration or termination of this Lease, Landlord may require Tenant, at Tenant's sole expense, to remove its Trade Fixtures and shall repair any and all damage caused by such removal.

19.    **RESTORATION.**

(a) If at any time during the Initial Term or any Additional Term the Premises are damaged by a fire or other casualty or Landlord is required to conduct Repairs (as defined in Section 11.2(b) of this Lease), Landlord shall notify Tenant in writing within thirty (30) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises (hereinafter "Landlord's Notice"). If the restoration time is estimated to exceed 90 days from the date of Landlord's Notice to begin reconstruction, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than thirty (30) days after Landlord's Notice. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 90 days or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease upon thirty (30) days written notice to the other if the Premises are damaged during the last six (6) months of the Lease Term and Landlord reasonably estimates that it will take more than thirty (30) days to repair such damage.

(b)      If the Premises are destroyed or substantially damaged by any peril not covered by the insurance maintained by Landlord or any mortgagee of Landlord requires that insurance proceeds be applied to the indebtedness secured by its mortgage (defined hereinafter), Landlord may terminate this Lease by delivering written notice of termination to Tenant within thirty (30) days after such destruction or damage or such requirement is made known by any such Landlord's mortgagee, as applicable, whereupon all rights and obligations hereunder shall cease and terminate, except for any liabilities of Tenant which accrued prior to Lease termination.

(c)      If such damage or destruction is caused by the act(s) or omission(s) of Tenant, its employees, agents or contractors, Tenant shall pay to Landlord with respect to any damage to the Premises, Building and/or Project the amount of the commercially reasonable deductible under Landlord's insurance policy within ten (10) days after presentment of Landlord's invoice.

20.    **CONDEMNATION.**

20.1    If during the Term, all or a substantial part of the Premises is taken by eminent domain, this Lease shall terminate as of the date of taking, and the Basic Rent and Additional Rent shall be apportioned to and abate from that date. Tenant shall have no right to participate in any award or damages for any such taking and hereby assigns all of its right, title and interest therein to Landlord. For purposes of this Article, "a substantial part of the Premises" shall mean so much of the Premises as to render the remainder inadequate and not practicably capable of repair so as to permit Tenant to carry on its business to substantially the same extent and with substantially the same efficiency as before the taking.

20.2    If, during the Term, less than "a substantial part of the Premises" is taken by eminent domain, this Lease shall remain in full force and effect and Tenant shall have no right to participate in any award or damages for the taking. Landlord shall, at its expense, up to but not in excess of the amount of the award of damages received, promptly make all necessary repairs and improvements needed to make the remainder of the Premises adequate to permit Tenant to carry on its business to substantially the same extent and the same efficiency as before the taking. If, as a result of any taking, a part of the Building is rendered permanently or temporarily unusable, the Basic Rent and Additional Rent shall be reduced by a fair and reasonable amount, not, however, to exceed the proportion by which the portion of the Premises taken or made unusable bears to the entire Premises. If the unusability is temporary, the rental abatement shall be apportioned from the date of taking to the date when full usability is restored. If the taking does not render any part of the Premises unusable, there shall be no abatement of Basic Rent and Additional Rent.

20.3    For the purpose of this Article, "taking under the power of eminent domain" shall include a negotiated sale or lease and transfer of possession to a condemning authority under bona fide threat of condemnation for public use. Landlord alone shall have the right to negotiate with the condemning authority and conduct and settle all litigation connected with the condemnation. As used in this Article, the words "award or damages" shall, in the event of such sale or settlement, include the purchase or settlement price.

20.4    Nothing shall, however, prevent Tenant from claiming and receiving from the condemning authority compensation for the taking of Tenant's own tangible property and damages for Tenant's loss of business, business interruption, or removal and relocation.

21.   **INSURANCE.**

(a) Landlord shall maintain all risk property insurance covering the full replacement cost of the Building (excluding foundations), less a commercially reasonable deductible if Landlord so chooses.  Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, commercial liability insurance, flood insurance, and rent loss insurance.  All such insurance shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 5 hereof.  The Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Building will be determined by Landlord based upon the insurer's cost calculations).  Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

(b) Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing during the Lease Term, Tenant, at its expense, shall obtain and maintain in full force the following insurance coverage:  (i) all risk property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant or for Tenant's benefit; (ii) employer's liability insurance with such limits as required by law; and (iv) commercial liability insurance, with a minimum limit of $1,000,000 per occurrence and a minimum umbrella limit of $2,000,000, for a total minimum combined general liability and umbrella limit of $3,000,000 (together with such additional umbrella coverage as Landlord may reasonably require) for property damage, personal injuries, or deaths of persons occurring in or about the Premises.  Landlord may from time to time require reasonable increases in any such limits.  The commercial liability policies shall name Landlord and Landlord's agents as additional insureds, insure on an occurrence and not a claims-made basis, be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless thirty (30) days prior written notice shall have been given to Landlord, contain a hostile fire endorsement or amended pollution endorsement, and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies).  Such certificates, or at Landlord's option, copies of the policies evidencing coverage shall be delivered to Landlord by Tenant within ten (10) days of the Commencement Date and at least fifteen (15) days prior to each renewal of said insurance.  If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord copies of such policies and certificates evidencing the coverage required herein, Landlord, in addition to any remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of the cost.

(c) The all risk property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against. The failure of a party to insure its property shall not void this waiver.  Notwithstanding anything to the contrary contained herein, Tenant hereby waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder (whether by self-insurance or otherwise), except where the negligence or fault of Landlord caused such loss.   Landlord hereby waives any claims against Tenant, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder to the extent insurance proceeds are received therefore, regardless of whether the negligence or fault of Tenant caused

such loss; however, Landlord's waiver shall not apply to any deductible amounts maintained by Landlord under its insurance.

22. **TENANT'S DEFAULT**.

22.1    Tenant shall be considered in default of this Lease upon the happening of any one of the following:

(a)    Failure to pay in full when due, any and all Monthly Installments of Basic Rent, Additional Rent or any other sum required by the terms of this Lease;

(b)    Violation of or failure to perform any non-monetary term, covenant or condition of this Lease, which violation or failure is not cured promptly but in no case more than thirty (30) days after written notice to Tenant; except that in the event Tenant is unable to complete the cure within the thirty (30) day period, the cure period shall be extended if Tenant has commenced the cure within said thirty (30) days and is diligently pursuing the cure. In no event, however, shall the cure period exceed ninety (90) days from the date of Landlord's notice, unless Landlord and Tenant mutually agree to an extension of the cure period.

(c)    The commencement of an action or proceeding under any section or chapter of the Federal Bankruptcy Act or under any similar law or statute of the United States or any state, or the adjudication of Tenant as a bankrupt or insolvent by any court of competent jurisdiction; the appointment of a receiver or trustee for all or substantially all of the assets of Tenant; or the making of any assignment for the benefit of creditors by Tenant or if Tenant admits in writing its inability to pay its debts generally as they come due or files Articles of Dissolution with the appropriate authority of the place of its incorporation;

(d)    The attachment, execution or other judicial seizure of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease;

(e)    The holding of possession of the Premises after the termination of this Lease without Landlord's written consent;

(f)    The suspension of business by Tenant;

(g)    The abandonment of the Premises by Tenant unless prior notice is given to Landlord and all Basic Rent and Additional Rent is kept current; or

(h)    The encumbrance of the Premises (or Tenant's interest therein), or any part thereof, by any mechanics' or materialmen's lien and/or any other lien or encumbrance, resulting from any act, matter or thing done or suffered to be done by Tenant.

22.2    Upon the occurrence of any event of default, Landlord shall, but only after providing Tenant with a second notice that it is in default, in addition to, and not in limitation of, any other remedy permitted by law or this Lease, have the option to do any one or more of the following:

(a)    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord. Should Tenant fail to surrender the Premises, Landlord may, without notice and without prejudice to any other remedy available, re-enter and take possession of the Premises and remove Tenant or anyone occupying the Premises and all property from the

Premises, which property may be removed and stored, for the account of, and at the expense and risk of Tenant. Tenant waives all claims for damages which may be caused by Landlord's reentry and taking possession of the Premises or removing or storing the furniture and property as provided. Tenant shall save Landlord harmless from any loss, fees, costs or damages suffered by Landlord because of any termination and reentry. No reentry pursuant to this subsection shall be considered or construed to be an illegal forcible entry. In its exercise of this option, Landlord has the right to change all locks and other security devises at the Premises.

(b)    Without terminating this Lease, declare to be due and payable immediately, the entire amount of all Basic Rent which would have become due and payable during the remainder of the Term of this Lease. Such present value shall be calculated at an interest rate equal to the 90-day U.S. Treasury bill rate at the date of such termination, in which event Tenant agrees to pay the same to Landlord immediately. This payment shall constitute payment in advance of the Basic Rent stipulated for the remainder of the Term. Acceptance by Landlord of the payment of Basic Rent shall not constitute a cure or waiver of any then existing default or any subsequent default.

(c)    Enter upon and take possession of the Premises, without terminating this Lease and without being liable to prosecution or any claims for damages. Landlord may then relet all or any portion of the Premises upon any terms and conditions as Landlord, in its sole discretion, may deem advisable. In the event of any reletting, rentals received by Landlord from reletting shall be applied: first, to the payment of any indebtedness including costs of collection and recovery, other than Basic Rent and Additional Rent, due from Tenant to Landlord; second, to the payment of the Basic Rent and Additional Rent due and unpaid; third, to the payment of cost of any repairs to the Premises; and the residue, if any, shall be held by Landlord and applied in payment of future Basic Rent and Additional Rent as the same may become due and payable. Should rentals received from reletting during any month be less than the Basic Rent required to be paid by Tenant herein, then Tenant shall immediately pay any deficiency to Landlord. Deficiencies shall be calculated and paid monthly. Notwithstanding any reletting without termination, Landlord may at any time elect to terminate this Lease for any act of uncured default. Should Landlord at any time terminate this Lease for any breach or act of uncured default, in addition to any other remedy it may have, Landlord may recover from Tenant all damages it may incur by reason of any breach or act of default. Landlord's recovery shall include the cost of recovering the Premises, legal fees, and the worth, at the time of termination, of the excess, if any, of the amount of Basic Rent reserved in this Lease for the remainder of the stated Term over the then reasonable rental value of the Premises, based on Landlord's rental rate for comparable space, for the remainder of the stated Term.

(d)    After providing Tenant with a second notice that it is in default and provided the default remains uncured, or, is in the process of being cured (in accordance with this Paragraph 22), change all locks and other security devises at the Premises without terminating this Lease and without any further notice to Tenant.

22.3    Should Tenant, in bad faith, contest (including all appeals) any action of Landlord to recover the Premises following any breach or act of default, and Landlord is ultimately successful in receiving a determination that its action was legal and proper, then, in that event, Tenant, recognizing certain intangible detriments to Landlord caused by the delay in recovering the Premises such as losing a prospective tenant, agrees to pay to Landlord as additional damages double the Monthly Installment of Basic Rent during the period of holding over from the date of default.

22.4    All remedies available to Landlord under this Lease and at law and in equity shall be cumulative and concurrent. No termination of this Lease, taking or recovering possession of the Premises, nor acceptance of any Monthly Installment of Basic Rent or Additional Rent by Landlord with knowledge of the breach of any covenant or condition, shall act as a waiver of the breach or deprive Landlord of any remedies or actions against Tenant for Basic Rent or Additional Rent, for charges, or for damages for the breach of any covenant or condition, nor shall the bringing of any action for Basic Rent or Additional Rent, charges or damages for breach, be construed as a waiver or release of the right to insist upon the forfeiture and to obtain possession of the Premises.

22.5    Tenant shall be considered in "Habitual Default" of this Lease upon (1) Tenant's failure, on two or more occasions during any leasehold year, to pay, when due, any Monthly Installment of Basic Rent, Additional Rent or any other sum required by the terms of this Lease, or (2) Tenant's repeated violation of any term, covenant or condition of this Lease after written notice of such violation. Upon the occurrence of any event of Habitual Default, Tenant shall immediately be deemed to have released any and all options or rights granted, or to be granted, to Tenant under the terms of this Lease (including, without limitation, rights of renewal, rights to terminate, or rights of first refusal).

23.    **WAIVER OF REDEMPTION**.  Tenant hereby expressly waives (to the extent legally permissible) for itself and all persons claiming by, through or under it, any right of redemption or right for the restoration of the operation of this Lease under any present or future law in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as provided in this Lease. Tenant understands that the Premises are leased exclusively for business, commercial, and mercantile purposes and, therefore, shall not be redeemable under any provision of law.

24.    **ASSIGNMENT OF LANDLORD'S INTEREST.**  Landlord shall have the right to assign this Lease to another entity. In the event of an assignment, Tenant agrees to recognize the assignee as Landlord and shall execute, upon Landlord's request, an instrument certifying the existence and good standing of this Lease and any agreement or modification of this Lease documenting the assignment, including endorsement of applicable insurance policies.

Tenant shall, after notice of assignment, pay all Basic Rent subsequently coming due to assignee and give all required notices under this Lease, both to Landlord and the assignee. Tenant shall also have all required policies of insurance endorsed so as to protect the assignee's interest as it may appear and deliver the policies or certificates to the assignee.

25.    **LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS.** If Tenant fails to timely cure its failure to perform any term, covenant or condition of this Lease or fails to perform any duty require by law, Landlord shall have the right, but not the duty, to perform these obligations without notice. Any performance by Landlord under this Article will be undertaken solely at the option of Landlord and at the sole cost and expense of Tenant. Tenant will pay Landlord all costs incurred by Landlord in performing Tenant's obligations, plus Landlord's reasonable supervisory fee, as Additional Rent.

26.    **WAIVER OF BREACH**.  The failure of the Landlord to insist upon a strict performance of any of the Lease terms, conditions, or covenants shall neither be deemed a waiver of any rights or remedies that the Landlord may have nor be deemed a waiver of any subsequent breach or default. This instrument may not be changed, modified, or discharged orally.

27.    **SEVERABILITY**.    Each and every term of this Lease is, and shall be construed to be, a separate and independent covenant and shall not be construed to be dependent on any other provision of this Lease unless expressly provided. If any term of this Lease shall, to any extent, be declared invalid or unenforceable, the remainder of this Lease shall not be affected.

28.    **ENVIRONMENTAL ASSURANCES.**

28.1    Representations.    Tenant represents to Landlord that, to the best of Tenant's knowledge, neither Tenant nor affiliates of Tenant has generated, stored, transported, treated or disposed of, or will generate, store, transport, treat or dispose of Hazardous Substances (as defined by federal or state laws) at, to or from the Premises, except for quantities of Hazardous Substances not in excess of reportable guidelines therefore.

28.2    Environmental Indemnification.    Tenant agrees to indemnify and defend Landlord from and against any costs, fees or expenses (including, without limitation, environmental assessment, investigation, and environmental remediation expenses, third party claims and environmental impairment expenses and reasonable attorneys' fees and expenses) incurred by Landlord in connection with Tenant's generation, storage, transportation, treatment or disposal of Hazardous Substances at, to or from the Premises in accordance with the foregoing and with Tenant's compliance with the foregoing representations and covenants, including, but not limited to, Landlord's costs in connection with its monitoring of the foregoing. This indemnification by Tenant shall survive the termination or expiration of this Lease.

28.3    Lien Notice.    Tenant shall promptly notify Landlord as to any liens threatened or attached against the Premises or the Real Property pursuant to any Environmental Law which are a result, direct or indirect, of Tenant's use or storage of Hazardous Substances. If such a lien is filed against the Premises or the Real Property, Tenant shall, within fifteen (15) days from the date that the lien is placed, and in any event prior to the date any governmental authority commences proceedings to sell the Real Property pursuant to the lien, either: (a) pay the claim and remove the lien; or (b) furnish either (i) a bond or cash deposit reasonably satisfactory to Landlord and Landlord's title insurance company in an amount not less than the claim out of which the lien arises, or (ii) other security satisfactory to the Landlord and to any superior mortgagee in an amount not less than that which is sufficient to discharge the claim out of which the lien arises.

28.4    No assigning of this Lease or subletting of the Premises shall release or be deemed to release the assignor or sublessor from liability under this Lease for the defaults of any successor assignee (immediate or remote) or any subtenant.

28.5    In the event this Lease is terminated, cancelled or surrendered for any reason whatsoever, Tenant shall deliver the Premises to Landlord free of any and all Hazardous Substances so that the Premises shall be returned to Landlord in the same condition as when delivered to Tenant.

29.    **HOLDING OVER**.    If Tenant fails to vacate the Premises after the termination of the Lease Term, Tenant shall be a tenant at will or at sufferance, and Tenant shall pay, in addition to any other rent or other sums then due Landlord, a daily base rental equal to 200% of the Base Rent in effect on the expiration or termination date, even if Landlord consents to such holdover (which consent shall be effective only if in writing).    Tenant shall also be liable for all Operating Expenses incurred during such holdover period.  In addition, Tenant shall be liable for all damages (including attorneys' fees and expenses) of whatever type (including consequential damages) incurred by Landlord as a result of such holding over.  No holding over by Tenant,

whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph 29 shall not be construed as consent for Tenant to retain possession of the Premises.

30.    **COMMISSIONS**.  Tenant represents that Tenant has dealt directly with, and only with, the Broker in connection with this Lease, as set forth on the Cover Sheet, and that no other broker negotiated this Lease or is entitled to any commissions in connection with it. Tenant shall hold Landlord harmless from and indemnify Landlord for any costs incurred by Landlord arising out of any other broker's claim that such other broker has assisted Tenant with respect to this Lease.

31.    **ATTORNEY'S FEES**:  In the event of employment of any attorney by Landlord because of Tenant's uncured violation of any term or provision of this Lease, Tenant shall pay all reasonable fees of attorneys whether incurred in court, out of court, in bankruptcy or administrative proceedings.

32.    **TIME**.  Time is of the essence of this Lease with respect to Tenant's monetary obligations.

33.    **PATRIOT ACT**.  Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("OFAC"); (ii) designated by the President of OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named in the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the Term, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

34.    **ZONING**.  Landlord represents that, as of the date hereof, Landlord has not received from any state or local governmental authority any notice that the Building is in violation of any applicable state or local building and zoning codes. Landlord assumes no responsibility for current zoning requirements or future changes in zoning classifications of the Real Property.

35.    **LIMITED PERSONAL LIABILITY**.  The term "Landlord" as used in this Lease means only the owner, the mortgagee, or the trustee or the beneficiary under a deed of trust, as the case may be, for the time being, of the Building (or the owner of a lease of the Building), so that in the event of any transfer of title to the Building (or an assignment or sublease of a lease of the Building), the Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder thereafter accruing. Landlord is a limited partnership, and no partner, general or limited, of said partnership, as it may now or hereafter be constituted, shall have any personal liability to Tenant and/or any person or entity claiming under, by or through Tenant upon any action, claim, suit or demand brought under or pursuant to the terms and conditions of this Lease and/or arising out of the use or occupancy by Tenant of the Premises.

36.    **NOTICE**.  All notices to Tenant under this Lease shall be conclusively presumed to have been delivered (a) when actually delivered to the Premises or (b) three (3) days after mailing by United States mail, first class, return receipt requested, and postage prepaid, or (c)

by courier service, service fees prepaid, addressed to Tenant at the Premises or at Tenant's Address or to any other address Tenant may from time to time designate in writing. All notices to Landlord shall be conclusively presumed to have been delivered when actually delivered to Landlord at Landlord's Address or to any other place as Landlord may from time to time designate in writing.

37.    **MISCELLANEOUS**

37.1    <u>Rules and Regulations</u>.  Tenant shall, at all times during the Lease Term and any  extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises, Building and/or the Project.  The current rules and regulations are attached hereto as Exhibit C.  In the event of any conflict between said rules and regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control.  Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project.

37.2    <u>Security Service</u>.  Tenant acknowledges and agrees that, while Landlord may (but shall not be obligated to) patrol the Building, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

37.3    <u>Entire Agreement</u>.    This Lease constitutes the complete and entire agreement of Landlord and Tenant with respect to the subject matter hereof.  No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease.  This Lease may not be amended except by an instrument in writing signed by both parties hereto.

37.4    TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

37.5    This Lease shall be governed by the laws of the Commonwealth of Virginia.

37.6    Whenever a period of time is prescribed herein for action to be taken by the Landlord, Landlord shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, or force majeure, government laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord.

37.7    This Lease shall be effective only when fully executed by Landlord and Tenant.

37.8    Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

37.9    At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders.  Such annual statements shall be audited by an independent certified public accountant at Tenant's sole cost and expense.  Landlord shall hold such financial statements and information in confidence, and shall not disclose the same except: (i) to Landlord's lenders or potential lenders, (ii) to potential purchasers of all or a portion of the Project, (iii) otherwise as reasonably necessary for the operation of the Building and/or Project or administration of Landlord's business or (iv) if disclosure is required by any judicial or administrative order or ruling.

37.10    Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record.  Landlord may prepare and file, and upon request by Landlord, Tenant will execute a memorandum of lease.

37.11    Each party acknowledges that it has had the opportunity to consult counsel with respect to this Lease, and therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

37.12    All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such exhibits or addenda (other than the rules and regulations) and the terms of this Lease, such exhibits or addenda shall control.  In the event of a conflict between the rules and regulations attached hereto and the terms of this Lease, the terms of this Lease shall control.

37.13    If either party should prevail in any litigation instituted by or against the other related to this Lease, the prevailing party, as determined by the court, shall receive from the non-prevailing party all costs and reasonable attorneys' fees (payable at standard hourly rates) incurred in such litigation, including costs on appeal, as determined by the court.

37.14    This lease may be executed in counterparts.

38.    **RIGHT OF FIRST REFUSAL**. Upon Landlord's receipt of a bona-fide offer for Suite 110 (the "ROFR Space"), Landlord shall notify (the "Landlord's Notice") Tenant of its receipt thereof and the material terms of such offer (the "Offer") and Tenant shall have ten (10) days to either (i) exercise (thus, matching the materials terms as provided for in the Offer); or (ii) reject its Right of First Refusal(s) with respect to the ROFR Space.  If Tenant exercises its Right of First Refusal for the ROFR Space, this Lease shall be amended to add the ROFR Space consistent with the Offer (except that the term of this Lease as to the ROFR Space shall expire on the later of (i) the expiration date of the Lease; or (ii) the date upon which is five (5) years from the date of Landlord's Notice) and Landlord shall deliver to Tenant an amendment to this Lease incorporating the provisions of the Offer and making no other changes to this Lease within five (5) business days following Tenant's exercise of its Right of First Refusal.  Should Tenant (i) not execute such amended Lease, provided that such amendment shall be in form reasonably acceptable to Tenant, within seven (7) days of its receipt thereof; or (ii) fail to exercise its Right of First Refusal for the ROFR Space, with respect to the Offer then Tenant shall be deemed to have abandoned its rights with respect to such Offer with respect to the ROFR Space, Landlord shall be permitted to lease the ROFR Space on the terms of the Offer.

For any expansion by Tenant not initiated by a Right of First Refusal notice from Landlord, lease terms shall be mutually agreed upon by Tenant and Landlord.

39. **RENEWAL OPTION**. Tenant shall have the right to renew the Lease one 1) time for five (5) years at the current market rental rate in place as of the date of Tenant's Renewal Notice (as defined below). Tenant shall provide notice of intent (the "Renewal Notice") to renew the Lease by providing at least six (6) but not more than nine (9) months written notice to the Landlord. Landlord shall provide Tenant within ten (10) days of the Renewal Notice with a renewal proposal to be negotiated over the subsequent thirty (30) day period (the "Renewal Option Negotiation Period"). Should renewal terms not be mutually agreed upon by Tenant and Landlord during the Renewal Option Negotiating Period, Tenant shall, upon the expiration of the Renewal Option Negotiating Period, have the option of rescinding its option to renew. Should Tenant rescind its option to renew, Landlord shall be permitted to market the Premises immediately thereafter, including touring prospects through the Premises.

**IN WITNESS WHEREOF**, the Landlord has caused its seal to be affixed and its proper and duly authorized officers or partners to affix their signatures, and Tenant has caused its seal to be affixed and its proper and duly authorized officers or partners to affix their signatures, the day and year first written above.

WITNESS:

**LANDLORD:**
CSG Countryside, LLC

By: _____ (SEAL)

Name:  Alan C. Grabush
Title:  Authorized Person

WITNESS:

**TENANT**:
Skin Logic, LLC d/b/a ARIA Skin Care SPA
and ARIA Laser Skin Care Center

By: _____ (SEAL)

Name: _VALERIA GUNKOVA_

Title: _President_

**Exhibit A**

**Premises**



Tenant
Initial Here
V G

Landlord
Initial Here
AG

**Exhibit B**

**Proposed Tenant Improvements**



Tenant
Initial Here    V G

Landlord
Initial Here

## Exhibit C

### Rules and Regulations

Tenant, its agents, employees, contractors, licensees or invitees, shall comply with all rules and regulations established by Landlord from time to time. Any violation of the Rules and Regulations shall constitute a failure to perform a covenant of this Lease, and result in a default under the Lease. Landlord shall have the right to make additions and amendments to said Regulations from time to time, and any additions and amendments shall be binding on Tenant, its agents, employees, licensees or invitees, as if set forth in this Lease. In the event of a conflict between the following Rules and Regulations and the terms of the Lease to which this Addendum is attached, the terms of the Lease shall control.

1.  The sidewalk, entries, halls, passages, elevators, stairwells and driveways of the Premises, Building and/or Project shall not be obstructed by Tenant, its agents, employees, contractors, licensees or invitees, or used by them for any purpose other than ingress and egress to and from the Premises, Building and/or Project.

2.  Tenant, its agents, employees, contractors, licensees or invitees, shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, Building and/or Project.

3.  Except for seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Premises, Building and/or Project.

4.  Tenant, its agents, employees, contractors, licensees or invitees, shall not disturb the occupants of the Building and/or Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises, and shall not mark or defile the water closets, toilet rooms, windows, elevators or doors of the Building or interfere in any way with other tenants or those having business with them.

5.  If Tenant, its agents, employees, contractors, licensees or invitees, desires telephonic, cable, computer or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's, its agents, employees, licensees or invitees, expense.

6.  Tenant, its agents, employees, contractors, licensees or invitees, shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease. The use of oil, gas or flammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.  Parking any type of recreational vehicles is specifically prohibited on or about the Project. Except for the overnight parking of operative vehicles or as expressly permitted in the Lease, no vehicle of any type shall be stored in the parking areas at any time. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

8.    Tenant, its agents, employees, contractors, licensees or invitees, shall maintain the Premises in such a manner as to keep the Premises free from rodents, insects and other pests.

9.    Landlord reserves the right to exclude or expel from the Premises, Building and/or Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10.    Tenant, its agents, employees, contractors, licensees or invitees, shall not permit storage outside the Premises, Building and/or Project, including without limitation, outside storage of trucks and other vehicles, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

11.    No auction, public or private, will be permitted on the Premises, Building, or the Project.

12.    No awnings shall be placed over the windows in the Premises and/or Building, except with the prior written consent of Landlord.

13.    The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

14.    Tenant, its agents, employees, contractors, licensees or invitees, shall at all times conduct its operations in a good and workmanlike manner, employing best management practices to minimize the threat of any violation of Environmental Requirements.

15.    The toilet rooms, water closets and other water apparatus shall not be used for any purpose other than those for which there were constructed, and no sweepings, rubbish, rags, ashes, chemicals or the refuse from electric batteries or other unsuitable substances, shall be thrown therein. The cost of repair of any damage from such misuse or abuse by Tenants it's agents or employees, and shall be borne by the Tenant.

16.    No items shall be thrown or allowed to drop by Tenant, its agents, employees, licensees or invitees out of the windows or doors, or down the passages or shafts of the Building, and Tenant, its agents, employees, contractors, licensees, or invitees shall not sweep or throw or permit to be thrown from the Premises, any dirt or other substance into any of the corridors or halls, elevators, shafts or stairways of the Building.

17.    No articles (except for interior artwork) shall be fastened to, or holes drilled or nails or screws driven in to, walls, windows, partitions, nor shall the walls or partitions be painted, papered or otherwise covered, or in any way marked or broken, without the prior written consent of Landlord.

18.    Nothing shall be placed on the outside of the Building or Project or on the window, window sills or projections.

19.    The Landlord shall in all cases have the right to prescribe the weight and proper position of safes or other heavy objects in the Building. Landlord shall designate the time and manner in which these heavy objects and all furniture, fixtures or supplies shall be moved in

or out of the Building or moved around within the Building. Any damage caused by any of these operations or by any of these articles during the time they are in the Building, may be repaired by Landlord at Tenant's, its agents, employees, licensees or invitees, expense.

20.    No additional locks shall be placed upon any doors without the prior written consent of Landlord, and Tenant, its agents, employees, contractors, licensees or invitees, shall not permit any duplicate keys to be made.  All necessary keys shall be furnished by Landlord, and shall be surrendered upon the termination of this Lease. Tenant, its agents, employees, licensees or invitees, shall give Landlord or its agents an explanation of the combination of all locks upon the doors or vaults upon the termination of this Lease.

21.    Tenant, its agents, employees, contractors, licensees or invitees, shall see that windows are closed and the doors securely locked before leaving the Building.

22.    No food or beverage machinery except for use by Tenant, its agents, employees, licensees or invitees, or machinery of any kind, other than normal office machines shall be allowed to be operated on the Premises without the prior written consent of Landlord.

23.    No interference with the heating and air conditioning systems shall be permitted.  Regulating and adjusting of heating and air conditioning systems shall be done by employees of Landlord.

24.  Intentionally deleted.

25.    No smoking shall be permitted in any areas of the Building, including but not limited to, Corridors, elevators, stairwells and restrooms, in addition to Tenant's, its agents, employees, contractors, licensees or invitees, Premises.  Any smoking locations shall be determined by the Landlord and Tenant shall enforce such locations with their employees.

26.    Except as provided by Landlord as part of the Tenant Proposed Improvements, no electrical appliances, such as space heaters, microwaves or refrigerators, shall be permitted without Landlord's prior written approval. Such use by Tenant, its agents, employees, contractors, licensees or invitees is expressly prohibited.

27.    Space heaters are prohibited in Premises or Building.

28.    The occupancy rate of the Tenant shall not exceed one (1) person per two hundred (250) square feet of the premises.

29.    Moving Tenant furniture, fixtures, or equipment shall not be permitted within Building Hours and shall take place at dates and times as determined by Landlord. Landlord has right to charge Tenant to oversee the movement of such equipment, including but not limited to Tenant's vacating of the Premises.

30.    Tenant, its agents, employees, contractors, licensees or invitees, shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

31.    Tenant, its agents, employees, contractors, licensees or invitees, assume full responsibility for protecting the Premises from theft, robbery and pilferage.

32.    Tenant, its agents, employees, contractors, licensees or invitees, shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's, its agents, employees, contractors, licensees or invitees, ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

33.    If Tenant is conducting business in the Premises that causes labor strikes, Landlord shall have the right to terminate the Lease.

Tenant
Initial Here

Landlord
Initial Here

## Exhibit D

### Broom Clean Condition and Repair Requirements

1. All holes in the walls shall be repaired prior to move-out.  All walls shall be clean.

2. The carpets and vinyl tiles shall be in a clean condition and shall not have any holes or chips in them.

3. Facilities shall be returned in a broom clean condition.

4. If office machinery/equipment is removed, the electrical lines shall be properly terminated at the nearest junction box.

5. All mini-blinds shall not be damaged and be in good working order.

6. Tenant shall provide keys for all locks on the Premises, including front doors, rear doors, and interior doors.

7. All plumbing fixtures shall be in good working order.  Faucets and toilets shall not leak.

8. Remove any interior or exterior Tenant identification and cause same area to be restored to the condition that existed prior to the installation of said identification.

9. All personal property, furniture, artwork, telephone systems, cable systems, and trash shall be removed from the Premises, except to the extent as provided in Paragraph 18.

10. Forwarding address left with Landlord.


PROVIDED TENANT, AT ITS SOLE COST AND EXPENSE, HAS NOT MADE ANY AND ALL REPAIRS REQUIRED TO THE PREMISES IN ACCORDANCE WITH THIS EXHIBIT FAND/OR OTHER TERMS AS PROVIDED PER THE LEASE, LANDLORD, AT ITS SOLE OPTION, MAY EITHER (i) MAKE SAID REPAIRS AND INVOICE TENANT FOR SAME, PLUS LANDLORD'S OVERHEAD; AND/OR (ii) DEDUCT THE COST(S) OF SAID REPAIRS FROM TENANT'S SECURITY DEPOSIT.


Tenant
Initial Here            V G

Landlord
Initial Here            Jb

## Exhibit E

### LEASE GUARANTY

Whereas, **MNAP Medical Solutions, Inc.** ("MNAP") a PA Corporation, is an affiliate of **Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin Care Center** ("Tenant"). Because of investment in the Tenant, it is MNAP's direct interest and advantage to assist Tenant in securing a lease.  Therefore, in consideration of the making of the Lease by and between **CSG Countryside, LLC** as Landlord and **Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin Care Center** as Tenant, dated February, 25 2013 for the premises containing approximately **2,677** square feet, located at **2 Pidgeon Hill Drive, Suite 100** (hereinafter referred to as the "Lease") and for the purpose of inducing Landlord to enter into and make the Lease, the undersigned hereby unconditionally guarantees the full and prompt payment of rent and all other sums required to be paid by Tenant under the Lease ("Guaranteed Payments") and the full and faithful performance of all terms, conditions, covenants, obligations and agreements contained in the Lease on the Tenant's part to be performed ("Guaranteed Obligations") and the undersigned further promises to pay all of Landlord's costs and expenses (including reasonable attorney's fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this guaranty as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this guaranty.

      1.    Landlord may at any time and from time to time take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned on this guaranty:

      a.    grant an extension or extensions of time of payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

      b.    grant an indulgence or indulgences in any Guaranteed Payment or in the performance of any Guaranteed Obligation;

      c.    modify or amend the Lease or any term thereof, or any obligation of Tenant arising thereunder;

      d.    consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant or the Tenant's assigns or sublessees or a change or different use of the leased premises;

      e.    consent to an extension or extensions of the term of the Lease;

      f.    accept other guarantors; and/or

      g.    release any person primarily or secondarily liable.

The liability of the undersigned under this guaranty shall in no way be affected or impaired by any failure or delay in enforcing any Guaranteed Payment or Guaranteed Obligation or this guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor.  In order to hold the undersigned liable hereunder, there shall be no obligation on the part of Landlord, at any time, to

resort for payment to Tenant or any other guaranty or to any security or other rights and remedies, and Landlord shall have the right to enforce this guaranty irrespective of whether or not other proceedings or steps are pending or being taken seeking resort to or realization upon or from any of the foregoing.

2.     The undersigned waives all diligence in collection or in protection or any security, presentment, protest, demand, notice of dishonor or default, notice of acceptance of this guaranty, notice of any extensions granted or other action taken in reliance hereon and all demands and notices of any kind in connection with this guaranty or any Guaranteed Payment or Guaranteed Obligation.

3.     The undersigned hereby acknowledges full and complete notice and knowledge of all of the terms, conditions, covenants, obligations and agreements of the Lease.

4.     The payment by the undersigned of any amount pursuant to this guaranty shall not in any way entitle the undersigned to any right, title or interest (whether by subrogation or otherwise) of the Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

5.     This guaranty shall be continuing, absolute and unconditional and remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed, and all obligations of the undersigned under this guaranty are fulfilled.

6.     This guaranty shall also bind the successors, assigns, personal representatives, and heirs and administrators of the undersigned and inure to the benefit of Landlord, its successors and assigns. This guaranty shall be construed according to the laws of the state in which the leased premises are located, in which state it shall be performed by the undersigned.

7.     If this guaranty is executed by more than one person, all singular nouns and verbs herein relating to the undersigned shall include the plural number and the obligation of the several guarantors shall be joint and several.

8.     The Landlord and the undersigned intend and believe that each provision of this guaranty comports with all applicable law. However, if any provision of this guaranty is found by a court to be invalid for any reason, the parties intend that the remainder of this guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

IN WITNESS WHEREOF, the undersigned has caused this guaranty to be executed under seal this 25 day of February, 2013.

**MNAP MEDICAL SOLUTIONS, INC.**

_(signature)_ (SEAL)

Name: _Jacob T Bogatin_

Title: _Executive_

Address: _9008 Roosevelt Blvd_
_Philadelphia, PA 19145_

# FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made this 10 day of February, 2015 (the "Effective Date") between Liber, LLC, a Virginia limited liability company, ("Landlord") and Skin Logic, LLC d/b/a Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center, a Virginia limited liability company, ("Tenant").

## EXPLANATORY STATEMENT

**A.**    WHEREAS, Landlord's predecessor-in-interest, CSG Countryside, LLC, and Tenant entered into that certain Lease dated February 25, 2013 (the "Lease") for the rental to Tenant of 2,677 rental square feet located at 2 Pidgeon Hill Drive, Sterling, VA 20165 (the "Property"), which space is commonly referred to as "Suite 100" (the "Existing Space"); and

**B.**    WHEREAS, Landlord and Tenant desire that the Lease be amended to (i) expand the Premises into 2,953 rental square feet located in Suite 110 in the Property (the "Expansion Space", as shown in **Exhibit A**) and (ii) extend the term applicable to the Existing Space to be coterminous with the Expansion Space; and

**C.**    WHEREAS, by and pursuant to the terms of this First Amendment, upon the Effective Date, as defined above, the Lease will be amended as outlined below.

## AGREEMENT

NOW THEREFORE, the Explanatory Statement contained above being incorporated into this Amendment and in consideration of the Premises and of the payment of rent and other considerations moving between the parties, the parties hereto agree as follows: ·

1.    **Expansion Space.** Effective as of the Effective Date, the Premises, as defined in the Lease, shall include the Existing Space and the Expansion Space, for a total of 5,630 rental square feet in the Suites commonly referred to as 100 and 110.

2.    **Rent Commencement Date – Expansion Space.** The Rent Commencement Date for the Expansion Space shall be October 1, 2015.  Tenant shall have access to the Expansion Space free of rent until October 1, 2015 upon the Effective Date.

3.    **Expiration Date.** The Expiration Date, as defined in the Lease, shall be extended to September 30, 2025 and such date shall be applicable to both the Existing Space and the Expansion Space.

4.    **Basic Rent Schedule.** The Total Basic Rent Schedule provided for in Section 4 of the Cover Letter to the Lease shall remain in effect until October 1, 2015.  Effective October 1, 2015, the Total Basic Rent Schedule shall be replaced in its entirety with the following schedule:

| Period | Monthly Basic Rent | Period Total |
|---|---|---|
| 10/1/2015 - 9/30/2016 | $  8,445.00 | $  101,340.00 |
| 10/1/2016 - 9/30/2017 | $  8,445.00 | $  101,340.00 |
| 10/1/2017 - 9/30/2018 | $  8,959.30 | $  107,511.60 |
| 10/1/2018 - 9/30/2019 | $  9,228.08 | $  110,736.95 |

| 10/1/2019 - 9/30/2020 | $ 9,504.92 | $ 114,059.06 |
|---|---|---|
| 10/1/2020 - 9/30/2021 | $ 9,790.07 | $ 117,480.83 |
| 10/1/2021 - 9/30/2022 | $ 10,083.77 | $ 121,005.25 |
| 10/1/2022 - 9/30/2023 | $ 10,386.28 | $ 124,635.41 |
| 10/1/2023 - 9/30/2024 | $ 10,697.87 | $ 128,374.47 |
| 10/1/2024 - 9/30/2025 | $ 11,018.81 | $ 132,225.71 |

5.  **Tenant Improvements.** Tenant accepts the Expansion Space as is. Landlord, via a credit to Tenant's rental account for the Basic Rent of the Expansion Space only, shall provide Tenant with a tenant improvement allowance equal to $29,530.00 ($10.00 psf x 2,953 sf). Tenant, at its sole cost and expense, shall be responsible for delivering all tenant improvements in accordance with construction documents (the "Tenant Improvement CD's"), such Tenant Improvement CD's to include architectural, mechanical, electrical and plumbing drawings showing the design of the tenant improvements. Any changes to the Tenant Improvement CD's shall be documented via construction documents and submitted to Landlord for its review and approval prior to the commencement of construction of said changes. Landlord's approval shall not be unreasonably withheld; provided, however, that Landlord may, at its sole and absolute discretion, disapprove of any tenant improvement construction that is either structural in nature or is connected to or effecting any building systems, including but not limited to, mechanical, electrical and plumbing systems.

6.  **Restatement of Lease Guaranty.** By its execution of the Lease Guaranty provided for at **Exhibit B** hereto, MNAP Medical Solutions, Inc. does hereby restate its obligation as guarantor of the Lease.

7.  **Contingency for Use and Occupancy Permit.** It shall be a contingency to this First Amendment that Tenant, at its sole cost and expense, shall receive a Use and Occupancy Permit allowing for it to operate its business within the Expansion Space.

8.  **Lease Otherwise in Full Force and Effect.** Except as amended by this instrument, the Lease shall remain in full force and effect. No new rights, other than those listed above, shall be deemed to have been granted.

9.  **Binding Effect.** The terms of this Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10. **Renewal Option.** Tenant shall have the right to extend the term of this Lease for one (1) additional five (5) year lease term (the "Renewal Term"), upon the following conditions:

    a.  Tenant has not been in default at any time during the Term, beyond any applicable cure period;

    b.  Tenant is not subleasing more than fifty percent (50%) of Premises to any party other than a permitted Tenant Affiliate as defined in Section 15 of the Lease at a lease rate less than Tenant's current prevailing rate under this Lease;

    c.  Tenant has delivered to Landlord written notice of its intention to exercise this option, not less than nine (9) months prior to the end of the Lease Term; and

    d.  All lease terms for the Renewal Term shall be the same as in the Lease and this Amendment. The annual Basic Rent shall increase by three percent (3%) over the

prior period upon commencement of the Renewal Term and on each anniversary during the Renewal Term.

e.   At the conclusion of the Renewal Term Tenant and Landlord shall negotiate in good faith additional renewals upon terms and conditions mutually agreeable to both parties.

11.   **Condominium Unit Purchase Option.**  In the event Landlord converts the Property, including the Premises, to a commercial condominium and markets the Property for sale, Tenant shall have a limited right to purchase the condominium unit(s) which house the Premises.  Upon Landlord's election to convert the Property and Premises to a commercial condominium and market same for sale, and provided Tenant is not in default of the Lease or this Amendment and has not been late on any Rent, Landlord shall notify Tenant of its offer for Tenant to purchase the condominium unit(s) which hose the Premises, including the purchase price and terms of the sale.  Tenant shall have (90) calendar days to accept Landlord's offer and, provided all terms of the purchase agreement are fulfilled by Tenant (e.g., earnest money deposit), an additional  (90) calendar days to close.

12.   **Operating Expenses and Real Estate Taxes:**  As of the Effective Date, the Operating Expense Base Amount shall be defined as Operating Expenses for the period January 1, 2015 through December 31, 2015.  As of the Effective Date, Tenant's Proportionate Share shall be defined as 9.39% (5,630/59,964).  Beginning October 1, 2015, Tenant shall pay its Tenant's Proportionate Share of operating expense and real estate tax increases associated with the Premises in excess of the Operating Expense Base Amount pursuant to the terms of the Lease.

13.   **Ratification:**  The terms of the Lease, except as expressly modified hereby, shall remain in full force and effect.  All terms of the Lease, except as otherwise modified by this Amendment, are fully applicable. In the event that there shall be any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall govern and control.  Except as amended pursuant to the terms of this Amendment, the Lease is hereby ratified and confirmed in all aspects by Landlord and Tenant.

14.   **Counterparts:**  This Amendment may be executed in several counterparts and shall be valid and binding with the same force and effect as if all parties executed the same Amendment.

(signature page to follow)

3

IN WITNESS WHEREOF, the Landlord and Tenant have executed under seal this FIRST AMENDMENT TO LEASE AGREEMENT as of the date hereof.

**WITNESS:**                                         **LANDLORD:**

                                                     Liber, LLC
                                                     a Virginia limited liability company

_____                             By: _____ (SEAL)
                                                         Nathan W. Smith _____ (NAME)
                                                         Vice President + Leasing (TITLE)

                                                     **TENANT:**

                                                     Skin Logic, LLC d/b/a Aria Skin Care SPA and Aria
                                                     Laser Skin Care Center,
                                                     a Virginia limited liability company

_____                             By: _____ (SEAL)
                                                         VALERIA GUNKOVA _____ (NAME)
                                                         President _____ (TITLE)

4

FLOOR PLAN

TYPICAL WALL PARTITION

GENERAL NOTES

EARL P. HUSER, P.E.
CONSULTING ENGINEER
1714 HOPE LANE
MAPLE GLEN, PA 19002
TEL (215) 643-1175  FAX (215) 643-7522

AREA MEDIA SPA
2' PIDGEON HOLE, ROUTE 190
STERLING, VIRGINIA

ARCHITECTURAL
FLOOR PLAN, PHASE II—ADDITIONAL

A—1

## EXHIBIT B

## LEASE GUARANTY

Whereas, **MNAP Medical Solutions, Inc.** ("MNAP") a Pennsylvania Corporation, is an affiliate of **Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin Care Center** ("Tenant"). Because of investment in the Tenant, it is MNAP's direct interest and advantage to assist Tenant in securing a lease. Therefore, in consideration of the making of the Lease by and between **CSG Countryside, LLC** and **Skin Logic, LLC d/b/a ARIA Skin Care SPA and ARIA Laser Skin Care Center** as Tenant, dated February 25, 2013, which Lease was assigned to Liber, LLC as Landlord, and which Lease was amended by that certain First Amendment to Lease Agreement dated February ____, 2015 for the premises containing approximately 5,630 square feet, located at **2 Pidgeon Hill Drive, Suites 100 & 110** (hereinafter referred to as the "Lease") and for the purpose of inducing Landlord to enter into and make the Lease, the undersigned hereby unconditionally guarantees the full and prompt payment of rent and all other sums required to be paid by Tenant under the Lease ("Guaranteed Payments") and the full and faithful performance of all terms, conditions, covenants, obligations and agreements contained in the Lease on the Tenant's part to be performed ("Guaranteed Obligations") and the undersigned further promises to pay all of Landlord's costs and expenses (including reasonable attorney 's fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this guaranty as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this guaranty.

1.      Landlord may at any time and from time to time take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned on this guaranty:

          a.      grant an extension or extensions of time of payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

          b.      grant an indulgence or indulgences in any Guaranteed Payment or in the performance of any Guaranteed Obligation;

          c.      modify or amend the Lease or any term thereof, or any obligation of Tenant arising thereunder;

          d.      consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant or the Tenant's assigns or sublessees or a change or different use of the leased premises;

          e.      consent to an extension or extensions of the term of the Lease;

          f.      accept other guarantors; and/or

          g.      release any person primarily or secondarily liable.

The liability of the undersigned under this guaranty shall in no way be affected or impaired by any failure or delay in enforcing any Guaranteed Payment or Guaranteed Obligation or this guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise,

6

waiver, settlement, change, subordination, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor. In order to hold the undersigned liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort for payment to Tenant or any other guaranty or to any security or other rights and remedies, and Landlord shall have the irrespective of whether or not other proceedings or steps are pending or being taken seeking resort to or realization upon or from any of the foregoing.

2.    The undersigned waives all diligence in collection or in protection or any security, presentment, protest, demand , notice of dishonor or default, notice of acceptance of this guaranty, notice of any extensions granted or other action taken in reliance hereon and all demands and notices of any kind in connection with this guaranty or any Guaranteed Payment or Guaranteed Obligation.

3.    The undersigned hereby acknowledges full and complete notice and knowledge of all of the terms, conditions, covenants, obligations and agreements of the Lease.

4.    The payment by the undersigned of any amount pursuant to this guaranty shall not in any way entitle the undersigned to any right, title or interest (whether by subrogation or otherwise) of the Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

5.    This guaranty shall be continuing, absolute and unconditional and remain in  full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed, and all obligations of the undersigned  under this guaranty are fulfilled.

6.    This guaranty shall also bind the successors, assigns, personal representatives, and heirs and administrators of the undersigned and inure to the benefit of Landlord, its successors and assigns. This guaranty shall be construed according to the laws of the state in which the leased premises are located, in which state it shall be performed by the undersigned.

7.    If this guaranty is executed by more than one person , all singular nouns and verbs herein relating to the undersigned shall include the plural number and the obligation of the several guarantors shall be joint and several.

8.    The Landlord and the undersigned intend and believe that each provision of this guaranty comports with all applicable law. However, if any provision of this guaranty is found by a court to be invalid for any reason , the parties intend that the remainder of this guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

IN WITNESS WHEREOF, the undersigned has caused this guaranty to be executed under seal this ___ day of February, 2015.

MNAP MEDICAL SOLUTIONS, INC.

_Calcllcl_ (SEAL)

Name: JACOB BOATIN

Title: Execalrv

Address: 9909 Reeey Rc
         Plue PA 19115

7

## SECOND AMENDMENT TO OFFICE LEASE AGREEMENT

THIS SECOND AMENDMENT TO OFFICE LEASE AGREEMENT ("Amendment") is made and entered into this _17th_ day of March, 2017, by and between JUDICIAL DRIVE PROPERTY HOLDING, LLC, a Virginia limited liability company ("Judicial Drive" or "Landlord") and SKIN LOGIC, LLC d/b/a/ Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center, a Virginia limited liability company("Tenant").

## EXPLANATORY STATEMENT

WHEREAS, Landlord's predecessor-in-interest, Liber, LLC, and Tenant entered into that certain Lease dated February 25, 2015 (the "Lease") for the rental to Tenant of 5,630 rental square feet located at 2 Pidgeon Hill Drive, Sterling, VA 20165 (the "Property"), which space is commonly referred to as "Suites 100 and 110" (the "Existing Space"); and

WHEREAS, Landlord and Tenant desire that the Lease be amended to (i) expand to additional premises into 5,605 rental square feet located in Suite 120, 170, 180 together with the Men's and Women's restrooms on the first floor of the Property (the "Expansion Premises 1", as show in Exhibit A), (ii) expand into 7,082 rentable square feet located in Suite 260 – 4,728 sq.ft, Suite 240 – 2,354 sq.ft located on the second floor of the Property (the "Expansion Premises 2", as shown in Exhibit B), (iii) extend the term applicable to the Existing Premises to be coterminous with the Expansion Premises; and

WHEREAS, Tenant has continued in its occupancy of the Original Premises under the terms and conditions of the Original Lease until the completion of the Expansion Premises.

WHEREAS, by and pursuant to the term of this Second Amendment, upon the Effective Date, as defined above, the Lease will be amended as outlined below.

1

## AGREEMENT

NOW THEREFORE, the Explanatory Statement contained above being incorporated into this Amendment and in consideration of the premises and of the payment of rent and other considerations moving between the parties, the parties hereto agree as follows:

1. **Existing Space.** Tenant shall pay monthly rent payments to Landlord according to the existing lease terms until the agreed Commencement Date of the Second Amendment.

2. **Expansion Space.** Effective as of the Effective Date, the Premises, as defined in the Lease, shall include the Existing Space and the Expansion Spaces 1 & 2, for a total of 18,317 rentable square feet in the Suites commonly referred to as 100 and 120, 170, 180, Men/Women restrooms on the first floor and 260, 240. Rentable square footage of the building is measured at 60,520 square feet. Tenant acknowledges that Suite 180 may not be immediately available and that Suite 180 will be added to the Expansion Space and Rent for the portion of the Expansion Space represented by Suite 180 will not commence until that suite is delivered to Tenant. Landlord agrees that any delay in construction of Tenant Improvements to Suite 180 as a result of the unavailability of that Suite will entitle Tenant to an equal period of free rent for Expansion Space.

3. **Rent Commencement Date – Expansion Space.** The Rent Commencement Date for the Expansion Space shall be January 1, 2018. Tenant shall have access to the Expansion Space free of rent until January 1, 2018 upon the Effective Date.

4. **Expiration Date.** The Expiration Date, as defined in the Lease, shall be extended to December 31, 2027 and such date shall be applicable to both the Existing Space and the Expansion Space.

5. **Basic Rent Schedule.** Effective January 1, 2018, the Total Basic Rent Schedule shall be replaced in its entirety with the following schedule:

| Period | Monthly Basic Rent | Period Total |
|---|---|---|
| 1/1/2018 - 12/31/2022 | $15,264.17 | $183,170.00 |
| 1/1/2023 - 12/31/2027 | $16,790.58 | $201,486.96 |

2

6. **Additional Rent.** Tenant shall pay Additional Rent as defined below. Additional Rent shall mean "Expense Share" and "Tax Share", a.k.a Condominium Fee, which is estimated at approximately $7.50 per square foot as of the agreement date of this Amendment. The Condominium Fee, as set out below, may increase by not more than Two percent (2%) per year over any prior year during the term of the Lease as amended, as it may be extended.

| Period | Monthly Basic Rent | Period Total |
|---|---|---|
| 1/1/2018 - 12/31/2022 | $11,448.13 | $137,377.56 |
| 1/1/2023 - 12/31/2027 | $11,448.13 | $137,377.56 |

For each calendar year, Landlord shall estimate the amount of Additional Rent due for such year, and Tenant shall pay Landlord one-twelfth of such estimate on the first day of each month during such year. Such Operating Expenses and Real Estate Taxes shall be adjusted to represent 100% Building occupancy. Such estimate maybe revised by Landlord whenever it obtains information relevant to making such estimate more accurate. As soon as practical at the end of each calendar year, beginning with the end of the first lease year, Landlord shall deliver to Tenant a report certified by Landlord setting forth the actual Expenses and Taxes for such calendar year and a statement of the amount of the Additional Rent that Tenant has paid and is payable for such year. Unless Tenant has taken written exception to any item in such statement within thirty (30) days after receipt of such statement, such statement shall be considered final and accepted by Tenant and Tenant shall, within such thirty (30) days, pay to Landlord the amount of the Additional Rent due for such calendar year minus any payments of Additional Rent made by Tenant for such year. Upon reasonable notice, Landlord shall make the Landlord's accounts of Expenses and Taxes available for Tenant's inspection during reasonable building hours, but Tenant shall not be entitled to make or retain copies of such account. Landlord shall also make Landlord or Landlord's Property Manager's accounting staff available to answer reasonable questions related to such inspection. Tenant may not retain any person or entity to review or audit Landlord's accounts if such person or entity is compensated on a contingency fee basis. If Tenant's estimated payments of Additional Rent exceed the amount due Landlord for such calendar year, Landlord shall apply such excess as a credit against Tenant's other obligations under this Lease or promptly refund such excess to Tenant if the Term has already expired, provided Tennant is not then in default hereunder, in either case without interest to Tenant. If Tenant makes such timely written exception, a certification to both Landlord and

independent certified public account which shall be final and conclusive. Tenant agrees to pay the cost of such certification, unless it is determined that Landlord's original determination of Additional Rent was overstated by more than two percent (2%). If as a result of such certification process it is determined that Tenant overpaid Additional Rent, Landlord shall apply the amount of any such overpayment of Additional Rent as a credit against payments past or next due hereunder. If as a result of such certification process it is determined that Tenant underpaid Additional Rent, Tenant shall pay Landlord the amount of such underpayment within thirty (30) days of Tenant's receipt of a statement therefore.

7. **Payment of Rent.** All Rent shall be paid to Landlord in monthly installments, without offset or deduction, in the amounts as set forth in Section 5 and 6 of this Amendment, in advance, on or before the first day of each month of the term.

8. **Tenant Improvements.** Tenant accepts the Expansion Space as is. Landlord, for the Expansion Space only, shall provide Tenant with a tenant improvement allowance equal to $215,679 ($17.00 psf x 12,687 sf), payable on date of receiving construction permit. Tenant, at its sole cost and expense, shall be responsible for delivering all tenant improvements in accordance with construction documents (the "Tenant Improvement CD's"), such Tenant Improvement CD's to include architectural, mechanical, electrical and plumbing drawings showing the design of the tenant improvements. Any changes to the Tenant Improvement CD's shall be documented via construction documents and submitted to Landlord for its review and approval prior to the commencement of construction of said changes. Landlord's approval shall not be unreasonably withheld; provided, however, that Landlord may, at its sole and absolute discretion, disapprove of any tenant improvement construction that is either structural in nature or is connected to or effecting any building systems, including but not limited to, mechanical, electrical and plumbing systems.

9. **Contingency for Use and Occupancy Permit.** It shall be a contingency to this Third Amendment that Tenant, at its sole cost and expense, shall receive a Use and Occupancy Permit allowing for it to operate its business within the Expansion Space.

10. **Lease Otherwise in Full Force and Effect.** Except as amended by this instrument, the Lease shall remain in full force and effect. No new rights, other than those listed above, shall be deemed to have been granted.

4

11. **Binding Effect.** The terms of this Amendment shall be binding upon and inure to the benefit of the parties hereto and the irrespective successors and permitted assigns.

12. **Renewal Option.** Tenant shall have the right to extend the term of this Lease for Three (3) additional five (5) year lease terms (the "Renewal Term"), upon the following conditions:

> Tenant has not been in default at any time during the Term, beyond any applicable cure period;

> Tenant is not subleasing more than fifty percent (50%) of Premises to any party other than a permitted Tenant Affiliate as defined in Section 15 of the Lease at a lease rate less than Tenant's current prevailing rate under this Lease;

> Tenant has delivered to Landlord written notice of its intention to exercise this option, not less than six (6) months prior to the end of the Lease Term; and

> All lease terms for the Renewal Term shall be the same as in the Lease and this Amendment. The annual Basic Rent shall increase by three percent (3%) over then prior period upon commencement of the Renewal Term and on each anniversary during the Renewal Term.

> At the conclusion of the Renewal Term Tenant and Landlord shall negotiate in good faith additional renewals upon terms and conditions mutually agreeable to both parties.

13. **Condominium Unit Purchase Option.:** Tenant acknowledges that Landlord has converted the Property, including the Premises, to a commercial condominium and that Landlord markets units within the Property for sale. Landlord hereby grants to Tenant the Right of First Refusal to purchase the condominium unit(s) which house the Premises. At any time during the term of this Lease, as amended, provided that Tenant is not in default of the Lease, as amended, upon Landlord's receipt of a bona fide offer to purchase the premises, Landlord shall notify Tenant of the offer receive and for Tenant to purchase the condominium unit(s) which house the Premises, including the purchase price and terms of the sale. Tenant shall have thirty (30) days in which to notify Landlord of its election to purchase the premises on the same terms as are contained in the said offer, which purchase must be completed and closed not later than ninety (90) calendar days after Tenant receives notice of the offer from Landlord.

5

14. **Ratification.** The terms of the Lease, except as expressly modified hereby, shall remain in full force and effect. All terms of the Lease, except as otherwise modified by this Amendment, are fully applicable. In the event that there shall be any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall govern and control. Except as amended pursuant to the terms of this Amendment, the Lease is hereby ratified and confirmed in all aspects by Landlord and Tenant.

15. **Counterparts.** This Amendment may be executed in several counterparts and shall be valid and binding with the same force and effect as if all parties executed the same Amendment

IN WITNESS WHEREOF, the Landlord and Tenant have executed under seal this THIRD AMENDMENT TO LEASE AGREEMENT as of the date hereof.

WITNESS/ATTEST

LANDLORD:

JUDICIAL DRIVE PROPERTY HOLDING, LLC,
A Virginia limited liability company

By: _____ (SEAL)
(NAME)
  *Authorized*
_Managing Member_____(TITLE)

TENANT:

SKIN LOGIC, LLC d/b/a/ Aria Skin Care SPA and
Aria Laser Skin Care Center,
A Virginia limited liability company

By: _____ (SEAL)
(NAME)
_____(TITLE)

6