# EXHIBIT A TO MOTION TO SELL

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the **"Agreement"**) is made as of this day ___11/8/2024___, 2024, by and among Stephen A. Metz (the **"Trustee"**) Subchapter V Trustee for the Bankruptcy Estate of Skin Logic, LLC (the **"Debtor"),** as seller, and Leila Kump or designated assignee **Aria Elite LLC** (collectively, **"Buyer"),** as buyer.   Buyer, Debtor and Trustee may hereinafter also be referred to individually as a "party" and collectively as the "parties."

## <u>BACKGROUND</u>

A.      On August 24, 2023, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V, of Title 11 of the United States Code (the **"Bankruptcy Code"),** commencing Case No. 23-11352-KHK (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Virginia (the **"Bankruptcy Court").**

B.      On August 27, 2023, the United States Trustee appointed the Trustee as Subchapter V trustee in the Bankruptcy Case.

C.      On September 27, 2023, the Bankruptcy Court entered an Order Granting the Acting United States Trustee's Motion to Remove Debtor as Debtor in Possession and to Appoint Subchapter V Trustee as Operating Trustee Pursuant to 11 U.S.C. § 1185(a) (the "**Operating Order**").

D.      After entry of the Operating Order, the Trustee commenced a process to market the Debtor's assets for sale.

E.      The Trustee, along with his broker, have been in negotiations with the Buyer to acquire substantially all of the Debtor's assets (the "**Property**").

F.      The Buyer has now offered to purchase from Trustee, and Trustee has now agreed to sell to Buyer, the Debtor's Property on the terms and conditions set forth in this Agreement, subject to any higher and/or better offers that might be submitted by another buyer.  Approval of the Bankruptcy Court in the Bankruptcy Case is required as a condition of the Trustee's sale of the Property.

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements herein contained, and intending to be legally bound hereby, the parties represent, warrant, covenant, and agree, as follows:

## <u>TERMS AND CONDITIONS</u>

1.      <u>Sale and Purchase.</u> (a) The Trustee hereby agrees to sell, transfer, assign, and convey to Buyer all of his right, title, and interest in and to the Property defined in Schedule A - Assets, including all rights, claims and benefits appertaining to the Property, and Buyer hereby agrees to purchase the Property, subject to the conditions stated in Section 4 herein, and accept the sale, transfer and conveyance from the Trustee, for the Purchase Price and on and subject to the terms and conditions set forth in this Agreement.    The Property being purchased is detailed m "Schedule A -Assets".

2.      <u>Purchase Price.</u> Buyer shall pay the purchase price of ONE MILLION ONE

HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($1,150,000.00) ("**Purchase Price**") in cash, subject to the terms and conditions hereinafter set forth, as follows:

      2.1.  <u>Deposit.</u> Buyer shall deliver to the Trustee, a deposit of one hundred thousand dollars and no cents ($100,000.00) (the **"Deposit"**). Buyer shall deliver $50,000.00 of the Deposit to the Trustee within five (5) business days of execution of this Agreement and an additional $50,000.00 of the Deposit to the Trustee within five (5) business days of entry of the Sale Order (defined below). The Deposit shall be paid by certified check or other immediately available funds. The Deposit is a good faith earnest deposit by Buyer and is to be credited to the payment of the Purchase Price for the Property. The Deposit shall be held by the Trustee. Except as otherwise expressly set forth in this Agreement, upon its delivery to the Trustee by Buyer, the Deposit shall be deemed fully earned by the Trustee and non-refundable to Buyer subject only to**:** (a) the Trustee's termination of this Agreement for reasons other than a default by Buyer, (b) the Bankruptcy Court entering an order authorizing the Trustee to sell the Property to a third party other than Buyer, so long as Buyer is not in default of this Agreement, (c) the Bankruptcy Court rejecting this Agreement, or (d) the Buyer failing to obtain final approval by a lender to finance $1,050,000 of the Purchase Price, upon good faith efforts of the Buyer to obtain such a loan.

      2.2.  <u>Payment at Closing.</u> At the consummation of the transaction contemplated hereby (the **"Closing"),** Buyer shall deliver to the Trustee the following payment of the Purchase Price: (a) a certified check or wire payable to the order or account of the Trustee in an amount of One Million Fifty Thousand Dollars and No Cents ($1,050,000.00) as payment on the Purchase Price; and (b) the Deposit shall be applied to payment of the Purchase Price without set off.

      2.3.  <u>No Liabilities Assumed.</u> Buyer shall not assume any liabilities of Seller of any nature, except, however, Seller will assume and assign to Buyer, and Buyer will agree to perform and discharge any and all liabilities set forth in the lease attached hereto as part of Schedule B. Except as may be expressly provided in this Section 2.3, Buyer does not and will not assume or become liable for any obligations a n d / or liabilities of Seller, of any kind whatsoever, fixed liabilities or contingent, known or unknown (collectively, the "Retained Liabilities"), as a result of the transactions contemplated in this Agreement. Seller shall retain all of the Retained Liabilities, which shall remain the sole and exclusive responsibility of Seller to administer in the Bankruptcy Case.

3.    <u>Representations and Warranties.</u>

      3.1.  <u>Representations and Warranties of Trustee.</u> The Trustee warrants and represents to Buyer as follows:

      3.1.1.  Subject to the approval of the Bankruptcy Court at any hearing to approve the terms and conditions of this Agreement ("Sale Hearing"), the Trustee has the capacity, and all requisite actions have been taken and approvals obtained by the Trustee, to fully authorize and empower the Trustee to execute this Agreement and consummate the transactions contemplated hereby.

      3.1.2  The Trustee shall prepare the Sale Motion, Sale Notice and proposed

X2Sign Envelope ID: 823481

Sale Order (the "Sale Motion Documents"). The Buyer shall be provided a copy of the Sale Motion Documents two (2) business days before filing to review and approve. In the event of any discrepancy between this Agreement and the Sale Order, the terms of the Sale Order shall govern. The parties further acknowledge that this Agreement is not binding on, or enforceable by, the parties until entry of the Sale Order.

      3.2.   <u>Representations of Buyer.</u> Buyer represents and warrants as follows:

      3.2.1.  <u>Authority.</u> This Agreement has been properly executed by Buyer and is binding upon Buyer in accordance with its terms.

      3.2.2.  <u>No Conflict.</u> The execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder on the part of Buyer does not and will not violate any applicable law, ordinance, statute, rule, regulation, order, decree, or judgment, conflict with or result in the breach of any material terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge, or encumbrance upon any of the property or assets of the Buyer by reason of the terms of any contract, mortgage, lien, lease, agreement, indenture, instrument, or judgment to which Buyer is a party or which is or purports to be binding upon Buyer or which otherwise affects Buyer, which will not be discharged, assumed, or released at Closing. No action by any federal, state or municipal or other governmental department, commission, board, bureau or instrumentality is necessary to make this Agreement a valid instrument binding upon Buyer in accordance with its terms.

      3.2.3.  <u>Financial Ability; Legal Advice.</u> Buyer has the financial resources to consummate the transaction contemplated hereby, is solvent, and has not made a general assignment for the benefit of its creditors or been adjudicated a bankrupt or insolvent, nor has a receiver, liquidator, or trustee of Buyer or any of Buyer's assets been appointed or a petition filed by or against Buyer for bankruptcy, reorganization, or arrangement pursuant to the federal Bankruptcy Code or any similar federal or state statute, or any proceeding instituted for the dissolution or liquidation of Buyer. Furthermore, Buyer acknowledges that she is aware of the right to employ legal counsel and that it is advisable to do so.

      3.2.4.  <u>Management Assistance.</u> The Buyer intends to employ the assistance of Valeria Gunkova and Jacob Bogatin to provide assistance and training in the transfer of management and operation of the business during normal business hours at the location of the business for **24** months following Closing, without additional consideration by Buyer to Trustee.

      3.3.   <u>Purchase "As Is, Where Is."</u>

      3.3.1.  Buyer acknowledges and agrees that Buyer is familiar with the Property and has examined, or had the opportunity to examine, all matters concerning the Property which Buyer deems material to the transaction contemplated by this Agreement.

      3.3.2.  Buyer acknowledges and agrees that Buyer is acquiring the Property, in its "AS IS, WHERE IS" condition as of the Closing Date (including, without limitation, subject to all latent and patent defects), WITH ALL FAULTS, IF ANY, AND WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED. Other than as expressly set forth herein, neither the

Trustee, nor any of his agents, representatives, or attorneys have made any representations or warranties, direct or indirect, oral or written, express or implied, to Buyer or any agents, representatives, attorneys, or employees of Buyer with respect to the Property, its condition, its respective fitness for any particular purpose, or its respective compliance with any laws, and Buyer is not aware of and does not rely upon any such representation either to itself or any other party. Any information, documents, or materials which have been or hereafter are made available to Buyer are made available solely as an accommodation to Buyer in the conduct of its due diligence, and the Trustee makes no representation or warranty as to the accuracy or completeness thereof.

3.3.3.    Investigation by Buyer. Buyer has conducted its own independent review and analysis of the Property, any liabilities being assumed hereunder, and the Lease. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Cases. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Trustee, the Debtor, nor any of their respective affiliates or related persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its affiliates or related persons, except for the representations and warranties contained in Section 3.1 (which are subject to the limitations and restrictions contained in this Agreement); (ii) represents that she did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Property, the financial performance of the Debtor, the accuracy of Schedule A hereto (including but not limited to the specific items listed on Schedule A), or the physical condition of the Property; and (iii) agrees, to the fullest extent permitted by law, that none of Trustee, Debtor, their affiliates or any of their respective related persons shall have any liability or responsibility whatsoever to Buyer or her affiliates or related persons on any basis (including, without limitation, in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made, to Buyer or its affiliates or related persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Trustee set forth in this Agreement. Without limiting the generality of the foregoing, for the avoidance of doubt, Buyer acknowledges that Trustee (i) has not performed an inventory or inspection of the Property and makes no representations or warranties regarding the existence, condition, value, or count of the Property (including but not limited to the items on Schedule A) and (ii) shall have no liability nor any obligation to indemnify or reimburse Buyer or otherwise adjust the Purchase Price for any reason based upon Buyer's subsequent inspection and/or inventory of any of the Property. Buyer's obligations under this Agreement are not contingent upon Buyer's performance or completion of due diligence or satisfaction of the results therefrom.

3.3.4.    To the fullest extent permitted by law, Buyer hereby fully and forever releases and discharges the Trustee, and his representatives and attorneys, of and from any and all past, present, and future claims, damages, losses, warranties (express or implied), debts, liabilities, obligations, costs, expenses, demands, and causes of action of any kind or nature, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, fixed or contingent, matured or unmatured that Buyer has or may have or may claim to have in any way arising out of, relating to, or connected with (a) any latent or patent defect in the Property; or (b) any other matters set forth herein, except to the extent that the same would constitute a breach of any express provision, covenant, representation, or warranty set forth in this Agreement.

4

4.      Closing Conditions.

        4.1.    Sale Order. The obligation of the Trustee and Buyer to consummate the transactions described herein shall be contingent upon the Bankruptcy Court entering an order, in form and substance acceptable to Trustee and Buyer, which authorizes the Trustee to sell the Property to Buyer, defined on Schedule A, in accordance with the terms, provisions, and conditions of this Agreement (the **"Sale Order").**  The following are further conditions to the closing of the sale of the Property under this Agreement:

        4.1.1.  The Sale Order shall include a provision that Buyer is a good faith purchaser entitled to all the benefits and protections of 11 U.S.C. §363(m).

        4.1.2.  The representations and warranties of the parties are true and correct in all material respects when made and as of the date of closing of sale of Property.

        4.1.3   There is no breach of this Agreement by a party that has not been remedied to the satisfaction of the other parties.

        4.1.4   The Trustee has the right and authority to sell the Property to the Buyer in accordance with this Agreement.

5.      Closing: Deliveries.

        5.1.    Time of Closing. If the Bankruptcy Court waives the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) (the "**Stay**"), then the Buyer shall close within two (2) days of entry of the Sale Order by the Bankruptcy Court. Absent a waiver of the Stay by the Bankruptcy Court and unless otherwise agreed to by the Trustee and Buyer in writing, Closing shall take place on the fifteenth (15th) day following the entry of the Sale Order or such other day as agreed upon in writing by the parties (the **"Closing Date");** provided, however, that Closing shall occur only so long as the Sale Order and the effectiveness thereof have not been stayed, in whole or in part, by any subsequent order of the Bankruptcy Court or any other court of competent jurisdiction. Closing shall take place at the offices of the Trustee unless otherwise agreed to in writing by both the Trustee and Buyer. Buyer shall be in default in the event of its failure to close when obligated to do so and such failure continues for three (3) business days, in which event, the Trustee shall, at his option, be entitled to direct the termination of this Agreement, effective immediately upon Buyer's receipt of notice from the Trustee, and the Trustee shall be entitled to all of the remedies allowed by this Agreement as a result of such default, including without limitation retention of the Deposit.

        5.2     Notwithstanding Section 5.1, if Buyer has not yet obtained final approval from a lender to finance $1,050,000.00 of the Purchase Price, closing must occur after the Buyer obtains final approval from a lender to finance $1,050,000.00 of the Purchase Price, but not later than 60 days after entry of the Sale Order**.**

        5.3     Seller Deliveries. At Closing, Trustee shall deliver to Buyer the following,

X2Sign Envelope ID: 823481

and it shall be a condition to Buyer's obligation to close that Trustee shall have delivered the same to Buyer:

       5.3.1    The Trustee shall execute and deliver to the Buyer a Bill of Sale transferring the personal property and intellectual property to the Buyer.

       5.3.2    All other instruments and documents reasonably requested to effectuate this Agreement and the transactions contemplated hereby, including, but not limited to, a copy of the Sale Order.

       5.4    __Buyer Deliveries.__ At Closing, Buyer shall deliver to the Trustee the following, and it shall be a condition to Trustee's obligation to close that Buyer shall have delivered the same to Trustee:

       5.4.1    In accordance with Trustee's instructions, the amount required under Section 2.2 hereof.

       5.4.2    All other instruments and documents reasonably required to effectuate this Agreement and the transactions contemplated hereby.

       6.    __Remedies.__

       6.1.    __Buyer Default.__ If all conditions precedent to Buyer's obligation to purchase the Property have been satisfied, and Buyer breaches any term or provision of this Agreement and such breach is not cured within two (2) business days of receipt by Buyer of notice from the Trustee, including, but not limited to, any failure of the representations and/or warranties of Buyer hereunder to be true and correct both as of the date hereof and as of the Closing Date, then the Trustee shall, at his option, be entitled to direct the termination of this Agreement and the forfeiture of the Deposit as liquidated damages (and not as a penalty, the parties expressly acknowledging that damages in respect of such breach may be difficult or impossible to accurately ascertain) as his sole remedy.

       6.2.    __Seller Default.__ If all conditions precedent to the Trustee's obligations to sell the Property have been satisfied, and (i) Trustee breaches or fails to complete the sale of the Property when obligated to do so and such failure continues for one (1) business day, or (ii) following ten (10) business days written notice from Buyer, Trustee fails to perform his other obligations under this Agreement, Buyer may, as their only remedies therefore, terminate this Agreement and obtain a full refund of the Deposit and all other funds paid by Buyer to Trustee or Sales Agent for purchase of Property.

       7.    Intentionally Omitted.

       8.    __Notices.__ All notices and other communications provided for herein shall be in writing and shall be sent to the address set forth below (or such other address as a party may

hereafter designate for itself by notice to the other parties as required hereby) of the party for whom such notice or communication is intended:

      8.1.    If to Trustee:
              Stephen A. Metz, Trustee
              Offit Kurman, P.A.
              7501 Wisconsin Avenue, Suite 1000W
              Bethesda, MD 20814
              Email:  smetz@offitkurman.com

      8.2.    If to Buyer:

              Leila Kump, MD
              _____
              _____
              _____
              Email:  leila.kump@gmail.com

Any such notice or communication shall be sufficient if sent: by facsimile or email; by registered or certified mail, return receipt requested, postage prepaid; by hand delivery with a receipt; or by overnight courier service. Any such notice or communication shall be effective when the return receipt is executed or when delivery is refused.

    10.    <u>Brokers.</u>  The Trustee has employed Transworld Business Advisors of Richmond VA ("**Broker**") as his sales agent. The payment of any commission in connection with this Agreement to the Broker is subject to Bankruptcy Court approval.

    11.    <u>Miscellaneous.</u>

      11.1.    <u>Assignability.</u> Buyer may not assign or transfer its rights or obligations under this Agreement to any other individual, entity or other person without the written consent thereto by the Trustee; provided, however, that Buyer may, at Closing, take title to the Property in the name of an entity owned and controlled by Buyer. No assignment of this Agreement, or any portion thereof, by Buyer, whether or not consented to by the Trustee, shall serve to release Buyer from any provision of this Agreement; instead, Buyer shall remain fully liable hereunder.

      11.2.    <u>Governing Law; Bind and Inure.</u> This Agreement shall be governed by the laws of the Commonwealth of Virginia, without regard to conflicts of laws principles, and the applicable provisions of the Bankruptcy Code, and shall bind and inure to the benefit of the parties and their respective heirs, successors, and permitted assigns.

      11.3.    <u>Recording and Filing.</u> This Agreement or any notice or memorandum hereof shall not be recorded or filed in any public record, except in filings with the Bankruptcy Court.

      11.4.    <u>Headings.</u> The headings preceding the text of the paragraphs and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part

of this Agreement, nor shall they affect its meaning, construction or effect.

11.5. <u>Counterparts.</u> This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile or other electronic copy of this Agreement is effective as a signed agreement.

11.6. <u>Entire Agreement; Amendments.</u> This Agreement sets forth all of the promises, covenants, agreements, conditions, and undertakings between the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral or written, except as contained herein. This Agreement may not be changed orally but only by an agreement in writing, duly executed by or on behalf of the party or parties against whom enforcement of any waiver, change, modification, consent, or discharge is sought. The preamble and recitals to this Agreement as well as Schedules A and B hereto are incorporated herein by reference and made part of this Agreement.

11.7. <u>Performance on Saturdays, Sundays and Holidays.</u> Whenever the date fixed for the payment of funds, the giving of notice, or the performance of any other provision of this Agreement falls on a Saturday, Sunday, legal holiday, or any day on which banking institutions in the city of payment or performance are authorized by law to close, then such payment, notice or performance need not be made on such date, but shall be made on the next succeeding business day with the same force and effect as if made on the date fixed (and, as to payments, no additional interest shall accrue on such payment if payment is made on such next succeeding business day).

11.8. <u>Jurisdiction; Venue; Waiver of Jury Trial.</u> The Bankruptcy Court shall retain exclusive jurisdiction to hear and determine any matter arising from or relating to the sale of the Property and the enforcement of any rights and remedies of the Trustee or Buyer hereunder. Buyer hereby consents to such jurisdiction. If the Bankruptcy Court has no jurisdiction then the parties hereby submit to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Virginia, Alexandria Division. In the event of a dispute over the enforcement of this agreement and the Property described herein, the Bankruptcy Court shall retain jurisdiction for those matters. **THE PARTIES HEREBY WAIVE ALL RIGHTS TO A JURY TRIAL.** The parties acknowledge that the terms and conditions of this Agreement and the Trustee's obligations hereunder expressly are subject to approval by the Bankruptcy Court pursuant to the provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. All disputes arising under or related to this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

11.9 <u>Agreement Subject to Higher and Better Offers.</u> Buyer and Trustee acknowledge and agree that this Agreement is subject to higher and better offers from qualified bidders only, as approved by the Trustee, and approval of the Bankruptcy Court pursuant to such bidding and auction procedures and orders of the Bankruptcy Court as the Bankruptcy Court may direct. The Parties agree and acknowledge that the Trustee may enter into agreements with other buyers, subject to approval of the Bankruptcy Court. The trustee must promptly notify the Buyer of existing buyer agreements or of entering into agreements with other buyers.

11.10 <u>Releases.</u> Except for any obligations under this Agreement, the Buyer releases and forever discharges the (i) Trustee, (ii) Debtor (iii) the bankruptcy estate of Skin Logic, LLC, and

X2Sign Envelope ID: 823481

(iv) agents, officers, consultants, employees, legal counsel, accountants, financial advisors, brokers, and representatives of any kind of the Trustee, from each and every right, claim, debt, cause of action, demand, suit for damages, liability, transfers, act or right of action of any nature whatsoever, whether asserted or unasserted, known or unknown, including without limitation, any and all claims of any nature in the Bankruptcy Case.

*[Signature Page Follows]*

X2Sign Envelope ID: 823481

IN  WITNESS  WHEREOF,  the  parties  have  executed  and  delivered  this Asset Purchase
Agreement as of the date first above written.

Trustee (Seal):

*Stephen Metz*

_____

Stephen A. Metz, Esq., not individually but solely
in his capacity as Subchapter V Trustee, *In Re Skin Logic, LLC,
Case No. 23-11352-KHK*

Buyer (Seal):

*Leila Kump*

_____

Leila Kump MD
Aria Elite, LLC

10

Schedule A

The following assets comprise the Property being conveyed to the Buyer at Closing, subject to Section 3.3 of this Agreement.  In addition, notwithstanding anything herein to the contrary, to the extent any of the following constitute alterations, decorations, installations, additions or improvements made upon the premises leased by the Debtor, and are not movable, they shall be considered property of Debtor's landlord and not subject to the sale contemplated in this Agreement.

1. Account receivable
2. Inventory
3. Prepaid expenses, deposits
4. Prepaid rent to BNG Group LLC
5. Equipment,
6. Computers & Fixtures
7. Furniture & Fixtures
8. Software
9. Suites 100, 120, 180, 160, 240,260, Heater room, Pool equipment room under stairs, and Storage Room under stairs with all furniture, large and small equipment, fixtures, computers, accessories, special HVAC, and sanitizers UV Light, decorations.
10. Pool with a complete water purification and circulation system
11. Saunas with heating systems
12. 59 treatment room with furniture, fixtures, small equipment, decoration, special light, and salt blocks.
13. 13 fully equipped restrooms and 19 showers with furniture, accessories, and fixture
14. Salt room with built-in Himalayan salt blocks and a medical salt injection system, and an air heating system, with furniture and fixtures.
15. Hammam Room with tables and heating system
16. Steam room with Mr. Steam's equipment and aromatherapy system
17. Contrast the Kneipp therapy system
18. Two Hydrotherapy system
19. Two Laurence Wraps tables
20. Sharko Fat distraction Hydro system
21. Cafeteria furniture and fixture
22. The telephone communication system, network, servers, video system, speakers, and central control room of these systems with software and small tools
23. Three Commercial water heaters system 800 gallons
24. Hallway wall decoration lightning, special floor, and ceiling accessories
25. Hotel with 5 luxury decorated rooms with, furniture, accessories and fixtures
26. Management office with furniture, small equipment and fixture
27. Hot yoga inside a Himalayan salt blocks room with separate air ventilation and air treatment system. with heat-insulation of the ceiling, walls, and floor and special Zebra floor, furniture, fixtures, and accessories.
28. Two change rooms with lockers, furniture, and fixtures
29. Four reception areas with front desk, furniture, Displays for cosmetic products, accessories, and fixtures

X2Sign Envelope ID: 823481

30. Two Kitchen with Ice makers freezer, refrigerators, commercial dryers, washer and dishwasher equipment, furniture, and fixtures
31. Break Room with small equipment furniture and fixtures
32. Nails treatment room with equipment, furniture, and fixtures
33. 4 Storage rooms with inventory and supplies
34. Green Wall system for air purification, ozone enrichment removal of embolic $CO_2$ gases, and the elimination of bacteria and viruses.
35. Special ventilation, and AC systems in 1st and second-floor units
36. Candela GentleMax Pro
37. Candela VelaShape 3
38. Candela UltraShape
39. Candela UltraShape old
40. Zerona
41. Full Body Cryotherapy Machine
42. Inmode Transform, Trim Tone
43. Inmode Morpheus
44. Inmode Evoke
45. Inmode Triton
46. Cartesa   CO 2 Laser
47. SkinWave
48. Hologic Verizon
49. Visia Skin Analysis
50. Pronox
51. Employee uniforms, towels, Bed sheets, Robs, Sleepers
52. Aesthetic Machines and Equipment
53. Hot cabinets, Sterilizers, Steamers
54. Manicure Pedicure Equipment and furniture
55. Massage small equipment and furniture
56. Facial Small Equipment and furniture
57. Manicure, Pedicure Equipment and furniture
58. Computers, printers, scanners, monitors and televisions
59. Massage and facials Tables
60. Cafeteria furniture and fixture
61. Furniture and fixtures in Suite 500B
62. Other properties located in above mentions suites and rooms.

Intellectual properties:
1. List of clients, customers, vendors, suppliers
2. Marketing, promotional material, displays, exhibition small equipment, photos, video material,
3. Employee files, mailing lists, agreements, literature, pictures
4. Licenses, Registrations, Skin Logic, and DBA names.
5. Websites, Domain names, Protocols, emails, Management Software

## Schedule B

The Seller will assume and assign the Amended and Restated Deed of Lease by and between BNG, LLC and Skin Logic, LLC, d/b/a Aria Skin Care SPA, Aria MediSpa, and Aria Laser Skin Care Center (the "**Lease**"), attached hereto as part of this Schedule B.

At the closing Buyer will execute any and all Exhibits to the Lease, and any and all assignment-related documents that BNG, LLC ("**Landlord**") may require to be executed in conjunction with the assumption and assignment of the Lease.

**AMENDED AND RESTATED
DEED OF LEASE
by and between**

**BNG Group, LLC**

**and**

**SKIN LOGIC, LLC, d/b/a Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center**
----------------------------------------

X2Sign Envelope ID: 823481

# AMENDED AND RESTATED DEED OF LEASE

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 1. | Definitions and Attachments | 1 |
| 2. | Demise | 3 |
| 3. | Term | 3 |
| 4. | Security Deposit and Advance Rent | 3 |
| 5. | Use | 4 |
| 6. | Rent | 4 |
| 7. | Requirements of Applicable Law | 8 |
| 8. | Certificate of Occupancy | 8 |
| 9. | Contest-Statute, Ordinance, Etc. | 8 |
| 10. | Tenant's Improvements | 8 |
| 11. | Repairs and Maintenance | 9 |
| 12. | Conduct on Premises | 10 |
| 13. | Insurance | 11 |
| 14. | Rules and Regulations | 12 |
| 15. | Mechanics' Liens | 12 |
| 16. | Tenant's Failure to Repair | 12 |
| 17. | Property – Loss, Damage | 13 |
| 18. | Destruction – Fire or Other Casualty | 13 |
| 19. | Eminent Domain | 13 |
| 20. | Assignment | 13 |
| 21. | Default; Remedies; Bankruptcy of Tenant | 14 |
| 22. | Damages | 16 |
| 23. | Services and Utilities | 17 |
| 24. | Electricity and Water | 18 |
| 25. | Telephone and Telecommunications | 19 |
| 26. | Acceptance of Premises | 20 |
| 27. | Inability to Perform | 20 |
| 28. | No Waivers | 20 |
| 29. | Access to Premises and Change in Services | 20 |
| 30. | Estoppel Certificates | 20 |
| 31. | Subordination | 21 |
| 32. | Attornment | 21 |
| 33. | Notices | 21 |
| 34. | Relocation | 22 |
| 35. | Intentionally Deleted | 22 |
| 36. | Quiet Enjoyment | 22 |
| 37. | Vacation of Premises | 22 |
| 38. | Members' Liability | 22 |
| 39. | Separability | 22 |
| 40. | Indemnification | 23 |
| 41. | Captions | 23 |
| 42. | Intentionally Deleted | 23 |
| 43. | Recordation | 23 |
| 44. | Successors and Assigns | 23 |
| 45. | Integration of Agreements | 24 |
| 46. | Hazardous Material; Indemnity | 24 |

47.  Americans With Disabilities Act ...................................................................................... 26
48.  Several Liability ............................................................................................................... 26
49.  Intentionally Deleted ....................................................................................................... 26
50.  Signage ............................................................................................................................. 26
51.  Definition of Day and Days ............................................................................................. 26
52.  Tenant's Anti-Terrorism Representation .......................................................................... 27

X2Sign Envelope ID: 823481

## AMENDED AND RESTATED DEED OF LEASE

**THIS AMENDED AND RESTATED DEED OF LEASE** (this "Lease") is made this _____ day of _____, 2024, by and between **BNG Group, LLC** Virginia limited liability company (the "Landlord") and **Skin Logic, LLC, d/b/a Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center,** a Virginia limited liability company (the "Tenant").

WHEREAS, Landlord, as successor in interest to Judicial Drive Property Holding, LLC, a Virginia limited liability company, as successor in interest to Liber, LLC , as successor in interest to CSG Countryside, LLC, and Tenant are parties to a Deed of Lease dated February 25, 2013, as amended by a First Amendment to Lease Agreement dated February 10, 2015, and as further amended by a Second Amendment to Office Lease Agreement, dated March 19, 2017 (collectively, the "Original Lease"), pursuant to which Tenant leases 18,317 rentable square feet known as Suites 100, 120, 170 and 180, men's and women's restrooms on the first floor and Suites 240 and 260 (collectively, the "Premises") in the building located at 2 Pidgeon Hill Drive, Sterling, Virginia 20165 ("Building"); and

WHEREAS, Landlord and Tenant have agreed to amend and restate the Original Lease in its entirety.

NOW THEREFORE, that in consideration of the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows:

1.      Definitions and Attachments.

      1.1      Certain Defined Terms.

          1.1.1     "Building" means the office building located at 2 Pidgeon Hill Drive, Sterling, VA 20165, which is located within Loudoun County, Virginia. "Project" means the Building and adjacent property located at 2 Pidgeon Hill Drive, Sterling, VA 20165.

          1.1.2     "Rentable Area of the Building" means 60,520 rentable square feet, subject to adjustment in accordance with BOMA standards.

          1.1.3     "Premises" has the meaning given to such term in the Recitals.

          1.1.4     "Rentable Area of the Premises" means 18,317 rentable square feet.

          1.1.5     "Term" means a period of ten (10) years commencing on the date of this Lease and expiring on the last day of the one hundred twentieth (120th) month thereafter.

          1.1.6     "Base Rent" means the amount set forth on the following schedule:

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Lease Year 1* | $300,000.00 | $25,000.00 |
| Lease Year 2 | $336,000.00 | $28,000.00 |
| Lease Year 3 | $384,000.00 | $32,000.00 |
| Lease Year 4 | $456,000.00 | $38,000.00 |
| Lease Year 5 | $480,000.00 | $40,000.00 |
| Lease Year 6 | $509,626.16 | $42,468.85 |
| Lease Year 7 | $524,914.94 | $43,742.91 |

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Lease Year 8 | $540,662.39 | $45,055.20 |
| Lease Year 9 | $556,882.26 | $46,406.85 |
| Lease Year 10 | $573,588.73 | $47,799.06 |

*The first two months of Annual Rent in Year 1 shall be fully abated, provided that Tenant is not in default hereunder.

1.1.7    Intentionally Deleted.

1.1.8    Intentionally Deleted.

1.1.9    "Security Deposit" means the sum of security deposits required hereunder to be paid to Landlord upon the execution of the Lease in the amount of Twenty-Five Thousand and 00/100ths Dollars ($25,000.00).

1.1.10    "Tenant Notice Address" means

Skin Logic, LLC
2 Pidgeon Hill Suite 100
Sterling, VA, 20165

1.1.11    Intentionally Deleted.

1.1.12    Intentionally Deleted.

1.1.13    Intentionally Deleted.

1.2    Additional Defined Terms.

The following additional terms are defined in the places in this Lease noted below:

| Term | Section |
|---|---|
| "ADA" | 47 |
| "Applicable Laws" | 7 |
| "Approved Plans and Specifications" | 35 |
| "Building Expenses" | 6.2.2 |
| "Commencement Date" | 3.1 |
| "Common Areas" | 6.2.4 |
| "Cost of Building Expenses Per Square Foot" | 6.4.1 |
| "Cost of Taxes Per Square Foot" | 6.3.1 |
| "Default Rate" | 6.6 |
| "Hazardous Material" | 46 |
| "HVAC" | 23 |
| "Lease Year" | 6.2.5 |
| "Mortgagee" | 31 |
| "Normal Business Hours" | 23 |
| "Property" | 6.2.1 |
| "Successor" | 32 |
| "Taxes" | 6.2.3 |

2

1.3     <u>Recitals; Original Lease; Attachments</u>.

The recitals to this Lease are hereby incorporated herein by this reference. The Original Lease is hereby amended and restated in its entirety by this Lease and shall be of no further force or effect. The following documents are attached hereto, and such documents, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| | |
|---|---|
| Exhibit "A" | - Floor Plan |
| Exhibit "B" | - Rules and Regulations |
| Exhibit "C" | - Intentionally Deleted |
| Exhibit "D" | - Estoppel Certificate |
| Exhibit "E" | - Subordination, Attornment and Non-Disturbance Agreement |
| Exhibit "F" | - Guaranty |

2.     <u>Demise</u>. Landlord hereby leases unto Tenant, and Tenant does hereby rent from Landlord the Premises. In addition thereto, Tenant shall have the right to use, on a non-exclusive basis, and in common with the other tenants of the Building the Common Areas of the Building (as that term is defined in <u>Section 6.2.4</u> hereof).

3.     <u>Term</u>.

3.1     <u>Commencement Date and Term</u>. This Lease shall commence on the date of this Lease ("Commencement Date") and shall be for the Term.

3.2     Intentionally Deleted.

3.3     <u>Intentionally Deleted.</u>

4.     <u>Security Deposit and Advance Rent.</u> Upon Lease execution a Security Deposit and the first month of rent prepaid shall be due.

4.1     <u>Security Deposit</u>. Tenant has, upon execution of this Lease, paid to Landlord the Security Deposit to be held by Landlord as security for the performance by Tenant of all obligations imposed on Tenant hereunder. If Tenant shall perform all such obligations, the Security Deposit shall be refunded to Tenant, without interest, at the end of the Term. If Tenant shall default in any such obligation, Landlord shall be entitled to apply the Security Deposit toward Landlord's damages, and Tenant shall replenish the Security Deposit to the full amount within ten (10) days after receipt of a written notice from Landlord which sets forth the amount to be replenished. If the Security Deposit is not fully restored, it shall constitute an Event of Default (as defined in Section 21) under the terms of this Lease, and Landlord shall have the benefit of all remedies permitted pursuant to the terms of this Lease and the laws of the Commonwealth of Virginia. The Security Deposit shall not be considered an advance payment of rent or a measure of Landlord's damages in case of default by Tenant. Landlord may commingle the Security Deposit with other monies of Landlord. In the event of the sale or transfer of Landlord's interest in the Building, Landlord shall have the right to transfer the Security Deposit to the purchaser or transferee and upon such transfer Tenant shall look only to the new landlord for the return of the Security Deposit and Landlord shall thereupon be released from all liability to Tenant for the return of or accounting for the Security Deposit.

5.     <u>Use</u>. Tenant covenants that it shall use and occupy the Premises continuously during the Term of this Lease solely for a yoga studio and a medical and esthetician spa, including the following services: laser skin care, LED skin treatments, IPL photorejuvenation, eMatrix, skin analysis and consultation, chemical

peels, botox, dermabrasion/microdermabrasion, ultrasonic cellulite redaction and other facial skin care treatments, body scrub, wrap, massage, wax, manicure, pedicure and other ancillary laser, facial, skin and body treatments and for no other purpose whatsoever. Landlord makes no representation or warranty that the use is permitted by Applicable Law. Tenant shall be obligated, at it sole cost, to ensure that Tenant's use complies with Applicable Laws, and Tenant's use at all times shall be subject to and in accordance with applicable zoning regulations. Permitted use shall not include use as a school, college, university or educational institution of any type, use for any purpose which is not consistent with the operation of the Building as a first-class office building, use as a recruitment or temporary help service or agency, or any use involving regular traffic by the general public. Tenant acknowledges that (a) violation of the foregoing continuous occupancy and use covenant shall be a material breach of this Lease, and (b) Landlord considers such continuous use and occupancy covenant a valuable contractual interest with which no other landlord should interfere by attempting to induce Tenant to move to another building. Tenant recognizes that its occupancy of the Premises continuously throughout the Term of this Lease provides Landlord a significant benefit in the perception of the Building by other prospective tenants who will negotiate with Landlord for space in the Building in the future as well as the perception of other existing tenants who will be negotiating with Landlord to renew their leases and remain in the Building.

6.    Rent.

6.1    Base Rent. As rent for the Premises during each year of the Term, Tenant shall pay to Landlord an Annual Base Rent, in equal monthly installments, in advance on the first day of each calendar month during the Term, without deduction, setoff or demand in accordance with the schedule set forth in Section 1.1.6 above. In addition to the Base Rent, if the Term should commence on a day other than the first day of a calendar month, Tenant shall pay to Landlord upon the Commencement Date, a sum equaling that percentage of the monthly rent installment which equals the percentage of such calendar month falling within the Term.

6.2    Definitions. For the purposes hereof, the following definitions shall apply:

6.2.1    "Property" shall mean the Building and the Project, the land upon which the same are situated and all fixtures and equipment thereon or therein, all commonly owned or shared appurtenances, including but not limited to, parking areas, walkways, landscaping and utilities, whether located on the land upon which the Building or Project is situated or elsewhere.

6.2.2    "Building Expenses" shall be all those expenses paid or incurred by Landlord in connection with the owning, maintaining, operating and repairing of the Property or any part thereof, in a manner deemed reasonable and appropriate by Landlord and shall include, without limitation, the following:

6.2.2.1    All costs and expenses of operating, repairing, lighting, cleaning, and insuring (including liability for personal injury, death and property damage and workers' compensation insurance covering personnel) the Property or any part thereof, as well as all costs incurred in removing snow, ice and debris therefrom and of policing and regulating traffic with respect thereto, and depreciation of all machinery and equipment used therein or thereon, replacing or repairing of pavement, parking areas, curbs, walkways, drainage, lighting facilities, landscaping (including replanting and replacing flowers and other planting);

6.2.2.2    Electricity, water, steam and fuel used in lighting, heating, ventilating and air conditioning and all costs, charges, and expenses incurred by Landlord in connection with any change of any company providing electricity service, including, without limitation, maintenance, repair, installation

4

and service costs associated therewith, as well as all expenses associated with the installation of any energy or cost savings devices;

       6.2.2.3  Maintenance and repair of mechanical and electrical equipment including heating, ventilating and air conditioning equipment, not including equipment installed by or for the benefit of Tenant;

       6.2.2.4  Window cleaning and janitor service, including equipment, uniforms, and supplies and sundries;

       6.2.2.5  Maintenance of elevators, stairways, rest rooms, lobbies, hallways and other Common Areas;

       6.2.2.6  Repainting and redecoration of all Common Areas;

       6.2.2.7  Repair and maintenance of the parking areas, including without limitation, the resurfacing and striping of said areas;

       6.2.2.8   Sales or use taxes on supplies or services;

       6.2.2.9  Management fees, wages, salaries and compensation of all persons engaged in the maintenance, operation or repair of the Property and the provision of amenities to all tenants in the Property (including Landlord's share of all payroll taxes and the cost of an on-site or near-site office and segregated storage area for Landlord's parts, tools and supplies);

       6.2.2.10 Legal, accounting and engineering fees and expenses, except for those related to disputes with tenants or which are a result of and/or are based on Landlord's negligence or other tortious conduct;

       6.2.2.11 Costs and expenses that may result from compliance with any governmental laws or regulations that were not applicable to the Common Areas at the time same were originally constructed; and

       6.2.2.12 All other expenses which under generally accepted accounting principles would be considered as an expense of maintaining, operating, or repairing the Property.  Notwithstanding the foregoing, all expenses (whether or not such expenses are enumerated on items 1 through 11 of this <u>Section 6.2.2</u>) which would be considered capital in nature under generally accepted accounting principles shall be excluded from "Building Expenses" unless same are amortized in accordance with generally accepted accounting principles.

       6.2.3   "Taxes" shall mean all real property taxes including currently due installments of assessments, sewer rents, ad valorem charges, water rates, rents and charges, front foot benefit charges, business, professional and occupational license tax and all other governmental impositions in the nature of any of the foregoing.  Excluded from Taxes are (i) federal, state or local income taxes, (ii) franchise, gift, transfer, excise, capital stock, estate or inheritance taxes, and (iii) penalties or interest charged for late payment of Taxes.  If at any time during the Term the method of taxation prevailing at the commencement of the Term shall be altered so as to cause the whole or any part of the items listed in the first sentence of this subparagraph to be levied, assessed or imposed, wholly or partly as a capital levy, or otherwise, on the rents received from the Building, wholly or partly in lieu of imposition of or in addition to the increase of taxes in the nature of real estate taxes issued against the Property, then the charge to Landlord resulting from such altered additional method of taxation shall be deemed to be within the definition of "Taxes."

6.2.4    "Common Areas" shall mean those areas and facilities which may be from time to time furnished to the Building by Landlord for the non-exclusive general common use of tenants and other occupants of the Building, their officers, employees, and invitees, including (without limitation) the hallways, stairs, parking facilities, washrooms, and elevators.

6.2.5    "Lease Year" shall mean the first twelve (12) month period following the Commencement Date and each succeeding twelve (12) month period thereafter up to the end of the Term; provided, however, that if the Commencement Date shall occur on a day other than the first day of a calendar month, then the first Lease Year shall include that portion of a calendar month in which the Commencement Date occurs in addition to the first twelve (12) month period.

6.2.6    "Building Business Hours" shall mean 8:00 am-6:00 pm Monday -Friday and 8:00 am-2:00 pm on Saturdays.

6.3    Rent Adjustments for Taxes.

6.3.1  On or before April 30 of each Lease Year, Landlord shall total the Taxes and shall allocate such Taxes to the Rentable Area of the Building in the following manner: Taxes for the foregoing calendar year shall be totaled and such total shall be divided by the total rentable square feet in the Building thereby deriving the "Cost of Taxes Per Square Foot" of rentable area.

6.3.2    Tenant shall pay to Landlord, as additional rent at the time such Taxes are due and payable, the amount of Taxes times the number of square feet in the Rentable Area of the Premises. Any additional rent due Landlord under this Section shall be due and payable within thirty (30) days after Landlord shall have submitted a written statement to Tenant showing the amount due. For Tenant's obligation for such additional rent at the beginning or end of the Lease, see Section 6.5. Landlord may, in its discretion, make a reasonable estimate of such additional rent with respect to Taxes, and require Tenant to pay each month during such year 1/12 of such amount, at the time of payment of monthly installments of Monthly Base Rent. In such event, Tenant shall pay, or Landlord shall refund or credit to Tenant's account, any underpayment or overpayment of such additional rent within thirty (30) days of Landlord's annual written statement of Taxes due. Tenant shall have the right to examine, at Tenant's sole expense, Landlord's records with respect to Taxes; provided, however, that unless Tenant shall have given Landlord written notice of exception to any such statement within thirty (30) days after delivery thereof, the same shall be conclusive and binding on Tenant. Failure of Landlord to provide any statement within the time prescribed will not relieve Tenant of its obligations under this Section 6.3; provided, however, that Tenant will have no obligation to pay its portion of any increase in Taxes until receipt of a statement from Landlord as described above.

All reasonable expenses incurred by Landlord (including attorneys', appraisers' and consultants' fees, and other costs) in contesting any increase in Taxes or any increase in the assessment of the Property shall be included as an item of Taxes for the purpose of computing additional rent due hereunder.

6.4    Rent Adjustments for Building Expenses.

6.4.1    On or before April 30 of each Lease Year, Landlord shall compute the Building Expenses for such year and shall allocate such costs to the Rentable Area of the Building in the following manner: Building Expenses shall be totaled and such total shall be divided by the total Rentable Area of the Building thereby deriving the "Cost of Building Expenses Per Square Foot" of rentable area.

6.4.2    Tenant shall pay to Landlord, as additional rent, the amount of Building Expenses times the number of square feet of Rentable Area of the Premises, as set forth in <u>Section 1</u> above.  If occupancy of the Building during any calendar year is less than ninety percent (90%), then Building Expenses for that calendar year shall be "grossed up" to that amount of Building Expenses that, using reasonable projections, would normally be expected to be incurred during the calendar year in question if the Building was ninety percent (90%) occupied during the applicable calendar year period, as determined under generally accepted accounting principles; it being understood that the written statement submitted to Tenant shall provide a reasonably detailed description of how the Building Expenses were grossed up and that only those component expenses that are affected by variations in occupancy levels shall be grossed up.  Such additional rent shall be computed on a year-to-year basis.  Any such additional rent shall be due within thirty (30) days after Landlord has submitted a written statement to Tenant showing the amount due.  Landlord may, in its discretion, make a reasonable estimate of such additional rent with respect to any calendar year, and require Tenant to pay each month during such year 1/12 of such amount, at the time of payment of monthly installments of Base Rent.  In such event, Tenant shall pay, or Landlord shall refund or credit to Tenant's account, any underpayment or overpayment of such additional rent within sixty (60) days of Landlord's written statement of actual Building Expenses for the calendar year.  Tenant, at Tenant's sole expense, shall have the right to examine Landlord's records with respect to Building Expenses; provided, however, that unless Tenant shall have given Landlord written notice of exception to any such statement within sixty (60) days after delivery thereof, the same shall be conclusive and binding on Tenant.  Notwithstanding anything to the contrary contained herein, Landlord shall use diligent efforts to keep Building Expenses at reasonable amounts, while maintaining the Building as a first class office building. Tenant acknowledges that with regard to certain Building Expenses, some tenants may be paying various fees directly to the service provider (including, without limitation, janitorial services and electricity charges), in which event the  computation of Building Expenses per rentable square foot for such items shall be determined by using the total rentable square footage of the Building reduced by the rentable square footage of the tenants who are paying such fees directly to the service provider.  Failure of Landlord to provide any statement within the time prescribed will not relieve Tenant of its obligations under this <u>Section 6.4</u>; provided, however, that Tenant will have no obligation to pay its portion of Building Expenses until receipt of a statement from Landlord as described above.

6.5    <u>Additional Rent Payments</u>.  Tenant's obligation to pay any additional rent accruing during the Term pursuant to <u>Sections 6.3</u> and <u>6.4</u> hereof shall apply pro rata to the proportionate part of a calendar year as to Taxes and Building Expenses, in which this Lease begins or ends, for the portion of each such year during which this Lease is in effect.  Such obligation to make payments of such additional rent shall survive the expiration or sooner termination of the Term.

6.6    <u>Payments</u>.  All payments or installments of any rent hereunder and all sums whatsoever due under this Lease (including but not limited to court costs and attorneys' fees) shall be deemed rent and shall be paid to Landlord at the address designated by Landlord.  If any amount of Annual Base Rent or additional rent shall remain unpaid for five (5) calendar days after such payment becomes due, Tenant shall pay Landlord, without notice or demand, a late charge equal to the greater of (i) $35.00 and (ii) five percent (5%) of the such overdue amount to partially compensate Landlord for its administrative costs in connection with such overdue payment; which administrative costs Tenant expressly acknowledges are reasonable and do not constitute a penalty.  In addition, such overdue amounts shall bear interest at the rate of 18% per annum (but not more than the maximum allowable legal rate applicable to Tenant) (the "Default Rate") until paid.  Additionally, if any of Tenant's checks for payment of rent or additional rent are returned to Landlord for insufficient funds, Tenant shall pay to Landlord as additional rent the greater of (i) $50.00 or (ii) the amount of actual charges incurred by Landlord, for each such check returned for insufficient funds, and if two or more of Tenant's checks in payment of rent or additional rent due hereunder are returned for insufficient funds in any calendar year, Landlord reserves the right upon ten (10) days advance written notice to Tenant to thereafter require Tenant to pay all rent and additional rent and other sums whatsoever

due under this Lease in cash, by money order or by certified check or cashier's check   If an attorney is employed to enforce Landlord's rights under this Lease, Tenant shall pay all fees and expenses of such attorney whether or not legal proceedings are instituted by Landlord.  Time is of the essence in this Lease.

7.   Requirements of Applicable Law.  Tenant, at its sole cost and expense, shall comply promptly with all applicable laws, ordinances, rules and regulations of governmental authorities having jurisdiction over the Property ("Applicable Laws") now in force or which may hereafter be in force, which impose any duty upon Landlord or Tenant with respect to the use, occupancy or alteration of the Premises or any part thereof and for the prevention of fires; provided, however, that Landlord and not Tenant shall correct all structural defects in the Building necessary to comply with Applicable Laws, and make all repairs, changes or alterations necessary because the Building was not constructed in compliance with any of the Applicable Laws.

8.   Certificate of Occupancy.  Tenant shall not use or occupy the Premises or any portion thereof in violation of any certificate of occupancy, non-residential use permit, other permit, or any other governmental consent issued for the Building.  If any governmental authority, after the commencement of the Term, shall contend or declare that any portion of the Premises is being used for a purpose which is in violation of such certificate of occupancy, non-residential use permit, other permit, or consent, then Tenant shall, upon five (5) days' notice from Landlord, immediately discontinue such use of the Premises.  If thereafter the governmental authority asserting such violation threatens, commences or continues criminal or civil proceedings against Landlord for Tenant's failure to discontinue such use, in addition to any and all rights, privileges and remedies given to Landlord under this Lease for default therein, Landlord shall have the right to terminate this Lease forthwith.  Tenant shall indemnify and hold Landlord harmless of and from any and all liability for any such violation or violations.

9.   Contest-Statute, Ordinance, Etc.  Tenant may, after notice to Landlord, by appropriate proceedings conducted promptly at Tenant's own expense in Tenant's name and whenever necessary in Landlord's name, contest in good faith the validity or enforcement of any such statute, ordinance, law, order, regulation or requirement and may similarly contest any assertion of violation of any certificate of occupancy, non-residential use permit, other permit, or any consent issued for the Building.  Tenant may, pending such contest, defer compliance therewith if, in the opinion of counsel for Landlord, such deferral shall not subject either Landlord or the Premises or the Property (or any part thereof) to any penalty, fine or forfeiture, and if Tenant shall post a bond with corporate surety approved by Landlord sufficient, in Landlord's opinion, fully to indemnify Landlord from loss.

10.   Tenant's Improvements.  Tenant shall not make any alterations, decorations, installations, additions or improvements to the Premises, including but not limited to, the installation of any fixtures, amenities, equipment, appliances, or other apparatus, without Landlord's prior written consent, and then only by contractors or mechanics employed or approved by Landlord.  All such work, alterations, decorations, installations, additions or improvements shall be done at Tenant's sole expense and at such times and in such manner as Landlord may from time to time designate.  Landlord's consent to and/or approval of Tenant's plans and specifications for the aforesaid improvements shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities.  All alterations, decorations, installations, additions or improvements made by either of the parties hereto upon the Premises, except movable office furniture put in at the expense of Tenant and other items as mutually agreed upon in writing, shall be the property of Landlord and shall remain upon and be surrendered with the Premises at the termination of this Lease without molestation or injury.  At the time of Landlord's approval of any alterations, Landlord shall notify Tenant whether Tenant shall be required to remove such alterations at the expiration or earlier termination of the Lease, in which event Tenant, at Tenant's expense, shall remove any and all  improvements upon the expiration or earlier termination of the Lease. If Tenant fails to remove any such items, Landlord shall have

the right, but not the obligation, to remove and dispose of such items, and restore the Premises accordingly and Tenant shall reimburse Landlord for the costs of such removal, disposal and restoration within thirty (30) days after receipt of an invoice therefore, together with interest at the Default Rate, which shall accrue from the date the costs were incurred by Landlord.

11.    Repairs and Maintenance.

   11.1    Tenant's Care of the Premises and Building.  During the Term, Tenant shall:

        (i)    keep the Premises and the fixtures, appurtenances and improvements therein in good order and condition;

        (ii)    make repairs and replacements to the Premises required because of Tenant's misuse or primary negligence, except to the extent that the repairs or replacements are covered by Landlord's insurance as required hereunder;

        (iii)    repair and replace special equipment, including without limitation, humidifiers, appliances and additional HVAC equipment, and decorative treatments installed by or for the benefit of Tenant and that serve the Premises only, except to the extent the repairs or replacements are needed because of Landlord's misuse or primary negligence, and are not covered by Tenant's insurance as required hereunder;

        (iv)    pay for all damage to the Building, its fixtures and appurtenances, as well as all damages sustained by Tenant or occupants of the Building due to any waste, misuse or neglect of the Premises, its fixtures and appurtenances by Tenant, except to the extent that the repair of such damage is covered by Landlord's insurance as required hereunder to the extent that Landlord actually receives proceeds therefrom; and

        (v)    not commit waste.

   In addition, Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which such floor was designed to carry and which may be allowed under Applicable Laws.  Landlord reserves the right to prescribe the weight and position of all heavy equipment brought onto the Premises and prescribe any reinforcing required under the circumstances, all such reinforcing to be at Tenant's expense.  Should Tenant's services involve chemicals or similar products that impact the air quality of the building, Tenant shall, upon written notice by Landlord, install additional ventilation systems and equipment, upon the prior written approval of Landlord in accordance with the terms of this Lease, in order to ensure that the air quality of the Building is not impacted by the conduct of Tenant's business in the Premises.

   11.2    Landlord's Repairs.  Except for the repairs and replacements that Tenant is required to make pursuant to Section 11.1 above, Landlord shall make all other repairs and replacements to the Premises, Common Areas and Building (including Building fixtures and equipment) as shall be reasonably deemed necessary to maintain the Building in a condition comparable to other comparable office buildings in the Northern Virginia area.  This maintenance shall include the roof, foundation, exterior walls, interior structural walls, all structural components, and all systems such as mechanical, electrical, multi-tenant HVAC, and plumbing.  The costs associated with such repairs shall be deemed a part of Building Expenses; provided, however, that costs of all of such repairs which would be considered capital in nature under generally accepted accounting principles shall be paid by Landlord.  There shall be no allowance to Tenant for a diminution of rental value, no abatement of rent, and no liability on the part of Landlord by reason of

inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making any repairs or performing maintenance as provided for herein.

11.3    Time for Repairs.  Repairs or replacements required pursuant to Section 11.1 and 11.2 above shall be made within a reasonable time (depending on the nature of the repair or replacement needed - generally no more than fifteen (15) days) after receiving notice or having actual knowledge of the need for a repair or replacement.

11.4    Surrender of the Premises.  Upon the termination of this Lease, without the need for prior notice from Landlord, Tenant shall surrender the Premises to Landlord in broom clean condition and otherwise in the same condition that the Premises were in on the Commencement Date except for:

(i)    ordinary wear and tear;

(ii)    damage by the elements, fire, and other casualty unless Tenant would be required to repair under the provisions of this Lease;

(iii)    damage arising from any cause not required to be repaired or replaced by Tenant; and

(iv)    alterations as permitted by this Lease unless consent was conditioned on their removal.

On surrender Tenant shall remove from the Premises its personal property, trade fixtures and any alterations required to be removed pursuant to the terms of this Lease and repair any damage to the Premises caused by this removal.  Any items not removed by Tenant as required above shall be considered abandoned.  Landlord may dispose of abandoned items as Landlord chooses and bill Tenant for the cost of their disposal.

12.    Conduct on Premises.  Tenant shall not do, or permit anything to be done in the Premises, or bring or keep anything therein which shall, in any way, increase the rate of fire insurance on the Building, or invalidate or conflict with the fire insurance policies on the Building, fixtures or on property kept therein, or obstruct or interfere with the rights of Landlord or of other tenants, or in any other way injure or annoy Landlord or the other tenants, or subject Landlord to any liability for injury to persons or damage to property, or interfere with the good order of the Building, or conflict with Applicable Laws, or the recommendations of any insurance company or insurance rating organization.  Tenant agrees that any increase of fire insurance premiums on the Building or contents caused by the occupancy of Tenant and any expense or cost incurred in consequence of negligence or carelessness or the willful action of Tenant, Tenant's employees, agents, servants, or invitees shall, as they accrue be added to the rent heretofore reserved and be paid as a part thereof; and Landlord shall have all the rights and remedies for the collection of same as are conferred upon Landlord for the collection of rent provided to be paid pursuant to the terms of this Lease.

13.    Insurance.

13.1    Tenant's Insurance.  Tenant shall keep in force at its own expense, so long as this Lease remains in effect, (a) public liability insurance, including insurance against assumed or contractual liability under this Lease, with respect to the Premises, to afford protection with limits, per person and for each occurrence, of not less than Two Million Dollars ($2,000,000.00), combined single limit, with respect to personal injury and death and property damage, such insurance to provide for only a reasonable deductible, (b) all-risk property and casualty insurance, including theft, written at replacement cost value and with

10

replacement cost endorsement, covering all of Tenant's personal property in the Premises and all improvements and installed in the Premises by or on behalf of Tenant whether pursuant to the terms of Section 10 or otherwise, such insurance to provide for only a reasonable deductible, (c) if and to the extent required by law, workmen's compensation or similar insurance offering statutory coverage and containing statutory limits, (d) insurance covering plate and other interior glass in the Premises for and in the name of Landlord, and (e) business interruption insurance in an amount sufficient to reimburse Tenant for loss of earnings attributable to prevention of access to the Building or the Premises for a period of at least twelve (12) months. Such policies shall be maintained in companies and in form reasonably acceptable to Landlord and shall be written as primary policy coverage and not contributing with, or in excess of, any coverage which Landlord shall carry. Tenant shall deposit the policy or policies of such required insurance or certificates thereof with Landlord prior to the Commencement Date, which policies shall name Landlord or its designee and, at the request of Landlord, its mortgagees, as additional insured and shall also contain a provision stating that such policy or policies shall not be canceled except after thirty (30) days' written notice to Landlord or its designees. All such policies of insurance shall be effective as of the date Tenant occupies the Premises and shall be maintained in force at all times during the Term of this Lease and all other times during which Tenant shall occupy the Premises. In addition to the foregoing insurance coverage, Tenant shall require any contractor retained by it to perform work on the Premises to carry and maintain, at no expense to Landlord, during such times as contractor is working in the Premises, a non-deductible (i) comprehensive general liability insurance policy, including, but not limited to, contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection with limits per person and for each occurrence, of not less than Two Million Five Hundred Thousand Dollars ($2,500,000.00), combined single limit, with respect to personal injury and death and property damage, such insurance to provide for no deductible, and (ii) workmen's compensation insurance or similar insurance in form and amounts as required by law. In the event of damage to or destruction of the Premises and the termination of this Lease by Landlord pursuant to Section 18 herein, Tenant agrees that it shall pay Landlord all of its insurance proceeds relating to improvements made in the Premises by or on behalf of Tenant whether pursuant to the terms of Section 10 or otherwise. If Tenant fails to comply with its covenants made in this Section, if such insurance would terminate or if Landlord has reason to believe such insurance is about to be terminated, Landlord may at its option cause such insurance as it in its sole judgment deems necessary to be issued, and in such event Tenant agrees to pay promptly upon Landlord's demand, as additional rent the premiums for such insurance.

       13.2    <u>Landlord's Insurance</u>. Landlord shall keep in force at its own expense (a) contractual and comprehensive general liability insurance, including public liability and property damage, with a minimum combined single limit of liability of One Million Dollars ($1,000,000.00) for personal injuries or death of persons occurring in or about the Building and Premises, and (b) all-risk property and casualty insurance written at replacement cost value covering the Building and all of Landlord's improvements in and about same.

       13.3    <u>Waiver of Subrogation</u>. Each party hereto waives claims arising in any manner in its favor and against the other party and agrees that neither party hereto shall be liable to the other party or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to the Building, the Premises or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, or against liability on or about the Building, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage as was required to be covered by insurance carried pursuant to this Lease. Landlord shall use reasonable efforts to cause each insurance policy carried by it insuring against liability on or about the Building or insuring the Premises and the Building or income resulting therefrom against loss by fire or any of the casualties covered by the all-risk insurance carried by it hereunder to be written in such a manner as to provide that the insurer

waives all right of recovery by way of subrogation against Tenant in connection with any loss or damage covered by such policies. Tenant shall cause each insurance policy carried by it insuring against liability or insuring the Premises (including the contents thereof and Tenant's Improvements installed therein by Tenant or on its behalf) against loss by fire or any of the casualties covered by the all-risk insurance required hereunder to be written in such a manner as to provide that the insurer waives all right of recovery by way of subrogation against Landlord in connection with any loss or damage covered by such policies.

14.    Rules and Regulations.  Tenant shall be bound by the rules and regulations set forth on the schedule attached hereto as Exhibit "B" and made a part hereof. Landlord shall have the right, from time to time, to issue additional or amended rules and regulations regarding the use of the Building, so long as the rules shall be reasonable and non-discriminatory among tenants. When so issued the same shall be considered a part of this Lease and Tenant covenants that the additional or amended rules and regulations shall likewise be faithfully observed by Tenant, the employees of Tenant and all persons invited by Tenant into the Building, provided, that the additional or amended rules are made applicable to all tenants similarly situated as Tenant. Landlord shall not be liable to Tenant for the violation of any of the rules and regulations, or the breach of any covenant or condition in any lease, by any other tenant in the Building.

15.    Mechanics' Liens.  Tenant shall not do or suffer to be done any act, matter or thing whereby Tenant's interest in the Premises, or any part thereof, may be encumbered by any mechanics' lien. Tenant shall discharge, or bond off, within ten (10) days after the date of filing, any mechanics' liens filed against Tenant's interest in the Premises, or any part thereof, purporting to be for labor or material furnished or to be furnished to Tenant. Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and no mechanics' or other lien for labor or materials shall attach to or affect the reversionary or other estate or interest of Landlord in and to the Premises or the Property.

16.    Tenant's Failure to Repair.  In the event that Tenant fails after reasonable prior written notice from Landlord, to keep the Premises in a good state of condition and repair pursuant to Section 11 above, or to do any act or make any payment required under this Lease or otherwise fails to comply herewith, Landlord may, at its option (but without being obliged to do so) immediately, or at any time thereafter and without notice, perform the same for the account of Tenant, including the right to enter upon the Premises, at all reasonable hours to make such repairs, or do any act or make any payment or compliance which Tenant has failed to do, and upon demand, Tenant shall reimburse Landlord for any such expense incurred by Landlord including but not limited to any costs, damages and counsel fees. Any moneys expended by Landlord, as aforesaid, shall be deemed additional rent, collectible as such by Landlord. All rights given to Landlord in this Section shall be in addition to any other right or remedy of Landlord herein contained.

17.    Property -- Loss, Damage.  Landlord, its agents and employees shall not be liable to Tenant for (i) any damage or loss of property of Tenant placed in the custody of persons employed to provide services for or stored in or about the Premises and/or the Building, unless such damage or loss is the result of the negligence of Landlord, (ii) any injury or damage to persons, property or the business of Tenant resulting from a latent defect in or material change in the condition of the Building, and (iii) interference with the light, air, or other incorporeal hereditaments of the Premises.

18.    Destruction -- Fire or Other Casualty.  In case of partial damage to the Premises by fire or other casualty insured against by Landlord, Tenant shall give immediate notice thereof to Landlord, who shall thereupon cause damage to all property owned by it to be repaired with reasonable speed at expense of Landlord, to the extent of insurance proceeds actually received by Landlord, due allowance being made for reasonable delay which may arise by reason of adjustment of loss under insurance policies on the part of Landlord and/or Tenant, and for reasonable delay on account of "labor troubles" or any other cause beyond Landlord's control, and to the extent that the Premises are rendered untenantable the rent shall proportionately abate from the date of such casualty, provided the damage above mentioned occurred

without the fault or neglect of Tenant, Tenant's servants, employees, agents or visitors. If such partial damage is due to the fault or neglect of Tenant, or Tenant's servants, employees, agents, or invitees, the damage shall be repaired by Landlord to the extent of Landlord's insurance coverage, but there shall be no apportionment or abatement of rent. In the event the damage shall be so extensive to the whole Building as to render it uneconomical, in Landlord's opinion, to restore for its present uses and Landlord shall decide not to repair or rebuild the Building, this Lease, at the option of Landlord, shall be terminated upon written notice to Tenant and the rent shall, in such event, be paid to or adjusted as of the date of such damage, and the terms of this Lease shall expire by lapse of time upon the third day after such notice is mailed, and Tenant shall thereupon vacate the Premises and surrender the same to Landlord, but no such termination shall release Tenant from any liability to Landlord arising from such damage or from any breach of the obligations imposed on Tenant hereunder, or from any obligations accrued hereunder prior to such termination.

19.    Eminent Domain. If (1) the whole or more than fifty percent (50%) of the floor area of the Premises shall be taken or condemned by eminent domain for any public or quasi-public use or purpose, or (2) more than twenty-five percent (25%) of the floor area of the Building shall be so taken, and Landlord shall elect, in its sole discretion, by giving written notice to Tenant, any written notice to be given not more than sixty (60) days after the date on which title shall vest in such condemnation proceeding, to terminate this Lease, then, in either such event, the Term of this Lease shall cease and terminate as of the date of title vesting. In case of any taking or condemnation, whether or not the Term of this Lease shall cease and terminate, the entire award shall be the property of Landlord, and Tenant hereby assigns to Landlord all its right, title and interest in and to any such award, except that Tenant shall be entitled to claim, prove and receive in the proceedings such awards as may be allowed for moving expenses, loss of profit and fixtures and other equipment installed by it which shall not, under the terms of this Lease, be or become the property of Landlord at the termination hereof, but only if such awards shall be made by the condemnation, court or other authority in addition to, and be stated separately from, the award made by it for the Property or part thereof so taken.

20.    Assignment. So long as Tenant is not in default of any of the terms and conditions hereof, after the giving of all required notices and the expiration of all cure periods, Landlord shall not unreasonably withhold its consent to an assignment of this Lease or sublease of the Premises for any of the then remaining portion of the unexpired Term provided: (i) the net assets of the assignee or sublessee shall not be less than the net assets of Tenant at the time of the signing of this Lease; (ii) in the event of an assignment, such assignee shall assume in writing all of Tenant's obligations under this Lease; (iii) in the event of a sublease, such sublease shall in all respects be subject to and in conformance with the terms of this Lease; and (iv) in all events Tenant continues to remain liable on this Lease for the performance of all terms, including but not limited to, payment of all rent due hereunder. Landlord and Tenant acknowledge and agree that it shall not be unreasonable for Landlord to withhold its consent to an assignment if in Landlord's sole business judgment, the assignee lacks sufficient business experience or net worth to successfully operate its business within the Premises in accordance with the terms, covenants and conditions of this Lease. If this Lease shall be assigned, or if the Premises or any part thereof shall be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant or occupant and apply the net amount collected to the rent herein reserved, but no such collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further observance and performance by Tenant of the covenants herein contained. In addition, in the event of a proposed assignment, Landlord shall have the right, but not the obligation, to terminate this Lease by giving Tenant thirty (30) days' advance written notice ("Landlord's Termination Notice"); provided, however, that Tenant shall have the right to abrogate Landlord's Termination Notice by notifying Landlord within ten (10) days after receipt of Landlord's Termination Notice of the withdrawal of the request for consent to the assignment. For purposes of the foregoing, a transfer by operation of law or transfer of a controlling interest in Tenant as same exists as of the date hereof, shall be deemed to be an

X2Sign Envelope ID: 823481

assignment of this Lease.  No assignment or sublease, regardless of whether Landlord's consent has been granted or withheld, shall be deemed to release Tenant from any of its obligations nor shall the same be deemed to release any person guaranteeing the obligations of Tenant hereunder from their obligations as guarantor.  Landlord's acceptance of any name submitted by Tenant, an agent of Tenant, or anyone acting by, through or under Tenant for the purpose of being listed on the Building directory will not be deemed, nor will it substitute for, Landlord's consent, as required by this Lease, to any sublease, assignment, or other occupancy of the Premises by anyone other than Tenant or Tenant's employees.  Any profit or additional consideration or rent in excess of the Base Rent or additional rent payable by Tenant hereunder which is payable to Tenant as a result of any assignment or subletting shall be paid to Landlord as additional rent when received by Tenant.  All the foregoing notwithstanding, Tenant shall not enter into any lease, sublease, license, concession or other agreement for the use, occupancy or utilization of the Premises or any portion thereof, which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the income or profits derived by any person or entity from the property leased, used, occupied or utilized. Any such purported lease, sublease, license, concession or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use or occupancy of any part of the Premises. Any consent by Landlord hereunder shall not constitute a waiver of strict future compliance by Tenant with the provisions of this Section 20. In no event shall the proposed assignee or sublessee be occupying other space in the Building, nor shall it be a prospective tenant either then negotiating with Landlord or has negotiated with Landlord for premises within the prior six (6) month period.

21.    Default; Remedies; Bankruptcy of Tenant.  Any one or more of the following events shall constitute an "Event of Default" hereunder, at Landlord's election:  (a) the sale of Tenant's interest in the Premises under attachment, execution or similar legal process or the adjudication of Tenant as a bankrupt or insolvent, unless such adjudication is vacated within thirty (30) days; (b) the filing of a voluntary petition proposing the adjudication of Tenant (or any guarantor of Tenant's obligations hereunder) as a bankrupt or insolvent, or the reorganization of Tenant (or any such guarantor), or an arrangement by Tenant (or any such guarantor) with its creditors, whether pursuant to the U.S. Bankruptcy Code or any similar federal or state proceeding, unless such petition is filed by a party other than Tenant (or any such guarantor) and is withdrawn or dismissed within thirty (30) days after the date of its filing; (c) the admission, in writing, by Tenant (or any such guarantor) of its inability to pay its debts when due; (d) the appointment of a receiver or trustee for the business or property of Tenant (or any such guarantor), unless such appointment is vacated within thirty (30) days of its entry; (e) the making by Tenant (or any such guarantor) of an assignment for the benefit of its creditors, or if, in any other manner, Tenant's interest in this Lease shall pass to another by operation of law; (f) the failure of Tenant to pay any rent, additional rent or other sum of money when due and such failure continues for a period of five (5) days after receipt of written notice that the same is past due hereunder; (g) if Tenant fails to pay any rent or additional rent when due after Landlord shall have given Tenant written notice with respect to such non-payment once previously in any twelve (12) month period as provided in subsection (f) above; (h) Tenant shall abandon and/or vacate the Premises; and (i) the default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within thirty (30) days after the giving of notice thereof by Landlord, unless such default is of such nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default shall occur so long as Tenant shall commence the curing of the default within such thirty (30) day period and shall thereafter diligently prosecute the curing of same and complete such cure within sixty (60) days after such notice.

Upon the occurrence and continuance of an Event of Default, Landlord, with such notice to Tenant as provided for by law or as expressly provided for herein, may do any one or more of the following:  (a) sell, at public or private sale, all or any part of the goods, chattels, fixtures and other personal property belonging to Tenant which are or may be put into the Premises during the Term, whether or not exempt from sale under execution or attachment (it being agreed that the property shall at all times be bound with a lien in favor of Landlord and shall be chargeable for all rent and for the fulfillment of the other covenants

14

X2Sign Envelope ID: 823481

and agreements herein contained), and apply the proceeds of such sale, first, to the payment of all costs and expenses of conducting the sale or caring for or storing the property; second, toward the payment of any indebtedness, including, without limitation, indebtedness for rent, which may be or may become due from Tenant to Landlord; and third, to pay Tenant, on demand in writing, any surplus remaining after all indebtedness of Tenant to Landlord has been fully paid; (b) perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform and of which Landlord shall have given Tenant notice, the cost of which performance by Landlord, together, with interest thereon at the Default Rate from the date of such expenditure, shall be deemed additional rent and shall be payable by Tenant to Landlord upon demand; (c) elect to terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant in which event Tenant shall be liable for Base Rent, additional rent, and other indebtedness that otherwise would have been payable by Tenant during the remainder of the Term had there been no Event of Default, and on notice reenter the Premises, by summary proceedings or otherwise, and remove Tenant and all other persons and property from the Premises, and store such property in a public warehouse or elsewhere at the cost and for the account of Tenant, without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; and also the right, but not the obligation, to re-let the Premises for any unexpired balance of the Term, and collect the rent therefor.  In the event of such re-letting by Landlord, the re-letting shall be on such terms, conditions and rental as Landlord may deem proper, and the proceeds that may be collected from the same, less the expense of re-letting (including reasonable leasing fees and commissions and reasonable costs of renovating the Premises), shall be applied upon Tenant's rental obligation as set forth in this Lease for the unexpired portion of the Term.  Tenant shall be liable for any balance that may be due under this Lease, although Tenant shall have no further right of possession of the Premises; and (d) exercise any other legal or equitable right or remedy which it may have at law or in equity.  Notwithstanding the provisions of clause (b) above and regardless of whether an Event of Default shall have occurred, Landlord may exercise the remedy described in clause (b) without any notice to Tenant if Landlord, in its good faith judgment, believes it would be materially injured by the failure to take rapid action, or if the unperformed obligation of Tenant constitutes an emergency.  The provisions of this Section 21 shall operate as a notice to quit, and Tenant hereby waives any other notice to quit or notice of Landlord's intention to reenter the Premises or terminate this Lease.

TO THE EXTENT PERMITTED BY LAW, TENANT HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS OF REDEMPTION, GRANTED BY OR UNDER ANY PRESENT OR FUTURE LAWS IN THE EVENT OF TENANT'S BEING EVICTED OR DISPOSSESSED FOR ANY CAUSE, OR IN THE EVENT OF LANDLORD'S OBTAINING POSSESSION OF THE PREMISES, BY REASON OF THE VIOLATION BY TENANT OF ANY OF THE COVENANTS AND CONDITIONS OF THIS LEASE, OR OTHERWISE. LANDLORD AND TENANT HEREBY EXPRESSLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER PARTY ON ANY AND EVERY MATTER, DIRECTLY OR INDIRECTLY ARISING OUT OF OR WITH RESPECT TO THIS LEASE, INCLUDING, WITHOUT LIMITATION, THE RELATIONSHIP OF LANDLORD AND TENANT, THE USE AND OCCUPANCY BY TENANT OF THE PREMISES, ANY STATUTORY REMEDY AND/OR CLAIM OF INJURY OR DAMAGE REGARDING THIS LEASE.

Any costs and expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be additional rent and shall be repaid to Landlord by Tenant upon demand.

Notwithstanding any of the other provisions of this Lease, in the event Tenant shall voluntarily or involuntarily come under the jurisdiction of the U.S. Bankruptcy Code and thereafter Tenant or its trustee in bankruptcy, under the authority of and pursuant to applicable provisions thereof, shall have the power and so using same determine to assign this Lease, Tenant agrees that (i) Tenant or its trustee shall provide

to Landlord sufficient information enabling it to independently determine whether Landlord will incur actual and substantial detriment by reason of such assignment and (ii) "adequate assurance of future performance" under this Lease, as that term is generally defined under the U.S. Bankruptcy Code, shall be provided to Landlord by Tenant and its assignee as a condition of the assignment.

22.    <u>Damages</u>.  If this Lease is terminated by Landlord pursuant to <u>Section 21</u>, Tenant shall, nevertheless, remain liable for all rent and damages which may be due or sustained prior to such termination, and all reasonable costs, fees and expenses including, but not limited to, attorneys' fees, costs and expenses incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to others from time to time and additional damages (the "Liquidated Damages"), which at Landlord's election shall be either one or a combination of the following: (a) an amount equal to the Base Rent and additional rent due or which would have become due from the date of Tenant's default through the remainder of the Term, less than amount of rental, if any, which Landlord receives during such period from others to whom the Premises may be rented (other than any additional rent received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), which amount shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following Tenant's default and continuing until the date on which the Term would have expired but for Tenant's default, it being understood that separate suits may be brought from time to time to collect any such damages for any month(s) (and any such separate suit shall not in any manner prejudice the right of Landlord to collect any damages for any subsequent month(s)), or Landlord may defer initiating any such suit until after the expiration of the term (in which event such deferral shall not be construed as a waiver of Landlord's rights as set forth herein and Landlord's cause of action shall be deemed not to have accrued until the expiration of the Term), and it being further understood that if Landlord elects to bring suits from time to time prior to reletting the Premises, Landlord shall be entitled to its full damages through the date of the award of damages without regard to any Base Rent, additional rent or other sums that are or may be projected to be received by Landlord upon reletting of the Premises; or (b) an amount equal to the sum of (i) all Base Rent, additional rent and other sums due or which would be due and payable under this Lease as of the date of Tenant's default through the end of the scheduled Term, plus (ii) all expenses (including broker and attorneys' fees) and value of all vacancy periods projected by Landlord to be incurred in connection with the reletting of the Premises, minus (iii) any Base Rent, additional rent and other sums that Tenant proves by a preponderance of the evidence would be received by Landlord upon reletting of the Premises from the end of the vacancy period projected by Landlord through the expiration of the scheduled Term.  Such amount shall be discounted using a discount factor equal to the yield of the Treasury Note or Bill, as appropriate, having a maturity period approximately commensurate to the remainder of the Term, and such resulting amount shall be payable to Landlord in a lump sum on demand, it being understood that upon payment of such liquidated and agreed final damages, Tenant shall be released from further liability under this Lease with respect to the period after the date of such payment.  Landlord may bring suit to collect any such damages at any time after an Event of Default shall have occurred.

        If this Lease is terminated pursuant to <u>Section 21</u>, Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) which may be greater or less than the period which otherwise would have constituted the balance of the Term and on such terms and conditions (which may include concessions, free rent and/or alterations of the Premises) as Landlord, in its sole discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any rent due upon such reletting.

23.    <u>Services and Utilities</u>.  Landlord shall provide the following listed services and utilities, namely:

        (a)    heating, ventilation, and air conditioning ("HVAC") for the Premises during "Normal Business Hours" (as defined below) to maintain temperatures for comfortable use and occupancy;

16

(b)      electric energy in accordance with Section 24 following;

(c)      automatic passenger elevators providing adequate service leading to the floor on which the Premises are located;

(d)      weekday evening, unescorted janitorial services to the Premises including removal of trash;

(e)      hot and cold water sufficient for drinking, lavatory toilet and ordinary cleaning purposes from fixtures either within the Premises (if provided pursuant to this Lease) or on the floor on which the Premises are located, subject to Section 24 following;

(f)      replacement of standard lighting tubes, lamp ballasts and bulbs;

(g)      extermination and pest control when and if necessary; and

(h)      maintenance of Common Areas in a manner comparable to other comparable office buildings in the Sterling, VA area.

Notwithstanding the foregoing, if at any time during the Term, Landlord shall, after reasonable investigation determine that trash and similar waste generated by Tenant and/or emanating from the Premises is in excess of that of other standard office tenants within the Building leasing a premises of the same or similar size to that of the Premises, Landlord shall bill Tenant and Tenant shall pay to Landlord as additional rent hereunder within thirty (30) days of the date of Landlord's invoice for the same, those costs and expenses of trash removal which are reasonably attributable to such excess trash and similar waste generated by Tenant and/or emanating from the Premises. "Normal Business Hours" as used herein is defined from 11:00 a.m. to 7:00 p.m. on weekdays and from 9:00 a.m. to 6:00 p.m. on Saturdays and Sundays.  Landlord shall have no responsibility to provide any services under (a) above except during Normal Business Hours unless arrangements for after-hours services have been made pursuant to terms and conditions acceptable to Landlord and embodied in a separate written agreement between Landlord and Tenant.  Landlord reserves the right to stop service of the HVAC, elevator, plumbing and electric systems, when necessary, by reason of accident, or emergency, or for repairs, alterations, replacements, or improvements, which in the judgment of Landlord are desirable or necessary to be made, until the repairs, alterations, replacements, or improvements shall have been completed.  Landlord shall have no responsibility or liability for failure to supply HVAC, elevator, plumbing, cleaning, and electric service, during the period when prevented from so doing by laws, orders, or regulations of any federal, state, country or municipal authority or by strikes, accidents or by any other cause whatsoever beyond Landlord's control.  Landlord's obligations to supply HVAC are subject to applicable laws and regulations as to energy conservation and other such restrictions.  In the event that Tenant should require supplemental HVAC for the Premises, any maintenance repair and/or replacement required for such supplemental service shall be performed by Landlord but the cost of such maintenance repair and/or replacement (including labor and materials) shall be paid by Tenant as additional rent.

24.      Electricity and Water.  Throughout the Term, Landlord shall furnish Tenant without additional charge during Normal Business Hours (as defined in Section 23) a reasonable amount of electric current at 110 volts for lighting purposes within the Premises and the powering of a normal amount of office equipment and appliances.  "Normal Usage Amount" is defined for purposes of this Lease to mean electric power supplied at the rate of three (3) watts per square foot of Premises.  Tenant shall not install equipment of any kind or nature whatsoever nor engage in any practice or use which will or may necessitate any changes, replacements or additions to, or in the use of, the water system, heating system, plumbing system, air conditioning system, electrical system, floor load capacities, or other mechanical or structural system of

X2Sign Envelope ID: 823481

the Premises or the Building without first obtaining the prior written consent of Landlord, which consent may be conditioned upon, but not limited to, Tenant first securing at its expense additional capacity for any said service in the Building; provided, however, Tenant shall be responsible for paying for any excess utility consumption arising from any such change, replacement, use or addition, such payments to be based on Landlord's reasonable estimate or, at Landlord's option, a submeter or similar device to measure such usage (said device to be installed at Tenant's expense).  If any utilities are separately metered, Landlord shall adjust the Building Expenses accordingly, as reasonably determined by Landlord.

(1)     If Landlord reasonably determines based upon engineering studies of electrical load consumed that Tenant is materially exceeding the Normal Usage Amount, Tenant shall pay to Landlord such amounts as additional rent as will equitably reimburse Landlord for the cost of the extra electric power so consumed by Tenant; and

(2)     If Tenant shall desire to place and install in the Premises electric equipment or appliances other than normal and typical to general office usage it shall pay for such installations including any additional electric lines and facilities required and shall pay for the electric power used in such equipment if same exceeds Normal Usage Amount.  Machines, equipment and materials belonging to Tenant which cause vibration, noise, cold, heat, fumes or odors that may be transmitted outside of the Premises to such a degree as to be objectionable to Landlord in Landlord's reasonable opinion or to any other tenant in the Building shall be treated by Tenant at its sole expense so as to eliminate such objectionable condition, and shall not be allowed to operate until such time as the objectionable condition is remedied to Landlord's satisfaction.

Landlord has advised Tenant that presently Dominion Power ("Electric Service Provider") is the utility company selected by Landlord to provide electricity to the Building.  Notwithstanding the foregoing, if permitted by law, Landlord shall have the right at any time and from time to time during the Term to either contract for service from a different company or companies providing electricity service (each such company shall hereinafter be referred to as an "Alternative Service Provider") or continue to contract for service from the Electric Service Provider.

Tenant shall cooperate with Landlord, the Electric Service Provider and any Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, the Electric Service Provider, and any Alternative Service Provider reasonable access to the Building's electric lines, feeders, risers, wiring and any other machinery within the Premises, provided that Landlord shall use reasonable efforts to minimize its interference with Tenant's business in the Premises.

25.     Telephone and Telecommunications.  Landlord has arranged for the installation of telephone service within the Building to the ground floor telephone utility closet and conduit to the ground floor telephone and electrical riser closets. Tenant shall be responsible for contacting the utility company supplying the telephone service and arranging to have such telephone facilities as it may desire to be extended and put into operation in the Premises, including without limitation, obtaining a low voltage permit for phone and data wiring. Tenant acknowledges and agrees that all telephone and telecommunications services desired by Tenant shall be ordered and utilized at the sole expense of Tenant. All costs related to installation and the provision of such service shall be borne and paid for directly by Tenant.  Upon request by Landlord, Tenant, at Tenant's expense, shall remove the telephone facilities at the expiration or sooner termination of the Term.  Landlord will allow Tenant access for wiring, including electric, data and telecom, within the Building's public areas and designated chases, but will not guarantee access of the wiring through another tenant's space. Tenant, at Tenant's expense, shall be responsible for the relocation and its associated costs, if requested, of any data, telecom or electrical wiring that runs through another tenant's space, including the plenum area or otherwise.

18

In the event Tenant wishes to utilize the services of a telephone or telecommunications provider whose equipment is not servicing the Building at such time Tenant wishes to install its telecommunications equipment serving the Premises ("Provider"), no such Provider shall be permitted to install its lines or other equipment without first securing the prior written consent of Landlord, which consent shall not be unreasonably withheld. Prior to the commencement of any work in or about the Building by the Provider, the Provider shall agree to abide by such rules and regulations, job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Building and Property, the other tenants and occupants of the Building and Landlord, including, without limitation, providing security in such form and amount as reasonable determined by Landlord. Each Provider must be duly licensed, insured and reputable. Landlord shall incur no expense whatsoever with respect to any aspect of Provider's provision of its services, including without limitation, the costs of installation, materials and service.

In addition, Landlord reserves exclusively to itself and its successors and assigns the right to install, operate, maintain, repair, replace and remove fiber optic cable and conduit and associated equipment and appurtenances within the Building and the Premises so as to provide telecommunications service to and for the benefit of tenants and other occupants of the Building.

26.    Acceptance of Premises. Tenant is in possession of the Premises pursuant to the Original Lease and shall be deemed to have accepted same as being satisfactory and in the condition called for hereunder.

27.    Inability to Perform. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in no way be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease or to supply, or is delayed in supplying, any service to be supplied by it under the terms of this Lease or is unable to make, or is delayed in making any repairs, additions, alterations, or decorations or is unable to supply, or is delayed in supplying, any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strikes or labor troubles or any outside cause whatsoever including, but not limited to, governmental preemption in connection with an emergency, or by reason of any rule, order or regulation of any department or subdivision of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency. Similarly, Landlord shall not be liable for any interference with any services supplied to Tenant by others if such interference is caused by any of the reasons listed in this Section. Nothing contained in this Section shall be deemed to impose any obligation on Landlord not expressly imposed by other sections of this Lease.

28.    No Waivers. The failure of Landlord to insist, in any one or more instances, upon a strict performance of any of the covenants of this Lease, or to exercise any option herein contained, shall not be construed as a waiver, or a relinquishment for the future, of such covenant or option, but the same shall continue and remain in full force and effect. The receipt by Landlord of rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless expressed in writing and signed by Landlord.

29.    Access to Premises and Change in Services. Landlord shall have the right, without abatement of rent, to enter the Premises at any hour to examine the same, or to make such repairs and alterations as Landlord shall deem necessary for the safety and preservation of the Building, and also to exhibit the Premises to be let; provided, however, that except in the case of emergency such entry shall only be after notice first given to Tenant. If, during the last month of the Term, Tenant shall have removed all or substantially all of Tenant's property therefrom, Landlord may immediately enter and alter, renovate and redecorate the Premises, without elimination or abatement of rent, or incurring liability to Tenant for any compensation, and such acts shall have no effect upon this Lease. Nothing herein contained, however, shall

19

X2Sign Envelope ID: 823481

be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, supervision or repair, of the Building or any part thereof, other than as herein elsewhere expressly provided. Landlord shall also have the right at any time, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the arrangement and/or location of entrances or passageways, doors and doorways, and corridors, stairs, toilets, elevators, or other public parts of the Building, and to change the name by which the Building is commonly known and/or its mailing address.

30.    Estoppel Certificates.  Tenant agrees, at any time and from time to time, upon not less than ten (10) days' prior request by Landlord to execute, acknowledge and deliver to Landlord an estoppel certificate substantially in the form attached hereto as Exhibit "D" or such other reasonable form requested by Landlord which certifies that this Lease is unmodified and in full force (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates through which the rent and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of the signer of such certificate Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered hereunder may be relied upon by third parties not a party to this Lease.

31.    Subordination.  Tenant accepts this Lease, and the tenancy created hereunder, subject and subordinate to any mortgages, leases, leasehold mortgages or other security interests now or hereafter a lien upon or affecting the Building or the Property or any part thereof.  Tenant shall, at any time hereafter, within ten (10) days after request from Landlord, execute a Subordination, Non-Disturbance Agreement substantially in the form of Exhibit "E" attached hereto and made a part hereof or any instruments or other documents that may be required by any mortgage or mortgagee or  landlord (herein a "Mortgagee") for the purpose of subjecting or subordinating this Lease and the tenancy created hereunder to the lien of any such mortgage or mortgages or underlying lease, and the failure of Tenant to execute any such instruments, releases or documents shall constitute a default hereunder.

32.    Attornment.  Tenant agrees that upon any termination of Landlord's interest in the Premises, Tenant shall, upon request, attorn to the person or organization then holding title to the reversion of the Premises (the "Successor") and to all subsequent Successors, and shall pay to the Successor all of the rents and other monies required to be paid by Tenant hereunder and perform all of the other terms, covenants, conditions and obligations in this Lease contained; provided, however, that if in connection with such attornment Tenant shall so request from such Successor in writing, such Successor shall execute and deliver to Tenant an instrument wherein such Successor agrees that as long as Tenant performs all of the terms, covenants and conditions of this Lease, on Tenant's part to be performed, Tenant's possession under the provisions of this Lease shall not be disturbed by such Successor.  In the event that the Mortgagee succeeds to the interest of Landlord hereunder and is advised by its counsel that all or any portion of the Base Rent or additional rent payable by Tenant hereunder is or may be deemed to be unrelated business income within the meaning of the United States Internal Revenue Code or regulations issued thereunder, Mortgagee, as Landlord, shall have the right at any time, from time to time, to notify Tenant in writing of the required changes to the Lease. Tenant shall execute all documents necessary to affect any such amendment within ten (10) days after written request from Mortgagee, as landlord, provided that in no event shall such amendment increase Tenant's payment obligations or other liability under this Lease or reduce Landlord's obligations hereunder.

33.    Notices.  All notices and other communications to be made hereunder shall be in writing and shall be delivered to the addresses set forth below by any of the following means: (a) personal service or receipted courier service; (b) registered or certified first class mail, return receipt requested, or (c) nationally-recognized overnight delivery service.  Such addresses may be changed by notice to the other parties given

X2Sign Envelope ID: 823481

in the same manner as provided above.  Any notice or other communication if sent pursuant to clause (a) hereof shall be deemed received upon such personal service, if sent pursuant to subsection (b) shall be deemed received five (5) days following deposit in the mail and/or if sent pursuant to subsection (c) shall be deemed received the next succeeding business day following deposit with such nationally recognized overnight delivery service.

If to Landlord:       BNG Group, LLC
                      PO BOX 650127
                      Sterling, VA 20165

If to Tenant:         At the Premises and to Tenant's Notice Address.

Any party may designate a change of address by written notice to the above parties, given at least ten (10) days before such change of address is to become effective.

34.    Relocation.  Landlord reserves the right at any time upon sixty (60) days' prior written notice to relocate Tenant within the Building provided: (1) that Tenant approves the location and size of the new premises and (2) Landlord pays all reasonable moving costs incurred by Tenant in connection with such move.  If Landlord exercises this right, the written notice to Tenant shall include a drawing showing the size and location of the new premises.  If Tenant approves the new location, the parties shall execute an amendment to this Lease which will specify the change in premises, but this Lease shall in no other respect be amended and the rent payable hereunder shall not abate except for the period actually involved in the moving of Tenant.  If Tenant does not send Landlord written notice of its disapproval of the proposed relocation within the sixty (60) day period, Tenant shall be conclusively presumed to have approved the same.  If Tenant shall send a notice disapproving the proposed relocation during the sixty (60) day period, then Landlord, at its option, may (i) rescind the notice of relocation (in which event this Lease shall continue to the same extent as if no such notice had been sent), or (ii) terminate this Lease upon sixty (60) days' written notice (in which event the rights of the parties shall be the same as if the Lease had terminated by expiration of the Term).  Landlord shall make its election within ten (10) days following the first sixty (60) day period and shall give Tenant written notice thereof specifying its election.

35.    Intentionally Deleted.

36.    Quiet Enjoyment.  Tenant, upon the payment of rent and the performance of all the terms of this Lease, shall at all times during the Term peaceably and quietly enjoy the Premises without any disturbance from Landlord or any other person claiming through Landlord, subject to the terms hereof.

37.    Vacation of Premises.  Tenant shall vacate the Premises at the end of the Term.  If Tenant fails to vacate at such time there shall be payable to Landlord an amount equal to one hundred fifty percent (150%) of the monthly Base Rent stated in Section 1.1.6 paid immediately prior to the holding over period for each month or part of a month that Tenant holds over, plus all other payments provided for herein, and the payment and acceptance of such payments shall not constitute an extension or renewal of this Lease.  In event of any such holdover, Landlord shall also be entitled to all remedies provided by law for the speedy eviction of tenants, and to the payment of all attorneys' fees and expenses incurred in connection therewith.

38.    Members' Liability.  It is understood that the Landlord is a Virginia limited liability company.  All obligations of Landlord hereunder are limited to the interest of Landlord in the Property from time to time.  No member nor manager of Landlord, or of any successor partnership or other entity, shall have any personal responsibility or liability for the obligations of Landlord hereunder.

39.    <u>Separability</u>.  If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term or provision of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

40.    <u>Indemnification</u>.  Tenant shall indemnify and hold harmless Landlord and all of its and their respective partners, directors, officers, agents and employees from any and all liability, loss, cost or expense arising from all third-party claims resulting from or in connection with:

(i)    any act, omission or negligence of Tenant or any of its subtenants or licensees or its or their partners, directors, officers, agents, employees, invitees or contractors;

(ii)    any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease;

together with all costs and expenses reasonably incurred or paid in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and expenses.

In case any action or proceeding is brought against Landlord and/or any of its and their respective partners, directors, officers, agents or employees and such claim is a claim from which Tenant is obligated to indemnify Landlord pursuant to this <u>Section 40</u>, Tenant, upon notice from Landlord shall resist and defend such action or proceeding (by counsel reasonably satisfactory to Landlord).  The obligations of Tenant under this Section shall survive termination of this Lease.

41.    <u>Captions</u>.  All headings anywhere contained in this Lease are intended for convenience or reference only and are not to be deemed or taken as a summary of the provisions to which they pertain or as a construction thereof.

42.    <u>Intentionally Deleted</u>.

43.    <u>Recordation</u>.  Tenant covenants that it shall not, without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion, record this Lease or any memorandum of this Lease or offer this Lease or any memorandum of this Lease for recordation.  If at any time Landlord or any mortgagee of Landlord's interest in the Premises shall require the recordation of this Lease or any memorandum of this Lease, such recordation shall be at Landlord's expense.  If at any time Tenant shall require the recordation of this Lease or any memorandum of this Lease, such recordation shall be at Tenant's expense.  If the recordation of this Lease or any memorandum of this Lease shall be required by any valid governmental order, or if any government authority having jurisdiction in the matter shall assess and be entitled to collect transfer taxes or documentary stamp taxes, or both transfer taxes and documentary stamp taxes on this Lease or any memorandum of this Lease, Tenant shall execute such acknowledgments as may be necessary to effect such recordations and pay, upon request of Landlord, one half of all recording fees, transfer taxes and documentary stamp taxes payable on, or in connection with this Lease or any memorandum of this Lease or such recordation.

44.    <u>Successors and Assigns</u>.  The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant, and their respective heirs, personal representatives, successors and assigns (subject, however, to the terms of <u>Section 20</u> hereof).

X2Sign Envelope ID: 823481

45.     <u>Integration of Agreements</u>.  This writing is intended by Landlord and Tenant as a final expression of their agreement and is a complete and exclusive statement of its terms, and all negotiations, considerations and representations between Landlord and Tenant are incorporated.  The Original Lease is superseded in its entirety by this Lease.  No course of prior dealings between Landlord and Tenant or their affiliates shall be relevant or admissible to supplement, explain, or vary any of the terms of this Lease.  Acceptance of, or acquiescence to, a course of performance rendered under this Lease or any prior agreement between Landlord and Tenant or their affiliates shall not be relevant or admissible to determine the meaning of any of the terms or covenants of this Lease.  Other than as specifically set forth in this Lease, no representations, understandings, or agreements have been made or relied upon in the making of this Lease.

46.     <u>Hazardous Material; Indemnity</u>. Tenant further agrees to the following:

46.1    As used in this Lease, the following terms shall have the following meanings:

46.1.1  "Environmental Laws" shall mean all federal, state or local statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, authorizations, agreements, ordinances, administrative or judicial rulings or similar items relating to the protection of the environment or the protection of human health, including, without limitation, all requirements pertaining to reporting, licensing, permitting, investigation and remediation of emissions, discharges, Releases or Threats of Releases (as defined below) of Hazardous Materials into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials or relating to storage tanks.

46.1.2  "Hazardous Materials" shall mean (i) any substance, gas, material or chemical which is defined as or included in the definition of "hazardous substances", "toxic substances", "hazardous materials", "hazardous wastes" under any federal, state or local statute, law, or ordinance or under the regulations adopted or guidelines promulgated pursuant thereto, including, but not limited to, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9061 <u>et seq.</u> ("CERCLA"); the Hazardous Materials Transportation Act, as amended 49 U.S.C. §§ 1801, <u>et seq.</u>; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901, <u>et seq.</u>; (ii) radon gas in excess of four (4) picocuries per liter, friable asbestos, urea formaldehyde foam insulation, petroleum products, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of federal, state or local safety guidelines, whichever are more stringent; and (iii) any other substance, gas, material or chemical, exposure to or release of which is prohibited, limited or regulated by any governmental or quasi-governmental entity or authority that asserts or may assert jurisdiction over the Premises,  the Building or the Property.

46.1.3  "Hazardous Materials Inventory" shall mean a comprehensive inventory of all Hazardous Materials used, generated, stored, treated or disposed of by Tenant at the Premises.

46.1.4  "Losses" shall mean all claims, liabilities, obligations, losses (including, without limitation, diminution in the value of the Premises, the Building, or the Property, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises, the Building and/or the Property, damages arising from any adverse impact on marketing of space), damages, penalties, fees, actions, judgments, lawsuits, costs, expenses, disbursements, orders or decrees, including, without limitation, attorneys' and consultants' fees and expenses.

46.1.5  "Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping into soil, surface waters,

X2Sign Envelope ID: 823481

groundwaters, land, stream sediments, surface or subsurface strata, ambient air and any environmental medium comprising or proximate to and affecting the Premises, the Building or the Property.

46.1.6 "Threat of Release" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air and any environmental medium comprising or proximate to and affecting the Premises, the Building or the Property.

46.2   Tenant shall not generate, use, manufacture, recycle, handle, store, place, transport, treat, discharge or dispose of any Hazardous Materials at, on, in or near the Premises, the Building or the Property or cause any of the foregoing to occur at, on, in, or near the Premises, the Building or the Property, shall comply with all Environmental Laws in connection with Tenant's use or occupancy of the Premises and the Building, and promptly shall take all remedial action, at Tenant's sole cost and expense, but with Landlord's prior approval, necessary or desirable to remedy, clean-up and remove the presence of any Hazardous Materials resulting from Tenant's violation of the prohibitions set forth in this sentence or Tenant's failure to comply with Environmental Laws. Notwithstanding the foregoing, Tenant shall not be deemed to be prohibited from using products containing Hazardous Materials so long as such products are commonly found in an office environment and are handled, stored, used and disposed of in compliance with all Environmental Laws. In addition, Tenant shall (i) obtain, maintain in full force and effect, and comply with, all permits required under Environmental Laws; (ii) comply with all record keeping and reporting requirements imposed by Environmental Laws concerning the use, handling, treatment, storage, disposal or release of Hazardous Materials on the Premises, the Building and the Property; (iii) report to Landlord any release or discharge of Hazardous Materials within two (2) business days of such discharge or release; (iv) provide to Landlord copies of all written reports concerning such discharge of Hazardous Materials that are required to be filed with governmental or quasi-governmental entities under Environmental Laws; (vi) maintain and annually update a Hazardous Materials Inventory with respect to Hazardous Materials used, generated, treated, stored or disposed of at the Premises, the Building and the Property; and (vii) make available to Landlord for inspection and copying, at Landlord's expense, upon reasonable notice and at reasonable times, such Hazardous Materials Inventory and any other reports, inventories or other records required to be kept under Environmental Laws concerning the use, generation, treatment, storage, disposal or release of Hazardous Materials.

46.3   Without limitation on any other indemnities by or obligations of Tenant to Landlord under this Lease or otherwise, Tenant hereby covenants and agrees to indemnify, defend and hold harmless Landlord from and against any Losses incurred by Landlord as a result of Tenant's breach of any representation, covenant or warranty hereof; or as a result of any claim, demand, liability, obligation, right or cause of action, including, but not limited to governmental action or other third party action (collectively, "Claims"), that is asserted against Landlord, the Premises, the Building or the Property as a result of or which arises directly or indirectly, in whole or in part, out of the Release, Threat of Release, discharge, deposit, presence, treatment, transport, handling or disposal of any Hazardous Materials at, on, under, in, about, or from the Premises, the Building or the Property attributable to or arising out of the operations or activities or presence of Tenant or any assignee, sublessee, agent or representative of Tenant at or about the Premises, the Building or the Property.  This indemnification of Landlord and its Mortgagee(s) by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal, or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Building.

46.4   The indemnities, warranties and covenants contained in this Article shall survive termination of this Lease.

X2Sign Envelope ID: 823481

47.     <u>Americans with Disabilities Act</u>.  Notwithstanding any other provisions contained in this Lease and with the purpose of superseding any such provisions herein that might be construed to the contrary, it is the intent of Landlord and Tenant that at all times while this Lease shall be in effect that the following provisions shall be deemed their specific agreement as to how the responsibility for compliance (and cost) with the Americans With Disabilities Act and amendments to same ("ADA"), both as to the Premises and the Property, shall be allocated between them, namely:

47.1     Modifications, alterations and/or other changes required to and within the Common Areas shall be the responsibility of Landlord to perform and the cost of same shall be considered a part of the Building Expenses and treated as such.

47.2     Modifications, alterations and/or other charges required to and within the Common Areas, which are required as a result of Tenant's specific use of the Premises, as compared to office uses generally, shall be paid by Tenant within thirty (30) days after receipt of an invoice from Landlord, together with reasonable supporting documentation.

47.3     Modifications, alterations and/or other changes required to and within the Premises, whether capital in nature or non-capital in nature, shall be the responsibility of Tenant and at its cost and expense; unless the changes are structural in nature and result from the original design of the Building, in which instance they shall be the responsibility of Landlord and at its cost and expense.

Each party hereto shall indemnify and hold harmless the other party from any and all liability, loss, cost or expense arising as a result of a party not fulfilling its obligations as to compliance with the ADA as set forth in this Section.

48.     <u>Several Liability</u>.  If Tenant shall be one or more individuals, corporations or other entities, whether or not operating as a partnership or joint venture, then each such individual, corporation, entity, joint venturer or partner shall be deemed to be both jointly and severally liable for the payment of the entire rent and other payments specified herein.

49.     <u>Intentionally Deleted</u>.

50.     <u>Signage</u>.  Landlord, at Tenant's expense, shall provide Tenant with standard Building suite entry and lobby signage.  Tenant shall be responsible for obtaining appropriate permitting for exterior building signage and for the cost of exterior signage.  Landlord shall have the right to review any of Tenant's exterior signage requirements and signage must be consistent with current signage specifications.  Landlord will use Landlord's approved contractor to install any exterior signage at Tenant's sole cost.  Upon the expiration or earlier termination of this Lease, Tenant shall be responsible for the costs associated with removing all signage and repair damage to the Building or Premises caused by such removal

51.     <u>Definition of "Day" and "Days"</u>.  As used in the Lease, the terms "day" and "days" shall refer to calendar days unless specified to the contrary; provided, however, that if the deadline established for either party's performance hereunder occurs on a Saturday, Sunday or banking holiday in the Commonwealth of Virginia, the date of performance shall be extended to the next occurring business day.

52.     <u>Tenant's Anti-Terrorism Representation</u>.  Tenant hereby represents and warrants that neither Tenant, nor any of its officers, directors, shareholders, partners, members or affiliates (including without limitation indirect holders of equity interests in Tenant) is or will be an entity or person:  (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons"

(which list may be published from time to time in various mediums including, but not limited to, the OFAC website); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224;  (iv) is subject to sanctions of the United States government or is in violation of any federal, state, municipal or local laws, statutes, codes, ordinances, orders, decrees, rules or regulations relating to terrorism or money laundering, including, without limitation, EO13224 and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001; or (v) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) – (v) above are herein referred to as a "Prohibited Person").

Neither Tenant, nor any of its officers, directors, shareholders, partners, members or affiliates (including without limitation indirect holders of equity interests in Tenant) shall (a) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person, or (b) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224.  Tenant agrees to indemnify and hold Landlord harmless from and against all claims, lawsuits, costs (including reasonable counsel fees), losses, damages and liabilities that arise out of or relate to any activity associated with either (a) or (b) set forth above. If Tenant violates the provisions of this Section, such violation shall be considered an immediate Event of Default and Landlord shall not be required to grant Tenant any cure period prior to exercising its rights under this Lease, including, without limitation, termination of the Lease.

**** signatures on following page *****

IN WITNESS WHEREOF, Landlord and Tenant have respectively affixed their hands and seals to this Lease as of the day and year first above written.

WITNESS OR ATTEST:                    LANDLORD:

                                      BNG GROUP, LLC

_____                 By: _____(SEAL)
                                      Name: _____
                                      Title: _____


WITNESS OR ATTEST:                    TENANT:

                                       SKIN LOGIC, LLC, d/b/a Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center


_____                 By:_____(SEAL)
                                      Name:
                                      Title:


-

X2Sign Envelope ID: 823481

**EXHIBIT "A"**
**to Amended and Restated Deed of Lease by and between**
**BNG Group, LLC, Landlord**
**and Skin Logic, LLC as Tenant**

**FLOOR PLAN**

This is not an as-built plan.  It does not show existing conditions.

1

X2Sign Envelope ID: 823481

**EXHIBIT "B"**
**to Amended and Restated Deed of Lease by and between**
**BNG Group, LLC, Landlord**
**and Skin Logic, LLC as Tenant**

**RULES AND REGULATIONS**

To the extent that any of the following Rules and Regulations, or any Rules and Regulations subsequently enacted conflict with the provisions of the Lease, the provisions of the Lease shall control.

1. Tenant shall not obstruct or permit its agents, clerks or servants to obstruct, in any way, the sidewalks, entry passages, corridors, halls, stairways or elevators of the Building, or use the same in any other way than as a means of passage to and from the offices of Tenant; bring in, store, test or use any materials in the Building which could cause a fire or an explosion or produce any fumes or vapor; make or permit any improper noises in the Building; smoke in the elevators, the Premises, the Building or the Common Areas except in the exterior areas specifically designated by Landlord; throw substances of any kind out of the windows or doors, or down the passages of the Building, in the halls or passageways; sit on or place anything upon the window sills; or clean the windows.

2. Waterclosets and urinals shall not be used for any purpose other than those for which they were constructed; and no sweepings, rubbish, ashes, newspaper or any other substances of any kind shall be thrown into them. Waste and excessive or unusual use of electricity or water is prohibited.

3. Tenant shall not (i) obstruct the windows, doors, partitions and lights that reflect or admit light into the halls or other places in the Building, or (ii) inscribe, paint, affix, or otherwise display signs, advertisements or notices in, on, upon or behind any windows or on any door, partition or other part of the interior or exterior of the Building without the prior written consent of Landlord which shall not be unreasonably withheld. If such consent be given by Landlord, any such sign, advertisement, or notice shall be inscribed, painted or affixed by Landlord, or a company approved by Landlord, but the cost of the same shall be charged to and be paid by Tenant, and Tenant agrees to pay the same promptly, on demand.

4. No contract of any kind with any supplier of towels, water, ice, toilet articles, waxing, rug shampooing, venetian blind washing, furniture polishing, lamp servicing, cleaning of electrical fixtures, removal of waste paper, rubbish or garbage, or other like service shall be entered into by Tenant, nor shall any vending machine of any kind be installed in the Building, without the prior written consent of Landlord, which consent of Landlord shall not be unreasonably withheld.

5. When electric wiring of any kind is introduced, it must be connected as directed by Landlord, and no stringing or cutting of wires shall be allowed, except with the prior written consent of Landlord which shall not be unreasonably withheld, and shall be done only by contractors approved by Landlord. The number and location of telephones, telegraph instruments, electric appliances, call boxes, etc., shall be subject to Landlord's approval. No tenants shall lay linoleum or other similar floor covering so that the same shall be in direct contact with the floor of the Premises; and if linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall be first affixed to the floor by a paste or other material, the use of cement or other similar adhesive material being expressly prohibited.

6. No additional lock or locks shall be placed by Tenant on any door in the Building, without prior written consent of Landlord. Two keys will be furnished Tenant by Landlord; two additional keys will be supplied to Tenant by Landlord, upon request, without charge; any additional keys requested by Tenant shall be paid for by Tenant. Tenant, its agents and employees, shall not have any duplicate keys made and

1

shall not change any locks. All keys to doors and washrooms shall be returned to Landlord at the termination of the tenancy, and in the event of any loss of any keys furnished, Tenant shall pay Landlord the cost thereof.

7. Tenant shall not employ any person or persons other than Landlord's janitors for the purpose of cleaning the Premises, without prior written consent of Landlord which shall not be unreasonably withheld. Landlord shall not be responsible to Tenant for any loss of property from the Premises however occurring, or for any damage done to the effects of Tenant by such janitors or any of its employees, or by any other person or any other cause.

8. No bicycles, vehicles or animals of any kind (other than animals to assist the disabled) shall be brought into or kept in or about the Premises.

9. Tenant shall not conduct, or permit any other person to conduct, any auction upon the Premises; manufacture or store goods, wares or merchandise upon the Premises, without the prior written approval of Landlord, except the storage of usual supplies and inventory to be used by Tenant in the conduct of its business; permit the Premises to be used for gambling; make any unusual noises in the Building; permit to be played any musical instrument in the Premises; permit to be played any radio, television, recorded or wired music in such a loud manner as to disturb or annoy other tenants; or permit any unusual odors to be produced upon the Premises. Tenant shall not permit any portion of the Premises to be used for the storage, manufacture, or sale of intoxicating beverages, narcotics, tobacco in any form, or as a barber.

10. No awnings or other projections shall be attached to the outside walls of the Building. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises, without the prior written consent of Landlord which consent shall not be unreasonably withheld. Such curtains, blinds and shades must be of a quality, type, design, and color, and attached in a manner reasonably approved by Landlord.

11. Canvassing, soliciting and peddling in the Building are prohibited, and Tenant shall cooperate to prevent the same.

12. There shall not be used in the Premises or in the Building, either by Tenant or by others in the delivery or receipt of merchandise, any hand trucks except those equipped with rubber tires and side guards, and no hand trucks will be allowed in passenger elevators.

13. Tenant, before closing and leaving its Premises, shall ensure that all entrance doors to same are locked.

14. Landlord shall have the right to prohibit any advertising by Tenant which in Landlord's opinion tends to impair the reputation of the Building or its desirability as a building for offices, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

2

X2Sign Envelope ID: 823481

15.  Landlord hereby reserves to itself any and all rights not granted to Tenant hereunder, including, but not limited to, the following rights which are reserved to Landlord for its purposes in operating the Building:

(a)  the exclusive right to the use of the name of the Building for all purposes, except that Tenant may use the name as its business address and for no other purpose;

(b)  the right to change the name or address of the Building, without incurring any liability to Tenant for so doing;

(c)  the right to install and maintain a sign or signs on the exterior of the Building;

(d)  the exclusive right to use or dispose of the use of the roof of the Building;

(e)  the non-exclusive right to use the area above the ceiling of the Premises for the purpose of installing and maintaining telecommunications, water lines, utility lines, other conduit, sprinklers, drainlines, ductwork and HVAC connections and any other equipment necessary to provide services to any area in the Building;

(f)  the right to limit the space on the directory of the Building to be allotted to Tenant; and

(g)  the right to grant to anyone the right to conduct any particular business or undertaking in the Building.

16.  As used herein the term "Premises" shall mean and refer to the "Premises" as defined in Section 1 of the Lease.

17.  Tenant shall not operate space heaters or other heating or ventilating equipment without the express prior written consent of Landlord in each instance first obtained.  Tenant shall not install or operate any electrical equipment, appliances or lighting fixtures in the Premises which are not listed and labeled by Underwriter's Laboratories or other testing organization acceptable to Landlord.

18.  HVAC will be operational during the defined Normal Business Hours.   The cost of HVAC use after hours are $40 per hour.

**EXHIBIT "C"**
**Intentionally Deleted**

1

**EXHIBIT "D"**
**to Amended and Restated Deed of Lease by and between**
**BNG Group, LLC, Landlord**
**and Skin Logic, LLC, as Tenant**

**FORM OF ESTOPPEL CERTIFICATE**

**ESTOPPEL CERTIFICATE**

Date:

RE: Appl. # _____
   Mtge. # _____
   Name of Project: Countryside Office
   Address: 2 Pidgeon Hill Drive, Sterling, VA 20165
   Tenant's Floor and Suite # _____ (the "Premises)

Ladies and Gentlemen:

It is our understanding that the _____ ("") has placed a mortgage on the subject premises and that \_\_\_\_\_ has required this Certificate of the undersigned to be executed as a condition precedent to the transaction proceeding.

The undersigned, as tenant, under that certain Lease dated _____, made with _____, as Landlord, hereby ratifies the Lease and certifies that:

 a.   the "Commencement Date" of the Lease is _____; and

 b.   the undersigned is presently solvent and free from reorganization and/or bankruptcy and is in occupancy, open, and conducting business in the Premises;

 c.   the operation and use of the Premises do not involve the generation, treatment, storage, disposal or release of a hazardous substance or a solid waste into the environment, other than to the extent necessary to conduct its ordinary course of business in the Premises and in accordance with all applicable environmental laws, and that the Premises are being operated in accordance with all applicable environmental laws, zoning ordinances and building codes; and

 d.   the current base rental payable pursuant to the terms of the Lease is $ _____ per annum;

 e.   the Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way (except by agreement(s) dated _____), and neither party thereto is in default thereunder; and

 f.   the Lease described above represents the entire agreement between the parties as to the leasing of the Premises; and

2

X2Sign Envelope ID: 823481

g.          the current term of the Lease expires on _____; and

h.          all conditions under the Lease to be performed by the Landlord have been satisfied, including, without limitation, all co-tenancy requirements thereunder, if any; and

i.          all required contributions by Landlord to tenant on account of tenant's improvements have been received; and

j.          on this date there are no existing defenses or offsets, claims or counterclaims which the undersigned has against the enforcement of the Lease by the Landlord; and

k.          no rental has been paid in advance and no security (except the security deposit in the amount of $_____) has been deposited with Landlord; and

l.          tenant's floor area is _____ rentable square feet; and

m.          the most recent payment of current basic rental was for the payment due on _____, 20___, and all basic rental and additional rental payable pursuant to the terms of the Lease have been paid up to such date; and

n.          the undersigned acknowledges notice that Landlord's interest under the Lease and the rent and all other sums due thereunder have been assigned to _____as part of the security for a mortgage loan by _____ to _____. In the event _____, as lender, notifies the undersigned of a default under the mortgage and demands that the undersigned pay its rent and all other sums due under the Lease to _____, tenant agrees that it shall pay its rent and all such other sums to lender.

Very truly yours,

(Tenant)
By: _____
Its: _____

3

EXHIBIT "E"
**to Amended and Restated Deed of Lease by and between**
**BNG Group, LLC, Landlord**
**and Skin Logic, LLC, as Tenant**

FORM OF
**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made by and between _____("Lender") and _____, a _____ a [an] [individual] name of state [corporation] [limited liability company] [general partnership] [limited partnership] [d/b/a/ _____] with its principal place of business at _____ ("Tenant").

**RECITALS**:

A.   Lender has made or is about to make a loan (together with all advances and increases, the "Loan") to _____. ("Borrower").

B.   Borrower, as landlord, and Tenant have entered into a lease dated _____ as amended by amendments dated _____ (the "Lease") which leased to Tenant [Suite No. _____] [Floor _____] [Store No. _____] (the "Leased Space") located in the Property (defined below).

C.   The Loan is secured by the [Open-end] Mortgage, Assignment or Leases and Rents, Fixture Filing Statement and Security Agreement recorded or to be recorded in the official records of Loudoun County, Commonwealth of Virginia (together with all advances, increases, amendments or consolidations, the "Mortgage") and the Assignment of Leases and Rents recorded or to be recorded in such official records (together with all amendments or consolidations , the "Assignment"), assigning to Lender the Lease and all rent, additional rent and other sums payable by Tenant under the Lease (the "Rent").

D.   The Mortgage encumbers the real property, improvements and fixtures located at _____ in the City of _____, County of Loudoun, Commonwealth of Virginia, commonly known as _____ and described on Exhibit "A" (the "Property").

IN CONSIDERATION of the mutual agreements contained in this Agreement, Lender and Tenant agree as follows:

1.   The Lease and all of Tenant's rights under the Lease are and will remain subject and subordinate to the lien of the Mortgage and all of Lender's rights under the Mortgage and Tenant will not subordinate the Lease to any other lien against the Property without Lender's prior consent.

2.   This Agreement constitutes notice to Tenant of the Mortgage and the Assignment and, upon receipt of notice from Lender, Tenant will pay the Rent as and when due under the Lease to Lender and the payments will be credited against the Rent due under the Lease.

1

3.  Tenant does not have and will not acquire any right or option to purchase any portion of or interest, in the Property.

4.  Tenant and Lender agree that if Lender exercises its remedies under the Mortgage or the Assignment and if Tenant is not then in default under this Agreement and if Tenant is not then in default beyond any applicable grace and cure periods under the Lease:

(a) Lender will not name Tenant as a party to any judicial or non-judicial foreclosure or other proceeding to enforce the Mortgage unless joinder is required under applicable law but in such case Lender will not seek affirmative relief against Tenant, the Lease will not be terminated and Tenant's possession of the Leased Space will not be disturbed;

(b) If Lender or any other entity (a "Successor Landlord") acquires the Property through foreclosure, by other proceeding to enforce the Mortgage or by deed-in-lieu of foreclosure (a "Foreclosure") Tenant's possession of the Leased Space will not be disturbed and the Lease will continue in full force and effect between Successor Landlord and Tenant; and

(c) If, notwithstanding the foregoing, the Lease is terminated as a result of a Foreclosure, a lease between Successor Landlord and Tenant will be deemed created, with no further instrument required, on the same terms as the Lease except that the term of the replacement lease will be the then unexpired term of the Lease.  Successor Landlord and Tenant will execute a replacement lease at the request of either.

5.  Upon Foreclosure, Tenant will recognize and attorn to Successor Landlord as the landlord under the Lease for the balance of the term.  Tenant's attornment will be self-operative with no further instrument required to effectuate the attornment except that at Successor Landlord's request, Tenant will execute instruments reasonably satisfactory to Successor Landlord confirming the attornment.

6.  Successor Landlord will not be:

(a) liable for any act or omission of any prior landlord under the Lease occurring before the date of the Foreclosure except for repair and maintenance obligations of a continuing nature imposed on the landlord under the Lease;

(b) required to credit Tenant with any Rent paid more than one month in advance or for any security deposit unless such Rent or security deposit has been received by Successor Landlord;

(c) bound by any amendment, renewal or extension of the Lease that is inconsistent with the terms of this Agreement or is not in writing and signed both by Tenant and landlord;

(d) bound by a reduction of the Rent unless the reduction is in connection with an extension or renewal of the Lease at prevailing market terms or was made with Lender's prior consent;

(e) bound by any reduction of the term of the Lease or any termination, cancellation or surrender of the Lease unless the reduction, termination, cancellation or surrender occurred during the last six (6) months of the term or was made with Lender's prior consent;

2

(f) bound by any amendment, renewal or extension of the Lease entered into without Lender's prior consent if the Leased Space represents 50% or more of the net rentable area of the building in which the Leased Space is located;

(g) subject to any credits, offsets, claims, counterclaims or defenses that Tenant may have that arose prior to the date of the Foreclosure or liable for any damages Tenant may suffer as a result of any misrepresentation, breach of warranty or any act of or failure to act by any party other than Successor Landlord;

(h) liable for obligations under the Lease with respect to any off-site property or facilities for the use of Tenant (such as off-site leased space or parking) unless Successor Landlord acquired in the Foreclosure the right, title or interest to the off-site property;

(i) bound by an obligation to make improvements to the Property, including the Leased Space to make any payment or give any credit or allowance to Tenant provided for in the Lease or to pay any leasing commissions arising out of the Lease, except that Successor Landlord will be:

(1) bound by any such obligations provided for in the Lender-approved form lease;
(2) bound by any such obligations if the overall economic terms of the Lease (including the economic terms of any renewal options) represented market terms for similar space in properties comparable to the Property when the Lease was executed; and

(3) bound to comply with the casualty and condemnation restoration provisions included in the Lease provided that Successor Landlord receives the insurance or condemnation proceeds.

7.  Lender will have the right, but not the obligation, to cure any defaults by Landlord under the Lease.  Tenant will notify Lender of any default that would entitle Tenant to terminate the Lease or abate the Rent and any notice of termination or abatement will not be effective unless Tenant has so notified Lender of the default and Lender has had a 30-day cure period (or such longer period as may be necessary if the default is not susceptible to cure within 30 days) commencing on the latest to occur of the date on which (i) the cure period under the Lease expires; (ii) Lender receives the notice required by this paragraph; and (iii) Successor Landlord obtains possession of the Property if the default is not susceptible to cure without possession.

8.  All notices, requests or consents required or permitted to be given under this Agreement must be in writing and sent by certified mail, return receipt requested or by nationally recognized overnight delivery service providing evidence of the date of delivery, with all charges prepaid, addressed to the appropriate party at the address set forth above.

9.  Any claim by Tenant against Successor Landlord under the Lease or this Agreement will be satisfied solely out of Successor Landlord's interest in the Property and Tenant will not seek recovery against or out of any other assets of Successor Landlord.  Successor Landlord will have no liability or responsibility for any obligations under the Lease that arise subsequent to any transfer of the Property by Successor Landlord.

X2Sign Envelope ID: 823481

10.  This Agreement is governed by and will be construed in accordance with the laws of the state or commonwealth in which the Property is located.

11.  Lender and Tenant waive trial by jury in any proceeding brought by, or counterclaim asserted by, Lender or Tenant relating to this Agreement.

12.  If there is a conflict between the terms of the Lease and this Agreement, the terms of this Agreement will prevail as between Successor Landlord and Tenant.

13.  This Agreement binds and inures to the benefit of Lender and Tenant and their respective successors, assigns, heirs, administrators, executors, agents and representatives.

14.  This Agreement contains the entire agreement between Lender and Tenant with respect to the subject matter of this Agreement, may be executed in counterparts that together constitute a single document and may be amended only by a writing signed by Lender and Tenant.

15.  Tenant certifies that: the Lease represents the entire agreement between the landlord under the Lease and Tenant regarding the Leased Space; the Lease is in full force and effect; neither party is in default under the Lease beyond any applicable grace and cure periods and no event has occurred which with the giving of notice or passage of time would constitute a default under the Lease; Tenant has entered into occupancy and is open and conducting business in the Leased Space; and all conditions to be performed to date by the landlord under the Lease have been satisfied.

IN WITNESS WHEREOF, Lender and Tenant have executed and delivered this Agreement as of _____, 2024.

By: _____
Name: _____
Title: _____

a [an] [individual] _____ [corporation] [limited liability company]  [general  partnership]  [limited  partnership]  [d/b/a _____.

By: _____
Name: _____
Title: _____

4

**EXHIBIT "F"**
**to Amended and Restated Deed of Lease by and between**
**BNG Group, LLC, Landlord**
**and Skin Logic, LLC as Tenant**

**GUARANTY**

IMPORTANT NOTICE: THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.

THIS GUARANTY is made this _____ day of _____, 2024("Effective Date") by _____ (jointly and severally, "Guarantor") for the benefit of BNG Group, LLC, a Virginia Limited Liability Company ("Landlord")

RECITALS:

A. Landlord has agreed to enter into an Amended and Restated Deed of Office Lease for the Premises ("Lease") dated of even date herewith with Skin Logic, LLC, d/b/a Aria Skin Care SPA, Aria Medispa and Aria Laser Skin Care Center, a Virginia limited liability company ("Tenant"), as more particularly described in the Lease.

B. It is a condition to Landlord's entering into the Lease with Tenant that Guarantor act as guarantor of the Lease for the term thereof and unconditionally be liable for, and guarantee the (a) full and punctual payment of any and all rent and other sums of money required to be paid to the Landlord by the Tenant for the term of the Lease (however defined therein) (collectively, "Rent"); and (b) the performance of and compliance by the Tenant with all of the covenants, conditions and agreements contained in the Lease during the term.

C. Guarantor is materially benefited by the execution of the Lease and has agreed unconditionally to act as guarantor as aforesaid.

NOW, THEREFORE, in consideration of the premises, Ten Dollars ($10.00) cash in hand paid by Landlord to Guarantor, and other good and valuable consideration, the receipt of which consideration is hereby acknowledged, and to induce Landlord to enter into the Lease as set forth above, Guarantor does hereby warrant, covenant and agree as follows:

1. Guarantor hereby unconditionally guarantees and becomes surety for the full and prompt payment to the Landlord of all Rent due during the term of the Lease and the full and prompt performance and observance of all the other covenants, conditions and agreements to be performed or observed by Tenant under the Lease.

2. This Guaranty is and shall be construed to be an absolute, unconditional, present and continuing guaranty of payment and performance and is in no way conditioned or contingent upon any attempt to collect from Tenant or upon any other condition or contingency; and, accordingly, Landlord shall have the right to proceed against Guarantor immediately upon the occurrence of an event of default (as defined in

1

the Lease) by Tenant under the Lease without taking any prior action or proceeding of any kind against the Tenant. This Guaranty shall continue in full force and effect until all sums becoming due under the Lease have been paid in full and the covenants, conditions and agreements of Tenant under the Lease have been fully performed and observed. Nothing shall discharge or satisfy Guarantor's liability hereunder except the full payment of all sums due under the Lease and hereunder and the full performance or observance of Tenant's covenants, conditions and agreements under the Lease.

3. In the event of the failure of Guarantor to pay any sum when due hereunder, Guarantor authorizes Lawrence Katz to confess judgment on behalf of Guarantor against Guarantor in the full amount of the Guaranty plus reasonable attorneys' fees. Guarantor consents to the jurisdiction of and agrees that venue shall be proper in the United States District Court for the Eastern District of Virginia and/or in the Circuit Court of Loudoun County, in the Commonwealth of Virginia. Guarantor waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon Guarantor any right or privilege of exemption, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment. The authority and power to appear for and enter judgment against Guarantor shall not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the beneficiary hereof shall deem necessary or advisable.

4. Guarantor's obligations under this Guaranty shall remain in full force and effect without regard to whether or not Guarantor shall have had notice or knowledge of, and shall not be impaired or affected by: (a) any amendment, extension or modification of or addition or supplement to any of the terms of the Lease; or (b) any compromise, release, consent, extension, indulgence or other action or inaction in respect of any of the terms of the Lease; or (c) any substitution or release, in whole or in part, of any security for the Lease or this Guaranty which may be held at any time by Landlord or Landlord's successors or assigns, provided, however, that Landlord shall give Guarantor notice of such substitution or release; or (d) any exercise or non-exercise by Landlord or Landlord's successors or 35 assigns of any right, power or remedy under or in respect of the Lease or any security held by Landlord with respect thereto, or any waiver of any such right, power or remedy; or (e) any bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, liquidation, or the like of Tenant; or (f) any limitation of Tenant's liability under the Lease or any limitation of Tenant's liability which may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of the Lease or any term thereof; or (g) any act or omission on Landlord's part with respect to the Lease; or (h) any other circumstance.

5. Except as provided in Section 4 above, Guarantor waives notice of acceptance of this Guaranty, notice of any change in Tenant's financial condition, and all other notices to which Tenant may otherwise be entitled. Provided, however, that Landlord shall also give Guarantor notice of any default under the Lease.

6. Guarantor agrees that Landlord may enforce this Guaranty concurrently with, or at any time subsequent to, the exercise of any right or remedy under the Lease or applicable law, and in furtherance of the foregoing, it is expressly understood and agreed that Landlord's exercise of any right or remedy under the Lease or applicable law shall not discharge Guarantor from its obligations under this Guaranty, such obligations being absolute and unconditional, and Guarantor hereby specifically waives the benefits of any statute or rule of law inconsistent with the terms hereof.

2

7. This Guaranty contains the sole and entire understanding and agreement between Guarantor and Landlord with respect to its entire subject matter, and all prior negotiations, discussions, commitments, representations, agreements and understandings with respect thereto are merged herein. This Guaranty cannot be changed or terminated orally.

8. If Landlord employs counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay Landlord's attorneys' fees on appeal or in bankruptcy proceedings, and all other costs and expenses reasonably connected therewith.

9. This Guaranty has been executed and delivered in and shall be governed, as to interpretation, construction, validity, breach, enforcement, effect and in all other respects, by the laws of the Commonwealth of Virginia.

10. If Guarantor advances or becomes obligated to pay any sum hereunder, the amount of such sum shall at all times be subordinate as to lien, time of payment and in all other respects to the amounts owing to Landlord under the Lease, and Guarantor shall not enforce or receive payment thereof until all sums owing to Landlord under the Lease have been paid and performance of all of Tenant's obligations under the Lease have been satisfied. Nothing herein contained is intended or shall be construed to give to Guarantor, until Landlord is paid, any right of subrogation in or under the Lease, or any right to participate in any way therein.

11. To the extent permitted by applicable law, Guarantor waives trial by jury with regard to any action or proceeding of any kind relating in any way to this Guaranty, the Lease or the interpretation, breach or enforcement thereof.

12. Guarantor represents and warrants that (a) this Guaranty is a valid and legally binding instrument for the purposes herein expressed, and (b) this Guaranty is the legal, valid, binding, and enforceable obligation of Guarantor in accordance with its terms.

13. If any term or provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Guaranty, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

14. Guarantor further agrees (a) that any action or proceeding brought by Landlord under this Guaranty will be litigated under the laws of the Commonwealth of Virginia (b) to be subject to the jurisdiction of the Courts of Loudoun County, Virginia, or (in a case involving diversity of citizenship) the United States District Court for the Eastern District of Virginia and (c) that service of any summons and complaint in any such action or proceeding may be made by registered or certified mail directed to Guarantor at the address hereinafter set forth, the undersigned hereby waiving personal service thereof, and (d) that within thirty (30) days after such mailing the Guarantors so served shall appear or answer within such thirty (30) day period, such Guarantor shall be in default and judgment may be entered by Landlord against the Guarantor for the amount demarked in any summons and complaint so served.

15. This Guaranty shall be binding upon Guarantor's successors and assigns and shall inure to the benefit of Landlord's successors, assigns and transferees.

3

16. The Guarantor represents and warrants that the value of the consideration received and to be received by the Guarantor is reasonably worth at least as much as the liability and obligations of the Guarantor hereunder, and such liability and obligations may reasonably be expected to benefit the Guarantor directly or indirectly.

17. Guarantor expressly waives to the fullest extent permitted by law any and all benefits which might otherwise be available to the Guarantor under Sections 49-25 and 49-26 of 37 the Code of Virginia (1950), as amended. This Guaranty is made and entered into on the date first set forth above.

18. Notwithstanding anything to the contrary herein, provided Tenant has not been in default under the Lease, this Guaranty shall terminate and be of no further force or effect from and after the fortieth (40th) month of the Term.

Address In Virginia:                    GUARANTOR:

                                                         _____[SEAL]
                                                       Name:
                                                       SS# _____

(COMMONWEALTH OF VIRGINIA)
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____. _____

Notary Public My commission expires: _____

Notary Registration No.:_____

4

X2Sign Envelope ID: 823481

4884-6488-9056, v. 1

4870-4041-7525, v. 1